**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ARKISHA K. HARRISON,

                             Plaintiff,

          v.                                  No. 5:15-CV-35
                                                  (LEK/CFH)

CAROLYN W. COLVIN, Commissioner
of Social Security Administration,

                                 Defendant.

_____

**APPEARANCES:**                        **OF COUNSEL:**

Arkisha K. Harrison
306 Parrish Lane
Syracuse, New York 13205
Plaintiff Pro Se

Social Security Administration          DAVID L. BROWN, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER

Plaintiff Arkisha K. Harrison ("plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner" or "defendant") denying her applications for supplemental security

income benefits ("SSI") and Disability Insurance Benefits ("DIB"). Plaintiff has not filed

a brief in this matter, but was given opportunities to do so. Dkt. Nos. 14-15. The

Commissioner has filed a brief pursuant to General Order 18, and seeks a judgment on

the pleadings.  Dkt. No. 16.  For the following reasons, it is recommended that the

matter be remanded.


# I.  Background

On September 13, 2011, plaintiff protectively filed for SSI and SSDI benefits,

alleging a disability onset date of March 11, 2011.  T at 117-129.  Those applications

were denied on December 9, 2011.  Id. at 23-28.  Plaintiff timely filed a request for a

hearing, and a hearing was held on June 10, 2013 before Administrative Law Judge

("ALJ") Stanley K. Chin.  T at 52-53; 6-22.[1]  Plaintiff's claim for benefits was denied by

the ALJ on June 28, 2013.  Id. at 29-38.  Plaintiff's timely-filed request for review was

denied, making the ALJ's findings the final determination of the Commissioner.  Id. at 1-

3.  This action followed.  Dkt. No. 1. ("Compl.").


## A.  Facts[2]

Plaintiff, born on April 13, 1977, was thirty-three years old on the alleged

disability onset date.  T at 36.  She is a high school graduate.  Id. at 18.  Plaintiff lived

with her two children, aged seven and fourteen at the time of the hearing, and her

fiancé.  Id. at 12.  Plaintiff's fiancé works two jobs.  Id.  Plaintiff does cooking and

cleaning, and her fiancé helps her.  Id.  Plaintiff bathes and dresses herself, and can

---

[1]  Plaintiff was represented by counsel at this hearing.  T at 51.

[2]  This "facts" section is a recitation of plaintiff's testimony at the hearing and does not amount to findings of facts by this Court.

2

leave her home to go to the store.  Id. at 12-13.  Plaintiff's friends visit her at her home.

Id.  Plaintiff's typical day involves dropping her son off at school and "do[ing] a little

chores around the house" such has making her bed, "[t]ry to clean the tub, a little

dishes."  Id. at 13.  Plaintiff enjoys scrapbooking.  Id.

Plaintiff provided that she is unable to work due to neck and back pain.  T at 13.

Plaintiff has undergone nerve block injections but they have not helped.  Id. at 14.

Plaintiff has not undergone any other treatments.  Id.  Plaintiff takes Flexeril for pain

which causes "a little drowsiness."  Id.  Plaintiff does not take pain medication because

her "body can't tolerate it[,]" she "get[s] nauseous, and [she] vomit[s]."  Id.  Plaintiff

contends that her doctors "wanted to put a [spinal cord] stimulator in [her]."  Id. at 15.

Plaintiff "was debating on it because [she is] a little nervous about something planted

inside [her], so [she] do[esn]'t think [she] want[s] to do that."  Id.  Plaintiff experiences

"numbness and tingling down [her] hands and feet."  Id.  Plaintiff reported she cannot

stand for more than ten to fifteen minutes at one time.  Id.  She opined that she could

walk less than one half of a mile before she "get[s] real bad, sharp pain down [her]

back."  Id. at 16.  She can sit for a "few minutes" before her back and neck get stiff and

then she needs to get up and move around.  Id.  Plaintiff is most comfortable "[l]aying

down with [her] feet up," which she does "[m]ainly throughout the day."  Id.

Plaintiff's neck pain causes her to get headaches, specifically when she is

reading or using her laptop.  T at 17.  Plaintiff gets headaches four times per week,

which last "[t]hroughout the day" and are "[r]eal intense, like a 10."  Id.  Plaintiff takes

Motrin for her headaches and puts a "cold pack" on her head and on the back of her

neck.  Id.  Plaintiff stated that she can lift five pounds occasionally.  Id.  If she tries to lift

more than five pounds, her "back usually gives out on [her] . . . . [She] get[s] real bad,

sharp pain down [her] neck all the way down to [her] lower back."  Id.  Plaintiff's past

work was in health care, helping patients with cleaning, shopping, bathing, dressing,

and eating.  Id. at 18.  The job involved a lot of lifting.  Id.

The ALJ presented a hypothetical to the vocational expert ("VE"): an individual of

the same age, education, and work experience as plaintiff, limited to lifting twenty

pounds occasionally, ten pounds frequently; standing/walking for six hours, sitting up to

eight hours, with normal breaks; occasional climbing of ladders, ropes, scaffolds;

frequent use of ramps and stairs; frequent balancing, stooping, kneeling, crouching,

and crawling; avoidance of concentrated exposure to environmental irritants; avoidance

of concentrated use of moving machinery and exposure to unprotected heights; limited

to simple, routine, repetitive tasks.  T at 20.   The VE testified that someone with such

an RFC could not perform plaintiff's past work as a nurse assistant or home health aide.

Id.  The VE testified further that such person could perform the role of mail clerk, sorter,

or marker, and that such jobs existed in significant numbers in the national economy.

Id. at 21.  In a second hypothetical, the ALJ added to the first hypothetical the additional

limitation of being off task twenty percent of the time.  Id.  The VE testified that there

would be no jobs for someone with that RFC.  Id.

## II. **Discussion** [3]

### A. **Standard of Review**

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). If supported by substantial evidence, the Commissioner's finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y.

---

[3] In accordance with the Second Circuit's decision in Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009) (per curium), the Court has attached hereto all unpublished cases cited to within this Report-Recommendation and Order.

5

2005) (citing <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. <u>See</u> <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g), as amended; <u>Halloran</u>, 362 F.3d at 31.

## B. **Determination of Disability**[4]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." <u>Id.</u> § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. <u>Id.</u> § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions

---

[4] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." <u>Donato v. Sec 'y of Health and Human Services</u>, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step,

the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

## C.  Failure to File a Brief

Plaintiff did not file a brief, despite being given more than one opportunity to do so.  Dkt. No. 12, 14. Plaintiff submitted a form complaint with an attached letter.  See Compl.  The letter does not set forth specific claimed errors in the ALJ's decision, and instead reiterates the treatment she has received, the pain she has experienced, and her belief that she is entitled to benefits.  Id. at 2-5.  It is well settled that a plaintiff bears the burden of establishing disability.  See Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). General Order 18 of the Northern District of New York provides, however, that the Court

> will 'consider' the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be 'heavily influenced by the Commissioner's version of the facts.'  In a case such as this, where the plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants.

Gregorka v. Commissioner of Soc. Sec., 13-CV-1408 (GTS/TWD), 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015) (quoting G.O. 18); Hubbard v. Commissioner of Soc. Sec., 14-CV-1401 (GTS/WBC), 2016 WL 551783, at *4 (N.D.N.Y. Jan. 14, 2016) (same).  Thus, despite plaintiff's failure to provide a brief, this Court must examine the record to consider whether the ALJ applied the proper standards, reaching a decision that is based on substantial evidence.  Id.

### D. ALJ Determination

Using the five-step disability sequential evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 11, 2011, the alleged onset date. T at 31. The ALJ determined at step two that plaintiff had the following severe impairments: lumbar spine disc bulge, asthma, and panic disorder without agoraphobia. Id. The ALJ acknowledged that a thyroid nodule was noted in a cervical MRI, which turned out to be a colloid cyst, but that followup testing showed normal results. Id. As there were no functional limitations caused by the cyst, the ALJ concluded that the colloid cyst was not a severe impairment. Id. At step three, the ALJ concluded that plaintiff did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404p, Appx. 1. Id. at 31-32. Before reaching step four, the ALJ concluded that plaintiff has the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can lift up to 20 pounds occasionally; lift up to 10 pounds frequently; and stand/walk about 6 hours and sit up to 6 hours in an 8-hour day, with normal breaks. The claimant could occasionally climb ladders, ropes, or scaffolds; frequently climb ramps or stairs; and frequently balance, stoop, kneel, crouch, and crawl. The claimant also needs to avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, gases, and poorly ventilated areas. The claimant needs to avoid concentrated use of moving machinery and exposure to unprotected heights. Work is also limited to simple, routine, and repetitive tasks.

Id. at 32-33. At step four, the ALJ determined that plaintiff was unable to perform any past relevant work. Id. at 36. The ALJ concluded that, "[c]onsidering plaintiff's age,

education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can perform[.]" Id. at 37. The ALJ provided, based on the VE's testimony, that plaintiff could perform the jobs of mail clerk, sorter, and marker. Id. Thus, the ALJ concluded that plaintiff "has not been under a disability, as defined in the Social Security Act from March 11, 2011, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g))." Id. at 38.

### B. Medical Evidence

#### a. James Walzer, D.C.

##### i. Treatment notes

Dr. Walzer, plaintiff's treating chiropractor, diagnosed plaintiff with cervical, thoracic, and lumbar complex  subluxation and sprain/strain. T at 218. At an initial consultation on March 15, 2011, plaintiff had decreased range of motion of the lumbar and cervical spine, and bilateral spasm and tenderness of the paracervical muscles, trapezius muscles, paradorsal muscles, and paralumbar muscles. Id. at 258. At a March 17 visit, plaintiff reported "improvement in areas of activities of daily living." Id. at 166. Dr. Walzer noted that plaintiff's condition "appears to be guarded." Id. At a March 30 visit, Dr. Walzer observed that plaintiff's symptoms of stiffness and soreness of upper back, mid back, neck, left and right upper extremities, shoulders, hands, lower extremities, and legs were "slowly improving with treatment." Id. at 263.

Dr. Walzer ordered an electrodiagnostic study which revealed "no evidence of

lumbar radiculopathy." T at 221. Dr. K. Walzer "note[d] that conventional Emg and nerve conduction studies cannot test small sensory fibers which, when relatively irritated, may underlie pain and paresthesias arising from within 'named' peripheral nerves, soft tissues and bony structures, and sensory roots." Id.

### ii.  Spinal MRI

Dr. Walzer ordered an MRI obtained of plaintiff's cervical spine. The MRI, taken on April 7, 2011, showed "[n]o fracture, spondylosisthesis, marrow replacement process, intrathecal mass, disc herniation, cord compression, or abnormal signal in the spinal cord." T at 224. The paraspinal soft tissues were within normal limits. Id. Anterior spondylosis was noted atT1-2 and T2-3." Id. The impression, as relevant here, was "no disc herniation" and "anterior spondylosis . . . at T1-2 and T2-3." Id. Dr. Walzer also ordered an MRI of the Lumbar spine. An MRI of the lumbar spine taken on April 7, 2011 showed no fracture, spondylolisthesis, narrow replacement process, interathecal mass, no spinal canal or foraminal stenosis, no retroperitoneal mass, lymphadenopthay, or aneurism. Id. at 225. The discs at L1-2, L2-3, L3-4, L5-S1 "levels appear within normal limits." Id. At the L4-L5 level, "a central disc bulge is noted." Id. The ALJ reviewed these findings. Id. at 34.

### b.  New York Spine & Wellness Center

During plaintiff's visits to the New York Spine and Wellness Center, plaintiff

treated largely with Jennifer Godlewski, PA or Robert Richman, PA.[5] On January 16, 2012 plaintiff reported pain at a level of eight out of ten. T at 399. Plaintiff's range of motion in her head/neck was "limited with rotation to the right at about 60 degrees and to the left at about 60 degrees. She has more pain when turning her head to the right. She also has pain with attempts at flexion and extension." Id. There was no swelling in plaintiff's upper or lower extremities. Id. Plaintiff's gait was "slightly antalgic" with "[s]tiff, guarded posture." Id. Plaintiff could get out of her chair without assistance. Id. Her lumbar region was "quite limited with flexion at about 30 degrees with low back pain." Id. An EMG and Nerve Conduction study were performed on May 5, 2012 by Rina Davis, M.D. Id. at 396. The impression was that it was "a normal study" and there was "no evidence of a cervical radiculopathy, peripheral neuropathy, or peripheral nerve entrapment." Id. at 398. Plaintiff received a trigger point injection on June 25. Id. at 394. At a July 16, visit, plaintiff indicated a minimum pain level of eight out of ten and a maximum pain level of ten out of ten. Id. at 390. Plaintiff's low back pain worsened with lifting, standing, walking, driving, and bending. Id. Plaintiff reported nausea caused by her neck pain. Id. at 391. Her gait was reported to be normal. Id. Ms. Godlewski referred plaintiff for an orthopedic surgery consult. Id. at 392. On August 29, plaintiff received trigger point injections. Id. at 388-89. PA Richman noted that plaintiff reported an increase in migraines after her last injection. Id. at 388.

---

[5]    Several of Ms. Godlewski's treatment notes indicate that Dr. Jason Lok or Dr. Joseph Cantania saw plaintiff and agreed with Ms. Godlewski's treatment plan for plaintiff. T at 379-80, 383-84, 401. However, some visits indicate that plaintiff was seen only by Ms. Godlewski or Robert Richman, PA, and without an accompanying signature from a medical doctor. See 389, 392, 394, 397, 406.

12

On September 13, 2012, plaintiff complained her pain was a ten out of ten.  T at 385.  She complained of low back, neck, arm, and leg pain.  Id. at 385.  Ms. Godlewski noted plaintiff's gait to be antalgic.  Id. at 386.  On November 11, plaintiff's pain was seven out of ten and she felt burning, numbness, aching, stabbing, and a constant pain.  Id. at 381.  She complained of pain in her low back, neck, both arms, and both feet.  Id.  Plaintiff reported anxiety and sleep disturbances.  Id. at 382.  At a November 14, visit, Ms. Godlewski noted that she was "unsure at this time the source of [plaintiff's] continued pain."  Id. at 384.  Plaintiff's pain was an eight out of ten on that visit.  Id.  On Plaintiff received a bilateral lumbar transforaminal nerve block.  Id. at 407.  Plaintiff had "50% pain relief" which lasted for two days, with a gradual return of pain.  Id.  On December 20, Ms. Godlewski concluded that plaintiff's "functional status is limited in the following areas: ability to work, ability to perform activities of daily living, aerobic activity, enjoyment of life, ability to perform housework, mood, sleep disturbance and social relationships."  T at 378.  Plaintiff reported pain at a level of nine out of ten on that visit.  Id. at 377.  She experienced difficulty sleeping and walking, with muscle pain and spasms, but no extremity weakness or fecal/urinary incontinence.  Id.  Plaintiff reported her anxiety and depression to be stable.  Id. at 378.  Her gait was antalgic.  Id. at 379.

### c.  Warren E. Wulff, M.D.[6]

Dr. Wulff examined plaintiff, following a referral, on October 3, 2012.  T at 373.

---

[6]  The ALJ referred to this provider as Warren Wulfi, M.D.; however, review of the record reveals that the proper spelling is Wulff.

Plaintiff complained of neck pain radiating down to her lower back with pain, numbness[.]" Id. Plaintiff's gait was normal, she could balance on heels and toes, and climb onto the examination table. Id. at 374. Plaintiff's cervical range of movement was "mildly limited secondary to pain," and her "[l]umbar flexibility is moderately limited secondary to pain." Id. at 374. Dr. Wulff indicated that plaintiff had "full unobstructed painless range of motion of both hips." Id. Plaintiff had tenderness to palpation of her "cervical spine in the midline and paraspinal muscles bilaterally," tenderness to palpation in the "lumbrosacral junction midline and paraspinal bilaterally," and tenderness to palpation of the "thoracic spine midline and paraspinal muscles bilaterally." Id. Dr. Wulff provided that he "do[es] not have an explanation for her low back pain or numbness." Id. at 375. He further concluded that plaintiff " is not a surgical candidate." Id. Dr. Wulff noted a fifty percent temporary impairment. Id. Dr. Wullff reviewed MRIs of plaintiff's lumbar and cervical spine from April 2011. Id. He also reviewed X-rays of the cervical and lumbar spine, concluding that the X-rays were normal, with "no evidence of significant degenerative change, trauma or deformity." Id. at 375-76.

Dr. Wulff obtained an MRI of plaintiff's lumbar spine on October 11, 2012. T at 369, 371. He noted

> [s]mall foraminal disc protrusions at L3-4 and L4-5. They do not lead to exiting neural foraminal stenosis. No significant dorsal disc herniation is identified. Normal position of the conus meddularis. No significant posterior facet anthropathy. There are congenitally short pedicals but no central canal stenosis appreciated. Normal signal characteristics of the lumbar vertebra and disc. Impression: Essentially normal exam.

Id. at 371-72. Dr. Wulff saw plaintiff on three occasions. Id. at 368, 371-72. The ALJ reviewed these records, including Dr. Wulff's review of the spine X-rays and MRIs, and concluded that Dr. Wulff's records show a lack of "any objective basis for the claimant's numerous symptoms and alleged limitations." Id. at 35.

### d. Joy Comisso, M.D.

Plaintiff visited Joy Commisso, MD, of the Family Medicine Center, on August 3, 2010 for headaches. T at 236. Plaintiff reported the headaches to be of a severity of seven out of ten, and indicated that they were located in the "frontal right" and "occipital." Id. The headaches caused nausea, dizziness, and a runny nose. Id. Dr. Commisso instructed plaintiff to try the over-the-counter pain medicine, Excedrine, and that if it is unsuccessful, to take Imitrex. Id. On October 12, 2010, plaintiff reported that her migraines were improving and occurred less than once per week. Id. at 238. She indicated that "Execedrin relieves her migraine pain." Id. On October 19, 2010plaintiff was treated for anemia with iron. Id. at 241. On January 20, 2011, plaintiff visited Dr. Commisso for headaches and anemia. Id. at 242. She reported that her headaches "occur intermittently" and are "unchanged." Id. Plaintiff noted that she has "migraines everyday with headache, phonophobia, photophobia x2 years. Imitrex did not help." Id. Dr. Commissio noted that plaintiff's migraines were "[l]ikely anxiety related," provided a prescription for Zomig, and noted that plaintiff should "[c]onsider counseling." Id. at 243. On February 22, 2011, plaintiff visited for a migraine follow up. Id. at 245.

Plaintiff noted that her headaches occur intermittently and that "[t]he problem is improving." Id. Dr. Commisso recommended that plaintiff continue taking Motrin as needed. Id.

On March 15, 2011, plaintiff reported to Dr. Commisso severe and constant neck pain following a motor vehicle accident in which her car was hit on the driver's front side by a tractor trailer. T at 247. Plaintiff complained of "severe and constant" neck pain, right arm and right leg pain, and "numbness and tingling to fingers and toes," and "tremors right side." Id. Dr. Commisso diagnosed plaintiff with whiplash and lower back pain. Id. at 250. She recommended that plaintiff continue taking Tylenol and Motrin, as needed, and that plaintiff engage in counseling for anxiety. Id. On April 28, plaintiff reported that her back pain had improved since her last visit to the chiropractor. Id. at 253.[7]

### e. Shari Gaal, Achieve Physical Therapy

On July 30, 2012, plaintiff reported that she had a "tough weekend" as she "stood a lot at a wedding and got hit in [the] back." T at 519.[8] Plaintiff's diagnoses was lumbago, displacement of lumbar intervertebral disc without myleopathy, and brachial neuritis or radiculitis NOS. Id. On August 9, plaintiff reported that she "survived bus ride south [for vacation] but with significant soreness." Id. at 509, 512. On August 16,

_____

[7] The only other treatment records in the administrative transcript from Dr. Commisso relate to plaintiff's treatment for thyroid problems. T at 251-56.

[8] It appears plaintiff began physical therapy on June 18, 2012. See, e.g., T at 411.

plaintiff reported that she took her son to the zoo the day before that was "pretty stiff." T at 506.  On September 5, plaintiff reported that she was "on feet a lot yesterday - did better that she would've a month ago."  Id. at 478.  On September 7, plaintiff was "generally sore but able to do more at home."  Id.  On October 18, plaintiff reported that she has difficulty doing her hair, lying in bed, and her son assists her with carrying her laundry basket.  Id. at 447.  She reported that chiropractic care did not help.  Id.  On October 30, plaintiff's neck was sore and she had a headache "after working on a craft yesterday."  Id. at 437.  Plaintiff was "gradually improving flexibility, but still functionally limited."  Id.  On November 1, plaintiff reported that she was "sore everywhere; did a lot of walking for [H]alloween last night."  Id. at 435.  On November 8, plaintiff's complaints were "not too bad today."  Id. at 431.  Plaintiff had "stiffness across lower back but strength and east of lifting seems to be improving."  Id.  On November 15, plaintiff had a "pretty good day, did have some arm numbness last night while sitting at laptop; saw MD and they want her to consider a spinal cord stimulator."  Id. at 425.  On November 13, plaintiff "had a terrible weekend due to overdoing it; was in tears and considered ER, but better today."  Id. at 427.  On November 27, plaintiff was "sore all over after doing a lot around the house yesterday, but she was doing stuff she wouldn't have been able to do a few months ago."  Id. at 417.  On November 27, plaintiff's pain was "not too bad despite having done a lot of walking last night shopping."  Id. at 419.  On November 29, plaintiff reported right thigh strain, and stated that she "did a lot of walking again yesterday."  Id. at 415.  On December 6, plaintiff reported that she "did a lot of stairs yesterday to decorate and is still ok today."  Id. at 411.  Her physical

therapist indicated "good progression in strength tolerating inc[.] strengthening with less difficulty." Id. She had an "abnormal posture with m. guarding." Id. Plaintiff's physical therapist indicated that her rehab potential was "fair." Id.

The ALJ reviewed plaintiff's physical therapy notes and observed that plaintiff "did more than she alleged was her maximum daily ability." T at 35. The ALJ noted plaintiff's attending a wedding and standing a lot, taking a long bus ride for vacation, taking her son to the zoo, walking a lot for Halloween, doing a lot of walking while shopping, performing activities around the house, and climbing stairs in her house to decorate. Id. The ALJ also noted that plaintiff "occasionally complain[ed] of stiffness and soreness after some strenuous activities, but there is no evidence of the disabling pain that she alleged at the hearing. Furthermore, her overall level of activities and frequency of her activities suggest that she is capable of the [RFC] set forth in this decision." Id.

### f. Christina Caldwell, Psy.D. - Psychiatric Consultative Examiner

The ALJ reviewed consultative examiner Christina Caldwell, Psy D.'s November 16, 2011 psychiatric evaluation. T at 35-36. Plaintiff reported difficulty sleeping due to pain. Id. at 328. She further contended that she "experiences panic attacks whenever she is on a highway." Id. Plaintiff "refuses to drive on the highway, but if she is driving with someone and they go on the highway, she experiences palpitations, sweating, breathing difficulties, and trembling." Id. Plaintiff's recent and remote memory skills were in tact. Id. at 329. Her insight and judgment were fair. Id. at 329-30. Plaintiff

reported the ability to: dress, bathe, and groom herself; drive when not on the highway; manage finances; clean; shop; and do laundry with help.  Id. at 330.  Plaintiff reported that she has two best friends "who she sees on occasion, and she receives a lot of support from them."  Id.  Plaintiff indicated that she has a close relationship with family and a "great relationship" with her fiancé and sons.  Id.  Plaintiff's hobbies and interests "include going to doctors appointments, caring for her sons, doing light cleaning, and cooking."  Id.  Dr. Caldwell concluded that plaintiff is able to

> follow and understand simple directions and instructions,
> able to perform simple tasks independently, able to maintain
> attention and concentration, able to maintain a regular
> schedule, able to learn new tasks, able to perform complex
> tasks independently, able to make appropriate decisions,
> and able to relate adequately with others.  She is limited in
> her ability to appropriately deal with stress.  Difficulties are
> caused by Axis I diagnosis and physical limitations.

Id. at 330.  Dr. Caldwell diagnosed panic disorder without agoraphobia.  Id.

The ALJ gave great weight to Dr. Caldwell's conclusions that plaintiff would have "some limits handling stress due to her panic disorder and physical limitations."  Id. at 36.  Accounting for this limitation in his RFC, the ALJ limited plaintiff to simple, routine, and repetitive tasks.  Id.


### g.  Ammaji Manyam, M.D. - Internal Medicine Consultative Examiner

Dr. Manyam performed a consultative internal medicine examination of plaintiff on November 16, 2011.  T at 332.  Plaintiff reported that she does not cook, but she "cleans seven days a week."  Id. at 333.  She showers, bathes, and dresses herself

without assistance.  Id.  She watches television, listens to the radio, and socializes with friends.  Id.  Plaintiff's gait was normal; she walked on heels and toes without difficulty; she could squat fully; her stance was normal; she needed no help changing, or getting on/off the exam table; and she rose from her chair without difficulty.  Id.

Plaintiff's cervical and bilateral spine showed "full flexion, extension, lateral extension bilaterally, and full rotary movement bilaterally."  T at 334.  There was "[n]o evident sublaxations, contractures, ankylosis, or thickening."  Id.  Plaintiff's joints were "stable and nontender."  Id.  Straight leg raises were negative bilaterally.  Id.  Plaintiff had full range of movement of shoulders, elbows, forearms, wrists, hips, knees, and ankles, bilaterally.  Id.  She had full strength in her upper and lower extremities and no muscle atrophy.  Id.  Dr. Manyam's prognosis for plaintiff was good.  Id.  Dr. Manyam opined that plaintiff had no physical limitations, but recommended that she avoid smoke, dust, and pollen, due to her history of asthma.  Id. at 335.   The ALJ accorded partial weight to Dr. Manyam's opinion because "[p]hysical examination findings by Dr. Kuhn . . .  and Dr. Wulf[f] did evidence some reduced ranges of motion and positive tenderness in the spine.  Id. at 36.

### h.  Gary L. Kuhn, D.C. - Chiropractic Consultative Examiner

Dr. Kuhn performed a chiropractic independent medical exam of plaintiff on July 29, 2011.  T at 321.  Based on Dr. Kuhn's examination, he opined that plaintiff suffered cervical sprain/strain, thoracic strain, lumbroscral sprain/strain.  Id. at 322.  Dr. Kuhn concluded that plaintiff "sustained a muscle and ligamentous injury and strain to the

cervical, thoracic, and lumbar regions." Id. at 323. Dr. Kuhn's prognosis was that plaintiff "needs to increase flexibility and stretching exercises. Prognosis should improve to excellent over the next three months with follow-up care and reconditioning." Id. He estimated that plaintiff could reach pre-injury status by September of 2011. Id. Dr. Kuhn opined that plaintiff's "[o]ccupational duties should be able to commence by the end of September [2011] based on this examination. It is too early to tell what the patient's restrictions would be at this time. Follow up examination may be necessary in 2-3 months[.]" Id.

The ALJ "considered [Dr. Kuhn's] clinical findings and conclusions in this decision as a whole." T at 324. However, the ALJ was "unable to consider his prediction as to when the claimant could work because its is merely a prediction[,]" and noted that Dr. Kuhn did not give an opinion as to plaintiff's functional capacity. Id.

### i. E. Kamin Psychology - Psychiatric Review Technique

E. Kamin, a state agency psychological consultant, reviewed plaintiff's medical records. T at 336. Dr. Kamin concluded that plaintiff did not have a severe mental limitation. Id. at 346-47. The ALJ accorded "little weight" to this opinion, and "more weight" to Dr. Caldwell's assessment because E. Kamin did not perform an in-person evaluation of plaintiff. Id. at 36.

### B. Severity

At step two of the sequential analysis, the ALJ must determine whether the

claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(ii). A finding of not severe is appropriate when an impairment, or combination of impairments, "does not significantly limit [the claimant's] physical or mental ability to do basic work activities." Id. § 416.921(a). "The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." Bergeron v. Astrue, No. 09-CV-1219, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011) (quoting McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)). The claimant bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c). The claimant must demonstrate that the impairment has "caused functional limitations that precluded him from engaging in any substantial activity for one year or more." Perez v. Astrue, 907 F. Supp. 2d 266, 272 (N.D.N.Y. 2012).

The ALJ concluded that plaintiff's severe impairments are lumbar spine disc bulge, asthma, and panic disorder. T at 31. An argument can be made that plaintiff's headaches/migraines should also have been determined to be a severe impairment. Plaintiff testified that she experiences headaches four times per week, which last "[t]hroughout the day" and are "[r]eal intense, like a 10." Id. at 17. Plaintiff takes Motrin for her headaches and puts a "cold pack" on her head and on the back of her neck. Id. Plaintiff treated for headaches/migraines with Dr. Commisso beginning in August 2010, prior to the alleged onset date. Id. at 236. Plaintiff reported a severity of seven out of ten. Id. Plaintiff indicated that Excedrin helped her headaches. Id. at 236. Plaintiff

returned to Dr. Commisso in March 2011, following the accident.  Id. at 247.  Plaintiff

did not make further complaints about migraines or headaches.  Id.

Substantial evidence supports that the ALJ did not find plaintiff's migraines or

headaches to be severe.  Although plaintiff testified as to their frequency or severity at

the hearing, T at 17, beyond treatment with her primary care provider and over the

counter headache medicine in August 2010 to February 2011, there is no record

evidence that plaintiff sought continued treatment for migraines.  Id. at 236, 238, 242.

Further, although plaintiff reported headaches as frequently as four times per week,

such frequency is not reported in plaintiff's activities of daily living.  Although plaintiff

indicated experiencing a headache to some treatment providers, it appears that the

headaches were in response to neck pain or nerve block injections.  Id. at 388.  Thus,

the ALJ did not commit error by failing to conclude that plaintiff's migraines/headaches

were a severe impairment, as the medical evidence does not support that her

migraines/headaches significantly limited her physical or mental ability to perform basic

work activities.  20 C.F.R. §§ 404.1520(c), 404.1521, 416.920(c), 41.921(b).  Even if

the ALJ did commit such error, an error at step two – either a failure to make a severity

determination regarding an impairment, or an erroneous determination that an

impairment is not severe – can be harmless error if the ALJ continues the analysis and

considers all impairments in his RFC determination.  See Tryon v. Astrue, 10-CV-537,

2012 WL 398952, at *3-4 (N.D.N.Y. Feb.7, 2012) ("Often when there are multiple

impairments, and the ALJ finds that only some of the impairments, but not others, are

severe, any error in the severity analysis is harmless because the ALJ continues with

the . . . sequential analysis, and does not deny plaintiff's application based on the second step alone." (internal quotation marks and citations omitted)); 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your [RFC]."). It would be harmless, as the ALJ found that plaintiff had other severe impairments and continued through the sequential evaluation past step two. T at 32-33. Accordingly, the ALJ's step two determination as to plaintiff's headaches or migraines is supported by substantial evidence.

### C. Listings

### i. 12.06

Impairments listed in Appendix 1 of the Regulations (the "Listings") are "acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995). Accordingly, a claimant who meets or equals a Listing is "conclusively presumed to be disabled and entitled to benefits." Id. at 1022; see 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").

The ALJ reasonably concluded that plaintiff's anxiety, although "severe" under step two, did not meet or medically equal listing 12.06. Section A calls for "medically documented findings" of either "a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or

situation"; or "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week"; or "recurrent obsessions or compulsions which are a source of marked distress"; or "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress"; or "generalized persistent anxiety accompanied by three out of four of the following signs or symptoms": motor tension, or autonomic hyperactivity, or apprehensive expectation, or vigilance and scanning.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.   If a claimant meets the requirements of paragraph A, she must still meet the criteria in paragraphs B or C of section 12.06 to be qualified as disabled at step three.  Id.  Paragraph B is met if the claimant suffers from at least two of the following: "marked restriction of activities of daily living"; "marked difficulties in maintaining social functioning"; "marked difficulties in maintaining concentration, persistence, or pace"; "repeated episodes of decompensation, each of extended duration."  Id.  If a claimant meets the criteria in paragraph A, but does not satisfy the requirements of paragraph B, she must still be found disabled at step three of the sequential evaluation if she is completely unable to function independently outside the area of her home, as explained in paragraph C.  Id.

In reviewing the requirements for anxiety-related disorders under listing 12.06, the ALJ reasonably concluded that plaintiff failed to demonstrate that she met the requirements of paragraph B or C.  Although plaintiff indicated anxiety, plaintiff indicated in her exam with Dr. Caldwell that her anxiety is related to driving on the highway, either herself or as a passenger.  T at 328.  She states that she will not drive

25

on highways due to this anxiety.  Id.  Plaintiff did not indicate that this anxiety caused any functional limitations beyond her ability to drive on the highway.  Id.  The ALJ concluded that plaintiff has mild limitations in social functioning.  Id. at 32.  This is supported by substantial evidence.  Plaintiff reported in her disability function report that, due to her illness, she cannot "[d]rive on highway, hangout with friends [&] family[, and go] shopping," do yard work, or exercise, yet in that same report plaintiff indicated that she shopped for groceries one a week and, in response to a question that inquired about changes in her social activities due to her injuries, she provided "none."  Id. at 163, 165-68.  Further, plaintiff reported having two best friends who provide good support, indicated that she socializes with others, and stated that she had a "great relationship" with her children and fiancé with whom she lives.  Id. at 329-30.  There is no evidence of any marked restrictions of daily living due to her anxiety.  Plaintiff indicated that she cleaned her house seven days a week, though her son helped at times with carrying the laundry basket; prepared food; groomed, bathed, and dressed herself; went shopping twice a week, decorated her home; took her son to the zoo; went on vacations; took public transportation; drove; cared for her children; and engaged in hobbies such as watching television and doing crafts.  Id. at 330, 333.  Further, plaintiff indicated that stress or changes in schedule do not effect her, she does not have trouble remembering things, she does not have difficulty getting along with others or those in positions of authority, she has no difficulty paying attention, she can follow spoken and written instructions, and her only difficulty in finishing what she starts is completing physical tasks due to pain.  Id. at 169-70.

All testing indicated that plaintiff had adequate concentration, persistence and pace, in tact memory skills (three of three objects immediately, two of three objects after five minutes, six digits forward and four digits backward), neutral mood, clear sensorioum, appropriate affect, intelligible and clear speech, cooperative and responsive to questions, adequate manner of relating, coherent and goal-directed though processes, appropriate eye contact, and oriented times three.  T at 329-330. Further, plaintiff has no evidence of repeated, extended episodes of decompensation. Thus, the ALJ's conclusion that plaintiff's anxiety did not meet or medically equal listing 12.06 is based on substantial evidence.

### ii.  1.04

Section 1.04 of the Listings, Disorders of the spine, requires "compromise of a nerve root (including the cauda equina) or the spinal cord" with one or more of the following: (a) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);" (b) "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;" or (c) "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable

imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.04.

The ALJ considered listing 1.04, but determined that the severity of plaintiff's impairment did not meet or medically equal the listing. T at 32. This finding is based on substantial evidence. Here, all imaging studies resulted in negative findings. The April 2011 cervical spine MRI showed no spondylosisthesis, no cord compression, no abnormal signal in the spinal cord, her paraspinal tissue was within normal limits. Id. at 224. The cervical MRI showed anterior spondylosis at T1-2 and T2-3. Id. The April 2011 lumbar MRI showed no fracture, no spondylolisthesis, and no spinal canal or foraminal stenosis. Id. at 225. The MRI revealed a central disc bulge at L4-L5. Id. An October 2012 lumbar spine MRI showed foraminal protrusion at L3-L4 and L4-L5. Id. at 371. However, it revealed no exiting neural foraminal stenosis, no significant dorsal disc herniation, normal conus, no significant posterior facet anthropathy, no central canal stenosis, normal signal characteristics of lumbar vertebra and disc. Id. at 371-72. Thus, the October 2012 MRI was determined to be an "essentially normal exam." Id. Her EMG was negative for lumbar radiculopathy, cervical radiculopathy, peripheral neuropathy, or peripheral nerve entrapment. Id. at 221, 398. Plaintiff had no atrophy or motor weakness. She had full muscle strength. Id. at 334. Dr. Wullf, the orthopedic surgeon, noted that he could not determine an etiology of plaintiff's pain and numbness. Id. at 375. He concluded that she was not a surgical candidate. Id. Other treatment providers were also unable to determine the cause of plaintiff's pain. Id. at 384. Therefore, the ALJ reasonably concluded that, despite plaintiff's complaints of

lumbar and cervical spine pain, plaintiff failed to meet or medically equal Listing 1.04.

Further, there is limited evidence that plaintiff is unable to ambulate effectively. Although some physical therapy notes indicated that plaintiff's gait was antalgic, T at 379, 386, 399, other treatment records noted that plaintiff's gait was normal, that she could stand on her toes and heels, that she was able to squat fully, rise from her chair, get on/off the examination table without assistance, and did not need to walk with an assistive device.  T at 333.  Treatment records indicated that plaintiff engaged in activities requiring her to sit or stand for extended periods of time, which does not suggest an inability to effectively ambulate, despite her contentions at the hearing.  Id. at 415, 417, 419, 435, 478, 506, 509, 512.  Although plaintiff reported some increased pain after engaging in extended activity, she did not indicate an inability to do so, as alleged at the hearing.  Id. at 15-16.

Thus, the ALJ's determination that plaintiff's lumbar spine disc bulge and related spine pain was not of a severity to meet or medically equal a listing is supported by substantial evidence.

**D.  RFC**

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC

29

assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

As previously indicated, the ALJ determined that plaintiff retained the RFC to perform light work; carry up to twenty pounds occasionally, and ten pounds frequently; stand or walk for up to six hours and sit for up to six hours in an eight-hour day; occasionally climb ladders, ropes or scaffolds; and frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. T at 32-33. The ALJ provided that plaintiff should avoid concentrated exposure to fumes, odors, dust, gases, and poorly-ventilated areas. Id. at 33. The ALJ also limited plaintiff to avoid concentrated use of moving machinery and unprotected heights. Id. Finally, plaintiff was limited to simple, routine, and repetitive tasks. Id.

### i. Mental RFC

The ALJ's RFC insofar as it considers plaintiff's mental impairment is supported by substantial evidence. Plaintiff indicated that she experienced anxiety and noted that she experiences this while driving on the highway. T at 328, 350. Plaintiff did not state that she had anxiety relating to any other daily activity or interaction. Id. Plaintiff was not taking medication for her anxiety and was not undergoing psychiatric or psychological treatment. Id. at 328. The ALJ considered consultative examiner Dr. Caldwell's findings that plaintiff has some difficulty dealing with stress, and thus, limited plaintiff to simple, routine, and repetitive tasks. Id. at 36. The psychiatric testing in the

record indicates that plaintiff can perform the mental demands of light work that is limited to simple, routine, and repetitive tasks. SSR 85-15 provides that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. As noted, Dr. Caldwell reported that plaintiff has no significant difficulty with any of these categories. Thus, the undersigned concludes that the RFC, insofar as it relates to plaintiff's anxiety, is supported by substantial evidence.

### ii.  Physical RFC

Here, the ALJ's RFC assessment insofar as it relates to plaintiff's physical limitations and abilities is not supported by substantial evidence as the ALJ failed to meet his duty to fully develop the record. The ALJ is under an affirmative duty to "make every reasonable effort" to develop the record. 20 C.F.R. §§ 404.1512(d), 416.912(d). Moreover, an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician, including an assessment of the claimant's functional capacity, in order to afford the claimant a full and fair hearing. Smith v. Astrue, 896 F. Supp. 2d. 163, 176 (N.D.N.Y. 2012). However, "the ALJ has no duty to re-contact a source where the evidence submitted by that source is complete where it includes all of the factors set forth in 20 C.F.R. 416.913 and there is no indication that further contact will result in additional information, re-contact is not

necessary." Slater v. Commissioner of Soc. Sec., 14-CV-255 (GTS), 2015 WL

6157396, at *7 (N.D.N.Y. Oct. 20, 2015) (citation omitted); Pellam v. Astrue, 508 F.

App'x 87, 90 (2d Cir. 2013) (concluding that the ALJ's review of all treatment notes from

the plaintiff's treating physician and an RFC assessment from a consultative examiner,

the ALJ was not obligated to supplement the record by obtaining an MSS from the

plaintiff's treating physician) (citing Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir.

1999)). 20 C.F.R. § 416.913 provides that

> [m]edical reports should include –
>
> (1) Medical history;
> (2) Clinical findings . . . ;
> (3) Laboratory findings . . . ;
> (4) Diagnosis;
> (5) Treatment prescribed with response, and prognosis; and
> (6) A statement about what you can still do despite your
> impairment(s) based on the acceptable medical source's
> findings on the factors under paragraphs (b)(1) through
> (b)(5) of this section . . . Although we will request a medical
> source statement about what you can still do despite your
> impairment(s), the lack of the medical source statement will
> not make the report incomplete.

The undersigned acknowledges that the record does not contain a medical

source statement ("MSS") from any of plaintiff's treating providers – PAs Jennifer

Godlewski and Robert Richman from the New York Spine & Wellness Center[9]; Dr.

James Walzer, D.C.; Dr. Wulff, orthopedic surgeon; primary care provider Joy

---

[9] As indicated above, supra n.4, it appears that plaintiff's treatment at the New York Spine &
Wellness Center was largely managed by P.A. Godlewski and Richman. Although some treatment notes
indicate that plaintiff was also seen by a Dr. Lok, or Dr. Cantania, the majority of treatment notes are
signed solely by a P.A. It unclear the extent to which Dr. Lok or Dr. Cantania had involvement in plaintiff's
treatment and care, and, thus, unclear whether the nature of the physicians' relationship with plaintiff
would rise to the level of "treating physician." See, e.g., George v. Bowen, 692 F. Supp. 215, 219
(S.D.N.Y. 1988).

Commisso, M.D.; or physical therapist Shari Gaal from Achieve Physical Therapy – containing a function-by-function assessment.

The only assessment of plaintiff's physical limitations in the administrative transcript is that of internal medicine consultative examiner Dr. Manyam, who opined that plaintiff had no limitations on her abilities to perform basic work activities. T at 35. However, the ALJ accorded only "partial weight" to Dr. Manyam's opinion that plaintiff had no physical limitations. Id. at 36. Although consultative chiropractor Dr. Kuhn indicated that plaintiff would likely be at pre-accident status by September 2011, the ALJ indicated that he was "unable to consider his prediction as to when the claimant could work because it is merely a prediction." Id. at 36. Further, the ALJ acknowledged that Dr. Kuhn did not provide an opinion as to plaintiff's functional capacity. Id. The ALJ gave little weight to state agency psychological consultant E. Kamin that plaintiff did not have any limitations. Id. Although the record contains treatment notes from plaintiff's treating providers, some of which are extensive, these providers make no comment on plaintiff's abilities to perform functions such as lifting, sitting, standing, and walking. The ALJ did not indicate the weight given to records of Dr. Walzer, providers at the New York Spine & Wellness Center, Dr. Wulff, or physical therapist Shari Gaal – likely due to the lack opinions of plaintiff's functional abilities from these providers.

The ALJ opines that plaintiff could lift up to twenty pounds occasionally, ten pounds frequently, and could walk/stand for at least six hours and sit for at least six hours in an eight hour work day. T at 33. However, the undersigned cannot determine the medical evidence on which the ALJ relies to reach this determination, as the only

assessment of plaintiff's physical abilities was assigned only partial weight.  Id. at 36.

Although the ALJ references that plaintiff's diagnostic and imaging studies revealed no

objective findings, it does not follow automatically that plaintiff has no physical

limitations merely because of a lack of positive imaging studies or testing.  It is

inappropriate for an ALJ to reach his conclusion as to a plaintiff's RFC "through her own

interpretation of various MRIs and x-ray reports contained in the treatment records."

Gross v. Astrue, 12-CV-6207P, 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014).

Although an ALJ may rely on the opinion of a consultative examiner to support an RFC

assessment, as they are deemed qualified experts in social security disability, Monguer

v. Heckler, 722 F.3d 1033, 1039 (2d Cir. 1983), where, as here, the ALJ gives only

"partial" or limited weight to such an opinion and that opinion is the *only* assessment of

plaintiff's functional limitation in the record by someone who has examined the plaintiff,

it cannot be said that the ALJ's opined limitations are properly supported by medical

evidence because "an ALJ is not qualified to assess a claimant's RFC on the basis of

bare medical findings, and as a result an ALJ's determination of RFC without a medical

advisor's assessment is not supported by substantial evidence."  Dailey v. Astrue, 09-

CV-99, 2010 WL 4703599, at *11 (W.D.N.Y. Oct. 26, 2010) (internal citation and

quotation marks omitted) (citing Suide v. Astrue, 371 F. App'x 684, 689-90 (7th Cir.

2010) (holding that "the evidentiary deficit" left by the ALJ's rejection of a physician's

reports, requires remand where the "rest of the record simply does not support the

parameters included in the ALJ's [RFC] determination, such as an ability to 'stand or

walk for six hours' in a typical work day.")).

The undersigned must assess whether the ALJ was required to recontact plaintiff's providers for an MSS and, if so, whether recontacting would likely result in additional information. See Slater, 2015 WL 6157396, at *7. Plaintiff's records indicate that she saw Dr. Wulff for three visits, and after obtaining MRI results, he indicated that he could find no objective reason for plaintiff's complaints of pain and numbness; thus, Dr. Wulff referred plaintiff back to the New York Spine & Wellness Center. T at 368-9, 372, 375. Thus, as Dr. Wulff saw plaintiff on just three visits, it is not likely that contacting Dr. Wulff to obtain an MSS would likely result in additional information helpful to forming an opinion on plaintiff's physical limitations. See, e.g., Donnelly v. Colvin, 13-CV-7344 (AJN/RLE), 2015 WL 1499227, at *12 (S.D.N.Y. Mar. 31, 2015) (holding that three visits with a doctor "do not constitute sufficient contact to warrant [the doctor's] opinion being afforded additional weight as [the plaintiff's] treating physician."). Similarly, Dr. Commisso, is plaintiff's primary care provider and an acceptable medical source; however, the administrative transcript largely contains treatment records for visits made prior to the alleged onset date and for headaches or for thyroid problems. Id. at 236-45. Plaintiff visited Dr. Commissio for neck pain following the accident on one occasion, at which time Dr. Commisso diagnosed whiplash recommended over the counter painkillers. Id. at 250. There is no evidence in the administrative transcript indicating that plaintiff continued treatment with Dr. Commisso for back pain or any alleged impairment resulting from the car accident. Thus, recontacting Dr. Commisso is not likely to result in information relevant to an RFC assessment.

The remainder of providers plaintiff visited for back and neck pain were not acceptable medical sources[10] – PA Jennifer Godlewski and Robert Richman; Dr. James Walzer, D.C.; and physical therapist Shari Gaal.  However, although physicians assistants, chiropractors, and physical therapists are not acceptable medical sources, and therefore their opinions and records cannot alone establish the existence of a medical impairment, they are considered "other source[s]" whose opinions should be considered and evaluated "on key issues such as impairment severity and functional effects[.]" SSR 06-03p.  The undersigned recognizes that the regulations do not direct the ALJ to contact providers other than treating physicians to obtain MSS.  20 C.F.R. § 416.913.  However, PA Godlewski and Richman from the New York Spine & Wellness Center, James Walzer, D.C., and physical therapist Shari Gaal have engaged in extensive treatment with plaintiff.  These providers have seen plaintiff over periods of several weeks or months, and likely have a greater knowledge of plaintiff's specific functional limitations.  Thus, obtaining an MSS from these providers is likely to result in additional information helpful to reaching a determination as to plaintiff's specific abilities or limitations in engaging in the physical activities necessary to perform basic work activities.

Ultimately, as the ALJ assigned "partial" weight to the only assessment of

---

[10]  Acceptable medical sources are (1) licensed physicians, (2) licensed or certified psychologists, (3) licensed optometrists, (4) licensed podiatrists, and (5) qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).

plaintiff's physical abilities in the record based on personal examination,[11] leaving an "evidentiary deficit" of any medical support for the opined RFC, Suide, 371 F' Appx. at 690, the ALJ's physical RFC cannot be said to be based on substantial evidence as the undersigned cannot determine upon what evidence the RFC is based.  Therefore, it is recommended that this matter be remanded, and that, on remand, the ALJ obtain medical source statements from treating providers and, if necessary, any acceptable medical sources or consultative sources in order to reach a complete assessment as to each of plaintiff's functional limitations.

## E.  Credibility

Courts in the Second Circuit have determined pain is an important element in determining credibility, and evidence of a plaintiff's complaints of pain and limiting symptoms must be carefully considered.  Ber v. Celebrezze, 333 F.2d 923 (2d Cir. 1994).  Further, if an ALJ rejects a claimant's testimony of pain and limitations, he must be explicit in the reasons for rejecting the testimony.  Brandon v. Bowen, 666 F.Supp. 604, 609 (S.D.N.Y. 1997).  However, subjective symptomatology, without more, cannot be the basis for a finding of disability.  A claimant must present medical evidence or findings that support the existence of an underlying condition which could reasonably

---

[11]  As discussed above, the undersigned recognizes that E. Kamin also reached a conclusion as to plaintiff's limitations; however, E. Kamin did not examine plaintiff and the ALJ accorded only little weight to his assessment.  T at 36.  Further, the ALJ reviewed Dr. Kuhn, D.C.'s determination, and indicates that he "considered" his clinical findings, but acknowledged that Dr. Kuhn did not assess plaintiff's functional capacity.  Id.  Thus, Dr. Manyam's opinion remains the only opinion as to plaintiff's specific functional abilities.

be expected to produce the symptomatology alleged.  See 42 U.S.C. §§ 423(d)(5)(A),

1382c (a)(3)(A); 20 C.F.R. §§ 404.1529(b), 416.929; SSR 96-7p; Gernavage v. Shalala,

882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

> An administrative law judge may properly reject claims of
> severe, disabling pain after weighing the objective medical
> evidence in the record, the claimant's demeanor, and other
> indicia of credibility, but must set forth his or her reasons
> with sufficient specificity to enable us to decide whether the
> determination is supported by substantial evidence.

Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (internal citations omitted).

Thus, the ALJ must follow a two-step process to evaluate the plaintiff's contention of

pain, set forth in SSR 96-7p:

> First, the adjudicator must consider whether there is an
> underlying medically determinable physical or medical
> impairment (s) . . . that could reasonably be expected to
> produce the individual's pain or other symptoms . . . .
>
> Second, . . . the adjudicator must evaluate the intensity,
> persistence, and limiting effects of the individual's symptoms
> to determine the extent to which the symptoms limit the
> individual's ability to do basic work activities . . . .

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if the

plaintiff's pain contentions are not supported by objective medical evidence, the ALJ

must consider the following factors in order to make a determination regarding the

plaintiff's credibility:

> 1. [Plaintiff's] daily activities;
> 2. The location, duration, frequency and intensity of
> [Plaintiff's] pain or other symptoms;
> 3. Precipitating and aggravating factors;
> 4. The type, dosage, effectiveness, and side effects of any
> medication [Plaintiff] take[s] or ha[s] taken to alleviate ...
> pain or other symptoms;

5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of ... pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve ... pain or other symptoms;
7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds that the plaintiff's pain contentions are not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, 05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y. 1987)).

The undersigned finds no error in the ALJ's credibility assessment. "It is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 642 (2d Cir.1983) (citations omitted). If there is substantial evidence in the record to support the Commissioner's findings, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Secretary, Dep't of Health & Human Servs. of U.S., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted). Further, the ALJ has the benefit of directly observing a claimant's demeanor and other indicia of credibility which entitles the ALJ's credibility assessment to considerable deference. See Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (citing Pascariello v. Heckler, 621 F.Supp. 1032, 1036 (S.D.N.Y. 1985)); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

Here, the ALJ indicated that he found plaintiff's "medicably determinable impairments could reasonably be expected to cause the alleged symptoms; however,

the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." T at 34. The ALJ noted that the "objective and clinical evidence of record" does not fully support plaintiff's complaints of disabling pain. Id. The ALJ referenced normal X-rays and CT scans of plaintiff's head and cervical spine taken the day of the motor vehicle accident. Id. He also indicated that plaintiff's lumbar and cervical MRIs from April 2011 "showed merely anterior spondylosis at T1-2 and T2-3 and an L4-5 central disc bulge. There was no herniation, fracture, or stenosis noted in those April 7, 2011 MRIs." Id. The ALJ also pointed out that the EMG taken for plaintiff's radicular right leg pain were negative for lumbar radiculopathy. Id. The ALJ cited plaintiff's treatment with Dr. Wulff, who noted plaintiff's ranges of motion were mildly to moderately reduced and she had tenderness to palpation in her thoracic spine level, but that her muscle strengths were full, she could walk comfortably, balance on toes and heels, and climb onto the examination table. Id. at 34-35. The ALJ also pointed out inconsistencies between plaintiff's allegations of her limitations at the hearing – that she could stand only fifteen minutes, walk a half of a mile, sit for a few minutes, and lift no more than five pounds – and compared that to her statements of activity to Dr. Caldwell during her examination and the variety of physical activities she reported to her physical therapist. Id. at 35. The ALJ also noted that consultative examiner Dr. Manyam indicated that plaintiff had full range of motion in her lumbar and cervical spine, normal gait and stance, intact grip and dexterity, and no physical limitations. Id. at 36. The ALJ also referred to Dr. Caldwell, the psychiatric consultative examiner, who noted that plaintiff had "some limits

40

handling stress due to her panic disorder and physical limitations." Id.  As the ALJ's credibility assessment is supported by plaintiff's activities of daily living, treatment, and largely normal test results, the undersigned finds that the ALJ's credibility determination was based on substantial evidence.

However, the undersigned does recognize that reconsideration of plaintiff's physical RFC may necessarily change the ALJ's credibility assessment – especially if, following remand, medical providers opine limitations that are more reflective of the limitations plaintiff espoused.  Therefore, to the extent the District Judge agrees that the matter must be remanded for a new physical RFC assessment, it is recommended that plaintiff's credibility be reassessed insofar as any additional medical evidence obtained on remand alters the initial credibility assessment.

### F.  Step Five Determination

"At step five of the sequential process, the ALJ considered Plaintiff's age, education, and RFC, to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform.  20 C.F.R. § 404.1569.   The ALJ relied on the testimony of a vocational expert.  At the hearing the VE testified that based on a hypothetical individual with Plaintiff's age, education, and RFC, there were jobs that existed in significant numbers in the national economy which she could perform. ).  The VE testified that a person with the abilities to lift twenty pounds occasionally, ten pounds frequently, stand and walk for about six hours, sit for up to six

hours in an eight hour day, occasionally climb ladders, ropes and scaffolds, frequently use ramps and stairs, frequently stoop, kneel, crouch and crawl, avoid concentrated exposure of environmental irritants and concentrated use of moving machinery and unprotected heights could perform the roles of mail clerk, sorter, or marker.  T at 20-21. Although the undersigned finds no error at step five insofar as it relates to plaintiff's mental abilities, as the undersigned concludes that the ALJ's physical RFC is not based on substantial evidence, his step five assessment can not be said to be supported by substantial evidence, as the hypothetical presented to the VE reflects that RFC. Because the ALJ's RFC assessment is based on substantial evidence, the ALJ did not err in posing hypothetical questions to the vocational expert that was based on that assessment.  Cf. Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record)."  Accordingly, should the matter be remanded, on remand, it is recommended that, if the ALJ is to get to step five of the sequential evaluation, a new step five assessment must be made that is reflective of the updated physical RFC, and, to the extent that the ALJ present hypothetical questions to a VE, such questions must also properly reflect the updated physical RFC.


III.  **Conclusion**

**WHEREFORE**, for the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 16) be **DENIED**, and that the Commissioner's decision denying disability

42

benefits be **REMANDED**, pursuant to 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Report-Recommendation and Order; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **fourteen (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: March 15, 2016
     Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

2011 WL 6255372
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michele BERGERON, Plaintiff,
v.
Michael ASTRUE, Commissioner
of Social Security, Defendant.

No. 09–CV–1219 (MAD).
|
Dec. 14, 2011.

**Attorneys and Law Firms**

Joseph M. Connors, Albany Law School Clinic, Albany, NY,
for Plaintiff.

Andreea L. Lechleitner, Social Security Administration
Office of Regional General Counsel, New York, NY, for
Defendant.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**INTRODUCTION**

 *\*1* Plaintiff Michele Bergeron brings the above-captioned
action pursuant to 42 U.S.C. § 405(g) and § 1381 of the
Social Security Act, seeking a review of the Commissioner
of Social Security's decision to deny her application for
disability insurance benefits ("DIB") and supplemental social
security income ("SSI").

**BACKGROUND**

On August 31, 2006, plaintiff filed an application for DIB. (T.
102). [1] On September 7, 2006, plaintiff filed an application
for SSI. (T. 108). Plaintiff was 45 years old at the time of
the applications with past work experience as a corrections
officer (18 years) and a day care provider. (T. 23, 31, 128,
135). From 1978 to 1993, plaintiff was in the Army/Navy
Reserve and was stationed for four years in Germany. (T.
192–209). Plaintiff's period of alleged disability began on

August 24, 2006 and ended on August 27, 2007, when she
began working at the Salvation Army Homeless Shelter.
During that year, plaintiff claims that she was disabled due to
AIDS, depression, anxiety, carpal tunnel syndrome, and arm/
shoulder/hand and leg/hip/knee impairments.

On February 7, 2007, plaintiff's applications were denied and
plaintiff requested a hearing by an ALJ which was held on
October 1, 2008. (T. 17, 52–57). On November 26, 2008, the
ALJ issued a decision denying plaintiff's claim for disability
benefits. (T. 8–16). The Appeals Council denied plaintiff's
request for review on September 2, 2009, making the ALJ's
decision the final determination of the Commissioner. (T. 1–
4). This action followed.

**DISCUSSION**

The Social Security Act (the "Act") authorizes payment of
disability insurance benefits to individuals with "disabilities."
The Act defines "disability" as the "inability to engage in
any substantial gainful activity by reason of any medically
determinable physical or mental impairment ... which has
lasted or can be expected to last for a continuous period of
not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is
a five-step analysis for evaluating disability claims:

"In essence, if the Commissioner determines (1) that
the claimant is not working, (2) that he has a 'severe
impairment,' (3) that the impairment is not one [listed in
Appendix 1 of the regulations] that conclusively requires
a determination of disability, and (4) that the claimant is
not capable of continuing in his prior type of work, the
Commissioner must find him disabled if (5) there is not
another type of work the claimant can do." The claimant
bears the burden of proof on the first four steps, while the
Social Security Administration bears the burden on the last
step.

Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir.2003)
(quoting Draegert v. Barnhart, 311 F.3d 468, 472 (2d
Cir.2002)); Shaw v. Chater, 221 F.3d 126, 132 (2d Cir.2000)
(internal citations omitted).

A Commissioner's determination that a claimant is not
disabled will be set aside when the factual findings are not
supported by "substantial evidence." 42 U.S.C. § 405(g); see
also Shaw, 221 F.3d at 131. Substantial evidence has been
interpreted to mean "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion." Id.

The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999).

**\*2** On November 26, 2008, the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since August 24, 2006. (T. 10). At step two, the ALJ concluded that plaintiff suffered from HIV infection which qualified as a "severe impairment" within the meaning of the Social Security Regulations (the "Regulations"). (T. 10). At the third step of the analysis, the ALJ determined that plaintiff's impairment did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 11). The ALJ found that plaintiff had the residual functional capacity ("RFC") to, "perform the full range of sedentary work". (T. 12). At step four, the ALJ concluded that plaintiff did not have the residual functional capacity to perform any of her past relevant work. (T. 15). At step five, relying on the medical-vocational guidelines ("the grids") set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T. 15). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 16).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the Commissioner erred by failing to make any findings regarding whether plaintiff's leg and arm impairments were "severe impairments"; (2) the Commissioner erred in finding that plaintiff's depression was not a "severe impairment"; (3) the ALJ committed reversible error by not assessing Listing 14.08N; (4) the ALJ erroneously failed to make any specific findings concerning plaintiff's physical and mental residual capacity; and (5) the ALJ should have elicited testimony from a vocational expert. (Dkt. No. 14).

## I. ALJ's Assessment of Plaintiff's Leg and Arm Impairments at Step 2

Plaintiff argues that the ALJ misapplied the relevant law in assessing the severity of her leg and arm impairments at the second step of the sequential evaluation. The Commissioner asserts that the ALJ evaluated the evidence and reasonably found that plaintiff did not have severe musculoskeletal impairments.

A "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities. *Meadors v. Astrue,* 370 F. App'x 179, 182 (2d

Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

**\*3** 20 C.F.R. § 404.1521(b); see also Social Security Ruling 85–28, 1985 WL 56856, at \*3–4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985).

Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment. *See* 20 C .F.R. § 404.1520(c). The severity analysis at step two may do no more than screen out *de minimis* claims. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe. *McConnell v. Astrue,* 2008 WL 833968, at \*2 (N.D.N.Y.2008) (citing *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995)). A condition that improves and is repairable may not be considered a disability for purposes of disability benefits. *See Pennay v. Astrue,* 2008 WL 4069114, at \*4 (N.D.N.Y.2008).

### A. Medical Evidence

### *Right Shoulder*

In September 1997, plaintiff was evaluated at the Work Assessment and Conditioning Center of Eastern New York by Michele McTague, P.T. for right shoulder pain. (T. 217). Ms. McTague noted that plaintiff injured her right shoulder in August 1995 and re-injured her shoulder in February and October 1996. Ms. McTague recommended that plaintiff receive physical therapy three times a week. On October 7, 1997, plaintiff was discharged from physical therapy after

completing five sessions. Plaintiff was unable to continue due to personal problems. (T. 215–233).

On November 6, 1998, plaintiff was treated by Dr. Richard J. D'Ascoli at Regional Orthopedics. [2] Dr. D'Ascoli noted that plaintiff's "shoulder is doing reasonably well" and that, "the only thing she is unable to do is to pass her military physical just yet because she has to be able to do 25 pushups, and she can only do approximately 15 or so because of discomfort here". (T. 244). Plaintiff complained of pain after using the extremity for excessive periods of time, but "generally feels fairly good with it". Upon examination, plaintiff exhibited good range of motion with a bit of weakness but no muscle spasm.

On July 22, 2002, plaintiff was seen at the St. Claire's Emergency Room complaining of right shoulder pain. (T. 231). Plaintiff was diagnosed with right rotator cuff tendinitis. Plaintiff followed with Dr. D'Ascoli on July 31, 2002. The doctor noted that plaintiff had been out of work since the 22nd and prescribed physical therapy. (T. 240). On August 5, 2002, plaintiff was evaluated at John Mack Physical Therapy. (T. 245–249). On September 30, 2002, plaintiff had a follow up visit for her right shoulder with Dr. D'Ascoli. (T. 240). Plaintiff had continued pain due to irritants at work. The doctor advised that if her pain did not resolve that she would need to consider injections and/or an MRI. On October 17, 2002, plaintiff was discharged from physical therapy after nine inconsistent visits due to lack of follow up.

**\*4** On May 1, 2003, plaintiff was treated at the Ellis Hospital Emergency room complaining of right shoulder pain after an altercation at work. (T. 233). She also complained of numbness and tingling in her right hand. X-rays were negative. Plaintiff was diagnosed with a right shoulder strain and prescribed Vicodin. On May 7, 2003, plaintiff had a follow up visit at Regional Orthopedics. During the examination, the doctor, Dr. G. Robert Cooley, noted that plaintiff had "near full range of motion" and no swelling. Dr. D'Ascoli diagnosed plaintiff with a right shoulder strain and advised her to return to work on May 12, 2003. (T. 239).

On September 14, 2006, plaintiff presented at the VA Medical Center in Albany with "a new complaint of right shoulder pain". [3] (T. 254). Nurse Shaw noted that plaintiff's pain was only noticeable when she moved her arm in the forward position and there was no swelling present. Plaintiff was prescribed Ibuprofen and advised to apply heat.

### Right Knee
On November 15, 1999, plaintiff was treated at the emergency room at St. Claire's Hospital for complaints of knee pain after "missing a step" and "twisting her knee". The x-rays were negative and plaintiff was treated with ice, Motrin, a soft bandage and crutches. On November 16, 1999, plaintiff returned to Regional Orthopedics for complaints of knee pain. Plaintiff was treated by Glenn Jones, RPA. (T. 244). Upon examination, RPA Jones noted tenderness and swelling. Plaintiff was advised to continue her course of treatment and return if the pain continued. (T. 244). On November 23, 1999, plaintiff returned with continued complaints of right knee pain. Upon examination, RPA Jones noted effusion and that plaintiff was unable to weight bear even with crutches. (T. 243). An MRI scan was ordered.

On December 7, 1999, plaintiff had an MRI of her right knee at St. Claire's Hospital. On December 14, 1999, Dr. D'Ascoli examined plaintiff and reviewed the films and found a "bucket handle medial meniscus tear". Since plaintiff was still symptomatic, she elected to proceed with arthroscopic surgery. (T. 243). On January 6, 2000, plaintiff underwent surgery at St. Claire's. (T. 227). Her post-operative diagnosis was a right medial meniscus tear. Plaintiff's follow up visits were normal and her range of motion was noted as "good".

### Right Wrist
On March 14, 2002, plaintiff returned to Regional Orthopedics complaining of right wrist pain. (T. 242). RPA Jones noted that plaintiff "has had carpal tunnel for some time" without treatment. Upon examination, plaintiff exhibited good range of motion without pain. X-rays were negative and Dr. D'Ascoli ordered EMG nerve conduction studies. On May 7, 2002, plaintiff returned for a follow-up visit. At that time, Dr. D'Ascoli noted that the EMG scans were negative but suggested that plaintiff consider injections. Plaintiff opted to exercise. (T. 240).

On December 3, 2002, plaintiff returned to Dr. D'Ascoli complaining of right wrist pain. The doctor noted that plaintiff could have a ganglion cyst but that x-rays were negative. [4] (T. 240).

### Orthopedic Consultative Examination
**\*5** On October 30, 2006, plaintiff was examined by Amelita Balagtas, M.D., at the request of the agency. (T. 284). Plaintiff complained of right shoulder and hip pain. Upon examination,

Dr. Balagtas noted that plaintiff had a full range of motion in her shoulders and hips. (T. 285–286). Dr. Balagtas diagnosed plaintiff with right hip and shoulder pain and opined that plaintiff would have slight to moderate limitations in activities that require bending, lifting, prolonged sitting, standing, walking, lifting, carrying and reaching involving the right upper extremity. (T. 286).

## B. Analysis

At step two, the ALJ failed to make any findings relating to plaintiff's arm/shoulder/hand or leg/hip/knee pain. [5] However, it is clear from the decision that the ALJ found these impairments to be "non-severe". The ALJ discussed plaintiff's joint pain and viewed the evidence "in a light most favorable to claimant" in his analysis of plaintiff's RFC:

> [p]hysical examinations have been essentially normal. X-rays were consistently within normal limits. She had complaints of some hip pain, but the examination was described as normal. There was little in the way of treatment of her musculoskeletal complaints.
>
> (T. 13).

Upon review of the record, the Court finds that the ALJ's conclusion is supported by substantial evidence. The Administrative Transcript does not contain any assessments from any treating source or physician regarding plaintiff's alleged musculoskeletal impairments and how those impairments affect her ability to perform work-related activities. Moreover, all of plaintiff's treatment relating to her knee and wrist predated the closed period of disability. Plaintiff treated sporadically for shoulder pain from 1997 through 2003. Moreover, from 2003 until 2006, the record contains no evidence related to any complaints of shoulder pain. During the period of alleged disability, plaintiff had only one examination relating to her shoulder. Similarly, plaintiff made no complaints of knee pain after her surgery in 2000 and no complaints relating to her wrist after 2002. All radiological films and scans, with the exception of the MRI of plaintiff's knee, were normal. After plaintiff's knee surgery, Dr. D'Ascoli noted that plaintiff was, "doing very well. She has a minimal effusion and her wounds are healed nicely and there is no evidence of [ ] infection". (T. 242). On January 20, 2000, Dr. D'Ascoli note that plaintiff's motion was good and that she was going back to full duty on February 1, 2000. (T. 242).

In support of her argument, plaintiff cites to the Northern District decision in *Ebert v. Astrue,* 2009 WL 3764219 (N.D.N.Y.2009). The Court has reviewed *Ebert* and finds the factual scenario in this matter to be distinguishable. In *Ebert,* the plaintiff provided extensive testimony regarding the debilitating affects of headaches and her efforts to combat the pain with prescription medication and the use of ice and hot packs. *Id.* at * 8. Further, the vocational expert testified that the plaintiff's migraines would affect her ability to work. *Id.* Accordingly, the Court found that the ALJ minimized the frequency and affects of the plaintiff's headaches. *Id.* at *8. In this matter, the record does not include such evidence. Indeed, during the hearing, plaintiff testified vaguely about "joint pain" in her "body", "knee" and "ankle" but never addressed or discussed any limitations relating to her shoulder, wrist or knee. (T. 27). Rather, plaintiff testified that her inability to work was due to depression, fatigue and the symptoms from AIDS. (T. 40); *see McConnell,* 2008 WL 833968, at * 14 (at her hearing, the plaintiff mentioned several ailments when prompted to discuss any medical conditions that caused her pain but never brought her knee injury to light).

**\*6** Any error by the ALJ in failing to address these impairments at step two was harmless because the ALJ proceeded beyond step two and considered all of plaintiff's impairments including her musculoskeletal complaints. *See Kemp v. Comm'r of Soc. Sec.,* 2011 WL 3876526, at *8 (N.D.N.Y.2011).

Given the lack of medical evidence and subjective testimony regarding plaintiff's limitations, the Court finds that substantial evidence exists to support the ALJ's determination regarding the severity of plaintiff's shoulder, knee and wrist impairments.

## II. ALJ's Assessment of Plaintiff's Depression at Step Two

Plaintiff argues that the ALJ erred in concluding that plaintiff's depression was not a severe impairment. Plaintiff contends that the ALJ misapplied the Treating Physician Rule and misconstrued the evidence regarding her activities of daily living.

The Regulations require the ALJ to utilize a "special technique" at each step of the administrative review process when a claimant suffers from a mental impairment. *Rosado v. Barnhart,* 290 F.Supp.2d 431, 437 (S.D.N.Y.2003) (citations omitted); 20 C.F.R. §§ 404.1520a(a); 416.920a(a). First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable mental

impairment." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); see also Dudelson v. Barnhart, 2005 WL 2249771, at *12 (S.D.N.Y.2005). If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment [ ]." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). This process requires the ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and other evidence relevant to the impairment and its treatment. 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). If the first three areas are rated as "none" or "mild," and the fourth as "none," the ALJ will conclude that the mental impairment is not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

A diagnosis of depression, without more, does not suggest that a plaintiff's depression severely impairs her performance of any major life activity. See Torres v. Astrue, 550 F.Supp.2d 404, 411 (W.D.N.Y.2008). The medical evidence must show that depression precludes a plaintiff from performing basic mental work activities. See Snyder v. Astrue, 2009 WL 2157139, at *4 (W.D.N.Y.2009). Moreover, evidence that medication provides relief from the severity of a mental condition can provide substantial evidence to support a finding that a plaintiff is not disabled. Pennay, 2008 WL 4069114, at *5.

*7 Here, the ALJ discussed the "technique" and the applicable Regulations and found:

> As a result of this impairment, the claimant has no limitation of activities of daily living. The claimant reported the ability to take care of her personal needs. She cared for the needs of children. She shopped for groceries, prepared meals, cleaned her home and did the laundry. There is, at best, mild limitation in maintaining social

functioning. The claimant admitted to the ability to take public transportation and go to the grocery store. She was involved in community events and attended church. (T.).

**A. Medical Evidence**

On October 14, 2005, plaintiff was evaluated as a new patient at the VA Medical Center in Albany. (T. 274). Dr. Devorah Wasserman noted that plaintiff suffered from anxiety and depression and referred plaintiff for a consultation with the Behavioral Health Department. On October 25, 2005, Sheryl Fowler, a social worker, examined plaintiff and noted that she suffered from depression as a result of work-related stressors and a history of "severe abuse". (T. 270). On October 28, 2005, Dr. William Cox, a psychiatrist, evaluated plaintiff for complaints of insomnia and anxiety. (T. 266). Dr. Cox noted that plaintiff suffered from stress due to her job and finances and diagnosed plaintiff with adjustment disorder and a GAF of 60. Dr. Cox prescribed Trazodone for insomnia. [6] On November 1, 2005, plaintiff returned to Ms. Fowler complaining of "ongoing tension" with her job. Plaintiff noted that her family was "stable". Ms. Fowler advised plaintiff to continue with her medications and attend supportive sessions. (T. 266). On January 13, 2006, plaintiff was a "no show" for her appointment with Dr. Cox. On March 2, 2006, plaintiff was seen by Nurse Practitioner Judy Shaw in the Infectious Disease unit. (T. 261). NP Shaw noted that plaintiff was "no longer seeing mental health and feels stable". NP Shaw advised plaintiff to continue taking Trazodone but noted that plaintiff was, "much better". On August 29, 2006, plaintiff was examined by Dr. Cynthia Carlyn in the Infectious Disease unit. Dr. Carlyn noted that plaintiff was on leave due to medical and psychological problems.

On September 12, 2006, NP Shaw completed a Medical Report of Adult with Allegation of HIV. In that report, NP Shaw opined that plaintiff was, "very anxious, insomnia, joint pain, depression, wt. loss. Unable to work." (T. 278). NP Shaw also opined that plaintiff had marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence and pace.

On October 30, 2006, Dr. Brett Hartman conducted a psychiatric consultative evaluation of plaintiff at the request the agency. (T. 279–283). Plaintiff advised that she was taking Trazodone and treating with a psychiatrist, "once

a month". Plaintiff complained of insomnia, anxiety and depression. Plaintiff claimed that she was irritable, lost interest in activities and had considerable bouts of diarrhea. Plaintiff denied suicidal thoughts but was overwhelmed and "cleans compulsively". Plaintiff was able to care for her personal needs, cook, clean and shop. She could manage money but was forgetful so she did not drive. She was taking two college classes and during the day reported watching television, using the computer and going for walks. Dr. Hartman diagnosed plaintiff with major depressive order, mild to moderate, without psychotic features. He opined that she could follow and understand simple instructions; could perform simple tasks and learn new tasks; could make appropriate decisions; had fair attention and concentration and the ability to maintain a routine schedule; a fair ability to perform complex tasks independently; and mild difficulty relating to others and mild problems dealing with normal stressors.

**\*8** On December 10, 2006, plaintiff appeared for a routine visit with NP Shaw. NP Shaw noted that plaintiff was "happy and bubbly" and "doing very well" and "just happy with everything she is doing in life". (T. 340). NP Shaw opined that plaintiff may start to decrease her dose of Trazodone in the future. On March 9, 2007, NP Shaw noted that plaintiff was "doing very well". Plaintiff was taking classes at Schenectady Community College and was "proud that she was on the Dean's List". (T. 343). While plaintiff continued to take Trazodone at night, "she feels that she is in much better spirits overall since leaving her job. She feels very fulfilled and keeps herself busy with, family and school". (T. 344). NP Shaw noted that plaintiff's depression was well controlled with medication and her change in lifestyle.

On April 24, 2008, Dr. Carlyn and NP Shaw submitted a letter with their opinion regarding plaintiff's impairments:

> It is my opinion that Ms. Bergeron has held a steady job for her entire life and worked hard to support herself and her family. The medical diagnoses AIDS/HIV, Major Depressive Disorder, anxiety accompanied by constant symptoms of fatigue, diarrhea, insomnia and night sweats all support a finding of Ms. Bergeron to be disabled from the time period of August 24, 2006 (disability

onset date) until August 27, 2007 when she began her current part time job. [7]

(T. 325).

## B. Treating Physician Rule

The Second Circuit has defined a treating physician as one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Coty v. Sullivan,* 793 F.Supp. 83, 85–86 (S.D.N.Y.1992) (quoting *Schisler v. Bowen,* 851 F.2d 43 (2d Cir.1988)). Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78–79; *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993).

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. 404.1527(d)(2). The Regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel,* 134 F.3d 501, 503–504 (2d Cir.1998). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999). The regulations specify that an ongoing treatment relationship is generally found where an acceptable medical source treats a claimant "with a frequency consistent with accepted medical practice for the type of

treatment and/or evaluation required for [the claimant's] medical condition(s) ." *Shatraw v. Astrue,* 2008 WL 4517811, at *11 (N.D.N.Y.2008) (finding four physicians were not treating sources because they each only treated the Plaintiff once and therefore did not develop an ongoing treatment relationship with the Plaintiff). Thus, an acceptable medical source who has treated or evaluated a claimant only a few times, or only after long intervals, may still be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the] condition(s)." 20 C.F .R. § 404.1502; *see, e.g., Fernandez v. Apfel,* 1998 WL 812591, at *3–4 (E.D.N.Y.1998) (finding that a physician the Plaintiff saw six to eight times over the course of one and a half to two years was not a treating source because the Plaintiff did not see the physician with a frequency consistent with the severe mental impairment he claimed). Plaintiff claims that the ALJ erroneously disregarded opinions from her treating physicians including Dr. William Cox, Dr. Jeffrey Fisher and Dr. Cynthia Carlyn. For several reasons, the Court finds this argument to be without merit. While plaintiff correctly states that the ALJ did not mention Drs. Cox or Fisher, the Court can evaluate the treating physicians opinion through a review of the record. *Bavaro v. Astrue,* 413 F. App'x 382, 383 (2d Cir.2011). First, Drs. Cox and Fisher did not provide any opinion or medical source statement regarding plaintiff's alleged functional impairments. Second,, based upon the record, Drs. Cox and Fisher cannot be considered "treating physicians" as they examined plaintiff on only one occasion. The doctors did not provide plaintiff with the type of ongoing medical treatment that would define them as a "treating physician". *See George,* 692 F.Supp. at 219 (holding that the nature of the physician's relationship with the plaintiff did not rise to the level of a treating physician as the physician had only seen the plaintiff on two occasions); *see also Quinones v. Barnhart,* 2006 WL 2136245, at *7 (S.D.N.Y.2006) (holding that the treating physician's opinion was correctly afforded less weight as he only saw the plaintiff on one occasion). Moreover, Drs. Cox and Fisher did not treat plaintiff during the relevant period, rather, each examined plaintiff in 2005, three years before the administrative hearing and one year before the period of disability at issue. *See Bavaro,* 413 F. App'x at 384; *see also Bromback v. Barnhart,* 2004 WL 1687223, at *7 (S.D.N.Y.2004) (holding that the ALJ should not have relied on an evaluation that was made one year prior to the hearing). With respect to Dr. Carlyn, the ALJ discussed the April 2008 opinion [8] :

*\*9 Although Dr. Shaw described "constant" fatigue, diarrhea, insomnia and night sweats, the record shows there are occasions where the claimant did not report such symptoms, which is inconsistent with the physician's statements. Treatment records document that the claimant's HIV was under good control and treatment. Her CD4 count was 586. It was also documented that her depression had improved. She was described as very outgoing and bubbly and happy with everything she was doing in life. In March 2007, it was noted that the claimant was doing very well. She reported that she felt well and had gained some weight. Therefore, the Administrative Law Judge accords little weight to this opinion as it was not well supported by the objective findings set forth in the record". (T. 14).

Upon review, the Court finds that the ALJ provided sufficient reasons for failing to assign controlling weight to Dr. Carlyn's opinions. First, Dr. Carlyn cannot be considered a "treating physician" as she examined only plaintiff once in 2006. At the completion of Dr. Carlyn's August 2006 examination, she suggested that plaintiff continue with her course of treatment for HIV and discussed gynecological and dental issues with plaintiff. Dr. Carlyn provided no opinion, diagnosis or any comment on plaintiff's complaints of depression, anxiety or insomnia and provided no course of treatment for those complaints. Accordingly, Dr. Carlyn's April 2008 opinion is not supported by the her treatment records from her one-time examination of plaintiff nearly two years prior to issuing that opinion Generally, the ALJ has a duty to develop a deficient record, even if the claimant is represented by counsel. *See Rosa,* 168 F.3d at 179. While the ALJ has a duty to recontact treating physicians to obtain a complete medical history, 20 C.F.R. §§ 404.1212(e)(1), 416. 912(e)(1), the ALJ had no such duty in this matter because Drs. Carlyn, Cox and Fisher were not "treating physicians". Moreover, plaintiff has not identified any gaps in the record for the relevant closed period of disability that would require the ALJ to recontact any physician. *See Spruill v. Astrue,* 2008 WL 4949326, at *4 (S.D.N.Y.2008) (the record contained the treating physicians treatment notes for the dates that the plaintiff claims she was treated).

For the foregoing reasons, the Court finds that the ALJ properly applied the Treating Physician rule.

### C. Activities of Daily Living

Plaintiff further claims that the ALJ committed legal error in assessing plaintiff's activities of daily living with respect to her depression. In the decision, the ALJ cited to Dr. Brett

Hartman's psychiatric evaluation. Plaintiff claims that the ALJ ignored reports from NP Shaw and Dr. Carlyn and other portions of plaintiff's administrative hearing testimony that contradict Dr. Hartman's report.

As previously discussed, in September 2006, NP Shaw opined that plaintiff had marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence and pace. Further, in April 2008, NP Shaw co-authored a letter with Dr. Carlyn and opined that plaintiff suffered from, *inter alia*, major depressive disorder, anxiety and insomnia.

**\*10** The ALJ discussed NP Shaw's assessment:

> Judy Shaw, NP, reported that the claimant had repeated manifestations of HIV infection with documented symptoms including fatigue, weight loss, pain and night sweats. She noted marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. The claimant was very anxious. She had insomnia, joint pain, depression and weight loss. Shaw further concluded that the claimant was unable to work. Although great weight cannot be accorded to the opinion of a nurse practitioner, the Administrative Law Judge has given careful consideration to this opinion and finds that it is not consistent with the medical evidence as a whole. A review of the claimant's VA progress notes do not reflect allegations of difficulties in completing tasks. As noted above, there was very little in the way of treatment records for her alleged mental impairment. (T. 14).

Upon a review of the record, the Court finds that the ALJ properly assessed NP Shaw's opinions and provided adequate reasons for not affording controlling weight to NP Shaw's conclusions. As the ALJ correctly noted, NP Shaw was not a treating source subject to the treating physician rule because a nurse practitioner is not an acceptable medical source. *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (citing 20 C.F.R. §§ 404.1513(d),

416.913(d) (listing a nurse practitioner as an other source, and not an acceptable medical source)). Accordingly, the ALJ was not compelled to afford NP Shaw's opinions controlling weight. However, even assuming the ALJ assigned significant weight to NP Shaw's September 2006 opinion, that opinion does not support plaintiff's claim that she suffers from limitations in daily living. Indeed, in Section 42b of the form completed by NP Shaw, the author is whether plaintiff's impairments resulted in "marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in completing tasks in a timely manner due to deficiencies in concentration persistence or pace". In response to that inquiry, NP Shaw only checked the box for "marked difficulties in completing tasks in a timely manner due to deficiencies in concentration persistence or pace".

NP Shaw's opinions are also contradicted by the weight of the credible evidence. The only "mental health" impairment for which plaintiff received medication was insomnia. Additionally, all treatment notes indicate that plaintiff's insomnia was "well controlled". NP Shaw's treatment records describe plaintiff as "bubbly", "happy", "proud to be on the Dean's List", "fulfilled" and "busy with her family and school". (T. 344).

Additionally, plaintiff's subjective testimony is not support by her treatment records. Plaintiff testified that she was depressed due to the fact that she had AIDS and that she had anxiety over whether she would infect other officers or inmates at her job. (T. 24–25). During the closed period, she claimed that she considered taking her own life, she was depressed, guilty and full of shame. (T. 26). Plaintiff also testified that she watched television, walked about two blocks on an average day, cleaned for five to ten minutes, and took on-line college classes. (T. 26). The treatment records from NP Shaw, Dr. Carlyn, Dr. Cox, Sheryl Fowler are completely devoid of any reference to suicidal thoughts or depression. Further, while plaintiff testified to such impairments, the records indicate that plaintiff was on the Dean's List, cleaned "compulsively", cooked, and shopped. (T. 279–283).

**\*11** Upon review of the record, the Court finds that there is substantial evidence to support the ALJ's decision that plaintiff's depression was a non-severe impairment as it did not prevent her from engaging in substantial gainful activity. Consequently, as substantial evidence supports the ALJ's decision that plaintiff's mental impairments were not medically determinable impairments, the ALJ did not err

when he failed to analyze plaintiff's impairments with respect to Paragraph "B" criteria.

### III. Listing 14.08N

An ALJ faced with an HIV-related disability must evaluate the claimant's allegations under Listings 14.00 (immune system disorders) and 14.08. *Milien v. Astrue,* 2010 WL 5232978, at *7 (E.D.N.Y.2010). Listing 14.08N was amended in June 16, 2008. The new listing, 14.08K, provides:

> Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A–J, but without the requisite findings for those listings (for example, carcinoma of the cervix not meeting the criteria in 14.08E, diarrhea not meeting the criteria in 14.08I), or other manifestations (for example, oral hairy leukoplakia, myositis, pancreatitis, hepatitis, peripheral neuropathy, glucose intolerance, muscle weakness, cognitive or other mental limitation) resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

*Haddock v. Astrue,* 2009 WL 3162170, at *7 (D.Colo.2009). "The listing for HIV at 14.08(N) clearly states that the HIV infection must result in the symptoms and limitations." *Id.* A plaintiff will not be found "disabled" due to HIV where the accompanying impairments were "isolated incidents" rather than "chronic" ailments. *See Roman v. Barnhart,* 477 F.Supp.2d 587, 598 (S.D.N.Y.2007).

### A. Medical Evidence

In October 2005, plaintiff sought treatment for HIV at the VA Medical Center in Albany. Plaintiff believes she contradicted the disease by way of a blood transfusion in 1981 following the delivery of her child in Germany. In 1989, while on active duty with the military in Germany, plaintiff was tested however, she was never informed or treated for the illness. In December 2005, after undergoing testing and consultations, plaintiff began a course of therapy and treatment including medication. In March 2006, plaintiff was treated by NP Shaw

after "a couple of missed appointments". (T. 261). Plaintiff had gained weight, denied any side effects including rash or vivid dreams and had a good response to her therapy. During plaintiff's June 2006 follow up, her condition was the same with her CD4 count about 200. (T. 260). During her July 2006 appointment, plaintiff denied experiencing any night sweats, headaches or fever. (T. 258). NP Shaw noted that her HIV "continues to be very well controlled".

*12 On August 26, 2006, plaintiff was treated by Dr. Carlyn with complaints of diarrhea, fatigue, hip pain, shoulder pain and fears and anxiety regarding her illness. (T. 254). Plaintiff's T-cell count was in the mid–500 range after being as low as 161. (T. 256). Upon examination, Dr. Carlyn noted that plaintiff was, "thin".

On September 12, 2006, NP Shaw completed a Medical Report on Adult with Allegation of HIV Infection. (T. 276). NP Shaw noted that plaintiff's HIV was diagnosed through laboratory testing and further opined that plaintiff suffered from HIV Wasting Syndrome and diarrhea.[9] NP Shaw noted that plaintiff experienced night sweats every night for eight hours, diarrhea two to three times a month, three or four times a day and daily fatigue. (T. 278).

On December 8, 2006, plaintiff had a routine visit with NP Shaw. At that time, plaintiff's CD4 count was 586 and Nurse Shaw noted, "she had good control of her HIV virus again". (T. 340). Plaintiff denied any side effects from her medication. NP Shaw noted that plaintiff retired from her position at the Schenectady County jail and was working as a teacher's assistant and taking classes at the community college.

In March 2007, during a routine visit, NP Shaw noted that plaintiff had gained some weight. (T. 343). Plaintiff had no physical complaints and while she continued to take Trazodone at night, she felt very fulfilled and in much better spirits. In May 2007, plaintiff was seen for an "urgent" visit complaining of a cough and low grade fever. NP Shaw noted, "[e]arlier she also had myalgia, anorexia, and nausea". Plaintiff's temperature was 99.3 and upon examination, NP Shaw did not detect any oral lesions. NP Shaw ordered a chest x-ray to rule out pneumonia and prescribed medication for plaintiff's cough. (T. 343).

### B. Analysis

Plaintiff argues that the ALJ erred because the decision does not mention Listing 14.08N. The Commissioner contends that Listing 14.08N is no longer in effect. The parallel listing is 14.08K and defendant argues, the medical evidence does not demonstrate that plaintiff meet that listing. The ALJ did not specifically mention Listing 14.08K or 14.08N but discussed the criteria for those listings in relation to plaintiff's HIV and found:

> Although the claimant has had a longstanding history of HIV the record shows that she has had good response to anti-retroviral treatments and has been in stable condition. The record does not reflect any bacterial infections, fungal infections, protozoan infections, viral infections, malignant neoplasms, hematologic abnormalities, neurological abnormalities, HIV wasting syndrome, cardiomyopathy, or other opportunistic infections. There was no evidence that she had diarrhea lasting for one month or longer that was resistant to treatment. There is similarly no evidence of marked limitations in activities of daily living, social functioning, or in her ability to complete tasks in a timely manner.

**\*13** (T. 11–12); *see Diaz v. Comm'r of Soc. Sec.,* 89 F. App'x 323, 327 (3d Cir.2004) (the ALJ did not explicitly name each listing but, "his reference to the criteria for those listings is an adequate indicator that these listings were, in fact, considered").

As noted in Parts IIB and IIC, the ALJ discussed NP Shaw's opinions:

> Judy Shaw, NP, reported that the claimant had repeated manifestations of HIV infection with documented symptoms including fatigue, weight loss, pain and night sweats. She noted marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. The claimant was very anxious. She had insomnia, joint pain, depression and weight loss. Shaw further

> concluded that the claimant was unable to work. Although great weight cannot be accorded to the opinion of a nurse practitioner, the Administrative Law Judge has given careful consideration to this opinion and finds that it is not consistent with the medical evidence as a whole. A review of the claimant's VA progress notes do not reflect allegations of difficulties in completing tasks. As noted above, there was very little in the way of treatment records for her alleged mental impairment. (T. 14).

As previously noted, the ALJ also discussed the April 2008 opinion:

> Although Dr. Shaw described "constant" fatigue, diarrhea, insomnia and night sweats, the record shows there are occasions where the claimant did not report such symptoms, which is inconsistent with the physician's statements. Treatment records document that the claimant's HIV was under good control and treatment. Her CD4 count was 586. It was also documented that her depression had improved. She was described as very outgoing and bubbly and happy with everything she was doing in life. In March 2007, it was noted that the claimant was doing very well. She reported that she felt well and had gained some weight. Therefore, the Administrative Law Judge accords little weight to this opinion as it was not well supported by the objective findings set forth in the record". (T. 14).

Upon review of the record, the Court finds that substantial evidence supports the ALJ's conclusion that plaintiff's HIV does not meet or medically equal a listed impairment. NP Shaw's opinion that plaintiff suffered from HIV Wasting Symptom is not supported by the objective evidence. According to plaintiff's records, from the time she began treatment until May 2007, plaintiff's weight increased over

ten pounds. In March and June 2006, plaintiff weighed 125 pounds. (T. 262). In July 2006, plaintiff weighed 128 pounds (T. 258) and in August 2006, she gained one pound. In December 2006, plaintiff weighed 132.8 pounds and in March 2007, plaintiff weighed 137 pounds. (T. 343). While NP Shaw noted plaintiff suffered from "anorexia" in May 2007, there is no indication in that treatment note that she was weighed during that visit and there is no prior reference in the record to anorexia.

 **\*14**  NP Shaw also opined that plaintiff suffered from diarrhea. During the administrative hearing, plaintiff testified that during the closed period, she suffered from diarrhea two to three times a week causing her to use the bathroom three times a day. (T. 24). However, the treatment notes belie plaintiff's statements and NP Shaw's opinion. In August 2006, plaintiff made complained of diarrhea to Dr. Carlyn. However, Dr. Carlyn's records are devoid of any further mention of diarrhea beyond plaintiff's complaint. Plaintiff did not receive any intravenous hydration, tube feeding or other prescription medication for her complaint of diarrhea and there are no other complaints in the record. NP Shaw also stated that plaintiff suffered from night sweats on a daily basis but that claim is wholly unsupported by plaintiff's subjective complaints or treatment records. Finally, NP Shaw opined that plaintiff suffered from insomnia due to her illness. However, the treatment records indicate that plaintiff's insomnia was well controlled with Trazodone and further, in December 2006, NP Shaw discussed the possibility of decreasing the dosage. (T. 341).

All evidence indicates that plaintiff responded well to her HIV treatment and that her disease was well-controlled with her antiretroviral therapy. *See Rumph v. Astrue,* 2010 WL 2976909, at \*5 (S.D.Fla.2010) (the plaintiff was in "overall good health" supporting the ALJ's decision that plaintiff did not meet Listing 14 .08K). Moreover, plaintiff's CD4 count increased steadily while she was taking her medication and she denied any side effects from her treatment. [10] *See Roman,* 477 F.Supp.2d at 589 (the plaintiff's impairments did not satisfy 14.08 as her records indicated she was doing well on her regimen and her CD4 count increased).

Even assuming plaintiff meets the requirements of 14.08K, she still must demonstrate restrictions of daily activities, difficulties in maintaining social functioning, or difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. NP Shaw opined that plaintiff suffered from marked difficulties due to deficiencies

in concentration, persistence and pace. However, as this Court previously discussed, NP Shaw's opinions are not entitled to controlling weight and further, are unsupported by her treatment records.

Accordingly, substantial evidence supports the ALJ's conclusion at step three that plaintiff does not meet Listing 14.08K.

### IV. Residual Functional Capacity ("RFC")

Residual functional capacity is:

> "what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

 **\*15** *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at \*2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a).

Plaintiff argues that the ALJ failed to properly assess her credibility and further claims that the ALJ committed reversible error when he failed to make specific findings regarding plaintiff's RFC. [11]

### A. Credibility

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with

his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence. See SSR 96–7p, 1996 WL 374186, at *2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record. SSR 96–7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. Saxon v. Astrue, 781 F.Supp.2d 92, 105 (N.D.N.Y.2011) (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. Melchior v. Apfel, 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. Howe–Andrews v. Astrue, 2007 WL 1839891, at *10 (E.D.N.Y.2007).

**\*16** In this case, the ALJ determined:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with

the above residual functional capacity assessment. (T. 12).

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ correctly applied the standard, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility. The ALJ discussed plaintiff's daily activities, i.e., housework, community activities and social/physical exertions, and found that they, "are not limited to the extent one would expect, given the complaints of disability symptoms and limitations". The ALJ thoroughly discussed plaintiff's subjective complaints, including the frequency and intensity of her symptoms, including diarrhea, joint pain, depression, insomnia and anxiety and the lack of support, in the record, for those complaints. The ALJ also discussed plaintiff's treatment including her prescription for Trazodone and the lack of any complaints regarding side effects from medication. (T. 13).

Taken as a whole, the record supports the ALJ's determination that plaintiff was not entirely credible. The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of pain and adequately specified the reasons for discrediting plaintiff's statements.

## B. Function–By–Function [12]

The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1545. [13] To determine RFC, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity. 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); Martone v. Apfel, 70 F.Supp.2d 145, 150 (N.D.N.Y.1999). Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy. Hogan v. Astrue, 491 F.Supp.2d 347, 354 (W.D.N.Y.2007). Further, the ALJ "must discuss the [plaintiff's] ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) ..., and describe the maximum amount of each work-related activity the individual can perform ..." Yates v.

*Comm'r of Soc. Sec.,* 2011 WL 705160, at *6 (N.D.N.Y.2011) (citing SSR 96–8).

**\*17** In this Circuit, the Southern District has held that a "function-by-function" analysis is "desirable". *Kelly v. Astrue,* 2011 WL 817507, at 8* (N.D.N.Y.2011) (citing *Casino–Ortiz v. Astrue,* 2007 WL 2745704, at * 13 (S.D.N.Y.2007)). However, the Eastern, Western and Northern Districts have remanded based upon the ALJ's failure to explicitly discuss a function by function analysis. *Id.* (citations omitted).

In the case at hand, the ALJ found that plaintiff, "has the residual functional capacity to perform the full range of sedentary work". (T. 12). The ALJ relied upon the opinion given by Amelita Balagtas, M.D. and concluded:

> Amelita Balagtas, M.D. reported that the claimant would have a slight to moderate limitations [sic] in activities that require bending, lifting, prolonged sitting, standing, walking, and in activities that require lifting, carrying, and reaching involving the right upper extremity. The Administrative Law Judge has given careful consideration to this opinion and it is reflected in the residual functional capacity cited above. (T. 14–15).

The ALJ did not discuss the amount which plaintiff could lift and/or carry or the amount of time plaintiff could walk, stand, and sit. The ALJ merely reported his RFC finding in conclusory fashion devoid of specifics regarding plaintiff's precise limitations. In the decision, the ALJ did not specifically assign weight to Dr. Balagtas' opinion, but clearly relied upon the doctor's findings in formulating the RFC. Dr. Balagtas examined plaintiff once and did not provide a functional analysis. Rather, the doctor opined that plaintiff had "slight to moderate limitations". Thus, Dr. Balagtas' opinion failed to provide the necessary information to enable the ALJ to properly assess plaintiff's RFC. *See Bennett v. Astrue,* 2009 WL 1035106, at * (N.D.N.Y.2009) (citing *Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir.2000) (holding that consulting physicians opinion that the plaintiff's impairment was "lifting and carrying moderate"; standing and walking, pushing and pulling and sitting mild" lacked specificity and did not permit the ALJ to make the necessary inference that the plaintiff could perform the exertional requirements of sedentary work)); *but see Shatraw,* 2008 WL 4517811, at * 14

(while specific findings were omitted from the RFC, the ALJ properly relied upon the consulting physicians opinion that the plaintiff could lift up to 20 pounds, stand and walk up to 6 hours a day, and sit for up to 6 hours a day as the conclusions were consistent with the definition of "light work").

Upon a review of the record, the ALJ did not sufficiently explain the basis for his RFC assessment and therefore, the Court cannot discern whether the proper legal standard was applied. *See Hodge v. Astrue,* 2009 WL 1940051, at * 10 (N.D.N.Y.2009). The ALJ stated the RFC, assessed plaintiff's credibility and reviewed NP Shaw's and Dr. Carlyn's opinions but erroneously failed to identify any restrictions resulting from plaintiff's HIV, which the ALJ found severe. In failing to do a function-by-function assessment, the ALJ may make the mistake warned of in SSR 96–8p. *Mardukhayev v. Comm'r of Soc. Sec.,* 2002 WL 603041, at *5 (E.D.N.Y.2002) (internal citation omitted) (failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions."). The Social Security Rulings are binding. *See Robins v. Astrue,* 2011 WL 2446371, at *4 (E.D.N.Y.2011). Thus, the case is remanded for proper evaluation of plaintiff's RFC including a function by function analysis of plaintiff's limitations. *See Bennett,* 2009 WL 1035106, at *13.

## V. Vocational Expert and the Medical–Vocational Guidelines

**\*18** Plaintiff argues that the ALJ erred in failing to elicit vocational expert testimony in this case, and instead relying exclusively on the Medical–Vocational Guidelines, or "grids." (Dkt. No. 14, p. 27).

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grids. *Rosa,* 168 F.3d at 78; *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986). The grids take into consideration a claimant's RFC, as well as his or her age, education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy. *Rosa,* 168 F.3d at 78. Whether or not the grids should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved. *Bapp,* 802 F.2d at 605. If a plaintiff's situation fits well within a particular classification, then resort to the grids is appropriate. *Id.* If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then

use of the grids is inappropriate, in which case further evidence and/or testimony is required. *Rosa,* 168 F.3d at 78; *Bapp,* 802 F.2d at 605–06. In such cases, the ALJ may rely on the grids only as a framework for decision-making. 20 C.F.R. § 416.969a(d). Nonexertional limitations include postural limitations such as limitations in climbing, reaching, stooping, crawling, balancing, and kneeling. § 416.969a(c). As one court has explained, [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain. *Sobolewski v. Apfel,* 985 F.Supp. 300, 310 (E.D.N.Y.1997) (citing 20 C.F.R. § 404.1569(a), (c)).

As discussed, the ALJ failed to properly assess the RFC, thus the findings made at the fifth step of the sequential analysis are affected. The Court has already determined that remand is necessary for further proceedings with respect to plaintiff's functional limitations. On remand, an analysis may require the testimony of a vocational expert regarding the effect that any nonexertional impairments may have on the plaintiff's ability to perform basic work activities. *See Pronti v. Barnhart,* 339 F.Supp.2d 480, 487 (W.D.N.Y.2004).

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED,** as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**\*19 ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2011 WL 6255372, 173 Soc.Sec.Rep.Serv. 116

## Footnotes

1    "(T.)" refers to pages of the Administrative Transcript, Dkt. No. 7.

2    The record contains Dr. D'Ascoli's treatment records from November 1998 through May 2003. While the November 1998 visit is the first treatment note, the record reads, "Michele is seen her [sic] for her final visit to close out her case". (T. 244).

3    In October 2005, plaintiff began treating at the VA Medical Center in Albany. On September 14, 2006, she was treated by Nurse Practitioner Judy Shaw in the Infectious Disease Department.

4    A ganglion cyst is a noncancerous fluid-filled lump formed on the elbow, knee, foot, shoulder, wrist, toe or finger. *Dorland's Illustrated Medical Dictionary,* 768 (31st ed.2007).

5    Plaintiff claims that she suffers from various musculoskeletal complaints. However, the record only contains complaints and treatment relating to her right shoulder, right wrist and right knee. As to plaintiff's hip pain, bone density scans taken in August 2006 were normal. (T. 251–253).

6    Trazodone is an antidepressant medication. *Dorland's* at 1336, 2125.

7    The April 2008 letter is co-authored by Dr. Carlyn and N.P. Shaw. The ALJ erroneously referred to "Dr. Shaw" in the opinion. (T. 14).

8    The ALJ erroneously referred to Dr. Shaw rather than Dr. Carlyn.

9    The report defined HIV Wasting Syndrome as "involuntary weight loss of 10 percent or more of baseline and, in the absence of a concurrent illness that could explain the findings, involving: chronic diarrhea with 2 or more loose stools daily lasting for 1 month or longer; or chronic weakness and documented fever greater that 100.4 degrees F for the majority of 1 month or longer". Diarrhea was defined as, "lasting for 1 month or longer, resistant to treatment, and requiring intravenous hydration, intravenous alimentation or tube feeding". (T. 277).

10   In March 2006, plaintiff's CD4 count increased from less than 200 to 409. (T. 262). In December 2006, plaintiff's CD4 count was 586. (T. 340). In January and March 2007, plaintiff's CD4 count was 454 but was still 21%. (T. 339, 342).

11    Plaintiff also argues that the ALJ failed to properly apply the Treating Physician rule. However, the Court has already addressed that contention and the analysis will not be repeated herein.

12    While defendant argued that the RFC is supported by substantial evidence, the Commissioner did not address plaintiff's argument regarding the omission of a "function-by-function" assessment.

13    The functions in paragraph (b) of sections 404.1545 and 416.945 include "certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching) ...." 20 C.F.R. §§ 404.1545(b), 416.945(b). The functions in paragraph (c) of sections 404.1545 and 416.945 include "certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting...." 20 C.F.R. §§ 404.1545(c), 416.945(c). The functions in paragraph (d) of sections 404.1545 and 416.945 include "[s]ome medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions ...." 20 C.F.R. §§ 404.1545(d), 416.945(d); *see also Schmidt v. Astrue,* 2010 WL 3807137, at *4, n. 2 (N.D.N.Y.2010).

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4703599
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.

Maureen P. DAILEY, Plaintiff,

v.

Michael J. ASTRUE Commissioner
of Social Security, Defendant.

No. 09–CV–0099(A)(M).
|
Oct. 26, 2010.

**Attorneys and Law Firms**

Amanda R. Jordan, Law Offices of Kenneth Hiller, Amherst, NY, for Plaintiff.

Kevin D. Robinson, U.S. Attorney's Office, Buffalo, NY, for Defendant.

**REPORT AND RECOMMENDATION**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

**\*1** This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. § 636(b)(1)(B) [4]. [1] Before me are the parties' cross motions for judgment on the pleadings pursuant to Fed.R.Civ.P. ("Rule") 12(c) [8, 10]. For the following reasons, I recommend that defendant's motion be denied and that plaintiff's cross-motion be granted in part and denied in part.

**PROCEDURAL BACKGROUND**

Pursuant to 42 U.S.C. § 405(g), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her application for Supplementary Security Income ("SSI"). Complaint [1]. Plaintiff filed an application for SSI on March 6, 2006, which was denied (T30–34). [2] A hearing was held before Administrative Law Judge Robert T. Harvey on August 25, 2008 (T480–519). Plaintiff was represented by

Amanda R. Jordan, Esq. *Id.* In a decision dated September 26, 2008, ALJ Harvey found that although plaintiff was disabled, her drug and alcohol abuse were contributing factors material to the determination of disability and that, absent her substance abuse, plaintiff would be found not disabled (T12–23) As a result, ALJ Harvey denied plaintiff's claim. *Id.* On January 12, 2009, the Appeals Council denied plaintiff's request for review, and ALJ Harvey's decision was adopted as the Commissioner's final decision (T4–6). This action followed.

**THE ADMINISTRATIVE RECORD**

Plaintiff sought SSI due to depression, post-traumatic stress disorder ("PTSD"), Hepatitis C, and mitral valve prolapse (T55).

**A. Relevant Medical Evidence**

**1. Treatment at Kaleida Health**
Plaintiff sporadically received substance abuse treatment at Kaleida Health in 2003 and 2005 (T251–261). During this time, plaintiff was using heroin, cocaine and opiates (257–258).

From June 2006 through December 2007, plaintiff again received substance abuse treatment at Kaleida (T204–250). On September 13, 2007, while still in treatment, plaintiff reported that she had used crack two days earlier (T250). She also admitted to smoking crack on December 10, 2007 (T204). Plaintiff was diagnosed with post-traumatic stress disorder, cocaine dependence, and Hepatitis C, as well as polysubstance dependence (T207, 213, 218). Plaintiff has been treated with methodone, Seroquel and Effexor (T210). As of September 13, 2007, plaintiff had 15 previous rehab hospitalizations and 12 psychiatric hospitalizations. *Id.* She was assessed with GAF scores of 50, 52, and 58 during this period (T207, 213, 218). [3]

**2. Treatment at Hope Haven**
Plaintiff received in-patient treatment at United Memorial Medical Center, Hope Haven from October 11, 2005 through November 10, 2005 (T115–135). On discharge, she was diagnosed with cocaine dependence, opiate dependence, and a history of psychosis (T125). She had abused alcohol four days prior to admission to Hope Haven, used marijuana

two months earlier, used heroin two weeks earlier, and used cocaine six months earlier (T116).

### 3. Treatment at Medina Memorial Health Center

**\*2** Plaintiff received treatment at the Medina Memorial Health Center for multiple symptoms associated with the withdrawal from alcohol and cocaine use from March 17, 2006 through March 21, 2006 (T139). She was prescribed methodone, Effexor and Seroquel. *Id.*

### 4. Treatment at Clearview Treatment Services

Plaintiff received in-patient treatment at Clearview Treatment Services from March 21, 2006 through April 9, 2006 (T141–145). She reported an extensive substance abuse history (T192).

During her treatment at Clearview, plaintiff reported no mental health issues, except for hearing voices on two occasions. Frank Ferraro, M.D. attributed this to her possibly hearing actual voices when she would fall asleep during group therapy sessions and the staff would call her name in an attempt to wake her (T143).

On the nineteenth day of her treatment, plaintiff left the facility against medical advice after she became belligerent with a staff member (T143–144). Plaintiff left treatment alert and oriented (T145). Dr. Ferraro diagnosed plaintiff with alcohol, cannabis, cocaine and opiate dependence, Hepatitis C, mitral valve prolapse, and depression with severe psychosis (T141). He assessed plaintiff to have a GAF of 37 (T141). [4]

### 5. Treatment at Sheehan Memorial Hospital

Plaintiff began in-patient treatment at Sheehan Memorial Hospital on November 13, 2006, for detoxification due to her progressive and excessive use of alcohol and cocaine (T263). Plaintiff told doctors that she drank a liter of vodka a day and used fifty dollars worth of crack cocaine per day (T265). Because plaintiff exhibited withdrawal symptoms, she was admitted to a medically-managed detoxification program, but she was discharged on November 15, 2006 because she "violated the admission criteria for safety". *Id.* Plaintiff was discharged in a stable condition. *Id.*

### 6. Treatment at Niagara Falls Memorial Medical Center

On November 17, 2006, soon after her discharge from Sheehan Memorial, plaintiff went to the Niagara Falls Memorial Medical Center, complaining that she heard voices (T351). Plaintiff admitted that she used crack the previous day and was having thoughts of suicide (T352). Plaintiff was admitted for psychiatric treatment and diagnosed with major depression with recurrent psychiatric fantasies, opiate dependency, cocaine abuse, alcohol abuse in remission, personality disorder, hepatis C, and mitral valve prolapse (T358). Her GAF was assessed to be between 20 and 30 at intake, but increased to 50 at discharge (T360). Plaintiff received inpatient treatment until November 27, 2006 (T347).

### 7. Treatment at Cazenovia Recovery Systems, Inc.

From January 2008 through June 2008, plaintiff attended treatment at Cazenovia Recovery Systems (T331–345). During a January 15, 2008 evaluation, plaintiff admitted to drinking alcohol on New Years Day, using crack five days earlier, and smoking marijuana two months earlier (T336). She claimed to have last used heroin two years ago. *Id.* Plaintiff was assessed with a GAF of 45 (T345).

### 8. Consultative Evaluations

**\*3** On May 18, 2006, Fenwei Meng, M.D., performed an internal medicine examination of plaintiff (T156–159). Her daily activities included cleaning, cooking, shopping, laundry, watching television and listening to the radio (T157). Dr. Meng reported normal findings, and opined that plaintiff had no limitations in speech, hearing, or vision, as well as full functioning in the spine, upper and lower extremities (T158).

On February 12, 2008, Kathleen Kelley, M.D., also performed an internal medicine examination (T198–201). Plaintiff stated that her only problem was Hepatitis C (T198). She also stated that "she cooks twice a week because she sees 'bugs', and she is scared" Dr. Kelley's clinical examination revealed normal findings, but that the plaintiff should not work with sharp objects, at heights, or with heavy equipment (T199–201). Dr. Kelley stated that plaintiff had no other limitations (T201).

Plaintiff was evaluated on May 18, 2010 by Renee Baskin, M.D., a psychologist (T160–164). Plaintiff reported that she completed the eleventh grade and planned to eventually obtain her GED (T160). She stated that she was employed in 1996, but left that position due to her drug use, and that she currently did not work because she did not "like human beings". *Id.* Plaintiff also admitted to a history of drug and

alcohol abuse, but that she had ended her drug and alcohol use on March 17, 2006, and had been clean ever since (T161). Plaintiff also told Dr. Baskin that she could perform all activities of daily living by herself (T163).

Dr. Baskin determined that plaintiff's manner of relating, social skills, and overall presentation were adequate, and noted that she responded to questions and was cooperative (T162). There was no evidence of hallucinations, delusions, or paranoia. *Id.* Plaintiff demonstrated intact attention and concentration, could perform simple calculations, and showed intact recent and remote memory skills. *Id.*

Dr. Baskin determined that plaintiff's intellectual functioning was low to below average, insight was limited, and judgment was fair. *Id.* She diagnosed plaintiff with depressive disorder, polysubstance dependence/abuse in very early remission, and personality disorder with borderline features (T163). She determined that plaintiff could understand and follow simple instructions independently, and could perform complex tasks with supervision; however, plaintiff may have trouble making appropriate decisions, relating to others, and dealing with stress. *Id.*

Dr. Baskin determined that plaintiff's "[d] ifficulties would be due to a history of substance abuse and very little time in recovery, as well as chronic and pervasive psychiatric illness. The results of the examination appear to be consistent with psychiatric and substance abuse problems, and this may significantly interfere with claimant's ability to function on a daily basis." *Id.*

On February 12, 2008, Thomas Ryan, Ph.D., a psychologist, evaluated plaintiff (T194–197). Plaintiff reported that she could dress, bathe, and groom herself, and that she performed some household chores with the help of a male friend who lived with her (T196). Plaintiff also told Dr. Thomas that she had never abused alcohol, that she had not used heroin or cocaine since 2004, and that she continued to receive methadone treatment (T195). Dr. Ryan noted that plaintiff's current symptoms of insomnia, dysphoric mood, irritability and auditory hallucinations could be related to her alcohol and drug dependence, and withdrawal. *Id.*

**\*4** Dr. Ryan noted that plaintiff's language and thought processes were coherent, her cognitive functioning was average to low average, and her insight and judgment were poor (T195–196). He diagnosed plaintiff with post-traumatic stress disorder and polysubstance abuse, in remission with methadone maintenance (T197). Dr. Ryan also noted that plaintiff demonstrated no significant limitations in her ability to perform simple tasks, maintain a regular schedule, and follow and understand simple directions (T196). However, he opined that plaintiff had significant limitations in performing complex tasks, making appropriate decisions, relating to others, and dealing with stress. *Id.* He found that these limitations were "consistent with psychiatric problems, which may interfere to some degree on a daily basis" (T197).

### 9. Hillary Tzetzo, M.D.'s Examination

Dr. Tzetzo, a state agency review physician, reviewed plaintiff's medical records in July 2006, and determined that plaintiff's mental impairments did not meet or equal the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (T168–184). Based upon her mental and substance addiction disorders, Dr. Tzetzo opined that plaintiff could maintain attention, understand a work supervisor, follow directions in a work setting with limited public contact, and use judgment to make work-related decisions (T168, 180).

### B. August 25, 2008 Administrative Hearing

Plaintiff testified that she was born in 1967 (T484) and completed the eighth grade in special education classes, but was able to read and perform simple arithmetic (T485–487). Plaintiff reported that she was also able to write phone messages and count change, but that she was unable to write a check (T486–487). At the time of the hearing, plaintiff lived in a residential facility for substance abusers where she mopped, swept, did laundry, and made her bed (T501–502).

Although she received no treatment for her Hepatitis C, she reported that the condition caused her to be fatigued (T488). Likewise, her depression resulted in mood swings, loss of appetite, and sometimes caused her to remain in bed for an entire day (T488–489). Plaintiff also stated that she experienced visual and audio hallucinations, such as people calling her name (T491–492). Plaintiff reported that she last attempted to hurt herself in March 1998 (T494).

At the time of the hearing, plaintiff took methadone and testified that she believed that she would relapse if she stopped taking it (T488). Plaintiff started using cocaine in 1992, but ceased doing so in 2007 (T498–499). Similarly, plaintiff began using heroin in 1997, and stopped in 2006 (T497). Plaintiff stated that she wanted to stop abusing drugs and alcohol because they made her symptoms worse

(T500). However, plaintiff also testified that her mental health condition has remained the same despite being sober since March 2008 (T512).

### C. ALJ Harvey's September 25, 2008 Decision

**\*5** ALJ Harvey found that plaintiff had the severe impairments of methadone dependence, depression, and post-traumatic stress disorder, and the non-severe impairment of Hepatitis C (T18). ALJ Harvey found based on all of plaintiff's impairments, including substance abuse disorder, and her RFC, that there were no jobs in the national economy she could perform (T21).

However, ALJ Harvey further found that her "substance use disorder is a contributing factor material to the determination of disability" (T23). He also found that if plaintiff was to stop using drugs and alcohol, her RFC would permit her to perform a significant number of jobs in the national economy. *Id.*

### ANALYSIS

### A. Scope of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "the findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". *Consolidated Edison Co. Of New York, Inc. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner. *See Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. *See Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. *Martin v. Shalala,* 1995 WL 222059, \*5 (W.D.N.Y.1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, the court must first determine "whether the Commissioner applied the correct legal standard". *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). "Failure to apply the correct legal standards is grounds for reversal." *Townley,* 748 F.2d at 112.

### B. The Disability Standard

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

**\*6** The determination of disability entails a five-step sequential evaluation process:

> "1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity [ ("RFC") ] to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000). *See* C.F.R. §§ 404.1520, 416.920.

"New regulations, effective August 23, 2003, limit the Commissioner's burden at step five. *See* 20 C.F.R. 404.1560(c) ... The Commissioner's step-four RFC determination (with the claimant bearing the burden of proof) now controls at both steps four and five.... The Commissioner applies the RFC determination from step four to meet his burden at step five. Using the claimant's RFC, the Commissioner must then show at step five that 'there is other gainful work in the national economy which the claimant could perform.' " *Spain v. Astrue,* 2009 WL 4110294, *3 (E.D.N.Y.2009).

Plaintiff raises a series of challenges to ALJ Harvey's decision, including (1) that compliance with a prescribed course of methadone treatment cannot be considered under the drug addiction and alcoholism ("DA & A") regulations [5] to be a "contributing factor material to" plaintiff's disability and that the DA & A regulations cannot be applied to deny benefits because of the medically documented side effects of a medically prescribed course of treatment (plaintiff's memorandum of law [10], Points I and II); (2) that plaintiff's daily activities are not inconsistent with a finding that she is disabled (*id.,* Point III); (3) that ALJ Harvey erred by substituting his opinion for medical expert opinion (*id.,* Point IV); (4) that the evidence demonstrates that plaintiff is unable to perform sustained work activities (*id.,* Point V); and (5) that ALJ Harvey failed to satisfy his burden of establishing that there is other work in the national economy that plaintiff can perform by failing to utilize a vocational expert. *Id.,* Point VI.

## C. ALJ Harvey's Evaluation of Plaintiff's Drug and Alcohol Use Must Be Clarified

*7 Plaintiff argues that compliance with a prescribed course of methadone treatment cannot be considered to be a "contributing factor material to" her disability, and that her psychiatric symptoms would worsen rather than improve if her methadone treatment ceased. Plaintiff's Memorandum of Law [10], Point I. In response, the Commissioner argues that ALJ Harvey correctly concluded that plaintiff had not stopped her drug use during the period at issue. Commissioner's Reply Memorandum of Law [11], Point 1.

"An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would ... be a contributing factor material to

the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d) (2)(C). "The relevant inquiry in determining whether substance abuse is a 'material contributing factor' is whether an individual would still be disabled if he were to stop using alcohol and/or drugs." *Pittman v. Astrue,* 2010 WL 1407255, *3 (W.D.N.Y.2010) (Skretny, J.). The regulations set forth a detailed process for making this determination:

"(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b); 20 C.F.R. § 404.1535(b).

"The proper analysis by the ALJ in a case where the claimant has alcohol or drug addiction issues is: first conduct the fivestep sequential evaluation 'without separating out the impact of alcoholism or drug addiction.'... If the ALJ determines that the claimant is not disabled, the claimant is not entitled to benefits and no further analysis is necessary. *Id.* If, considering the impact of the relevant addiction, the ALJ determines that the claimant is disabled, then the ALJ should proceed under section 404.1535 or 416.935, to determine if the claimant 'would still be found disabled if he or she stopped using alcohol or drugs.' *Id.*" *Bowers v. Astrue,* 2010 WL 2723220, *16 (D.Or.2010) (*quoting Bustamante v. Massanari,* 262 F.3d 949, 955 (9th Cir.2001)). "The disabled person bears the burden of proving that his alcoholism is not a contributing factor material to the disability determination."

*White v. Commissioner of Social Security,* 302 F.Supp.2d 170, 173 (W.D.N.Y.2004) (Larimer, J.).

**\*8** Here, ALJ Harvey determined that plaintiff's severe impairments included methadone dependence, depression and post traumatic stress disorder (T18). He found that plaintiff's "substance use disorder is a contributing factor material to the determination of disability" (T23), but also that her "methadone dependence is a contributing factor material to the determination of disability" (T21), thereby making it unclear whether anything other than her methodone dependence was a contributing factor material to the determination of disability. In turn, he found that if plaintiff "stopped substance abuse [,] ... there would be a significant number of jobs in the national economy that [she] could perform" (T23). In reaching this determination, ALJ Harvey noted that "[i]f the claimant stopped the substance abuse, the undersigned finds that the claimant's statements regarding her symptoms and resulting limitations are generally credible, but not to the extent alleged. The undersigned is not convinced that the claimant has stopped using drugs. The claimant testified that she takes methadone daily and admitted that she would relapse into using heroin if she stopped taking the methadone" (T22–23).

At the outset, I find that methadone, as a prescribed medication, does not preclude it from being assessed for materiality under 20 C.F.R. § 416.935. *See Dye v. Commissioner of Social Security,* 2008 WL 4449556, *19 (S.D.Ohio 2008) (on remand directing the ALJ to "determine which of plaintiff's current physical and mental limitations, upon which the defendant based plaintiff's current disability determination, would remain if plaintiff stopped using plaintiff's prescribed medications of Methadone, Xanax, Neurontin and Effexor and then determine whether any or all of plaintiff's remaining limitations would be disabling").

The discrepancy in the parties' remaining arguments appears to arise from the fact that ALJ Harvey's decision is not clear on whether he concluded that plaintiff's substance abuse, methadone dependence, or one or both are material to the determination of disability. He states both that the *"substance use* disorder is a contributing factor material to the determination of disability" (T23) (emphasis added) and that *"methadone dependence* is a contributing factor material to the determination of disability" (T21) (emphasis added). This is a significant ambiguity.

For example, if plaintiff's methadone use (rather than her drug and alcohol abuse) was found by ALJ Harvey to be a contributing factor material to the determination of disability, there would not be substantial evidence to support ALJ Harvey's conclusion that her RFC would improve if she ceased using methadone. Dr. Ryan found plaintiff's polysubstance abuse to be "in remission on methadone maintenance" (T197), and Dr. Baskin found that plaintiff's "psychiatric and substance abuse problems ... may significantly interfere with the claimant's ability to function on a daily basis" (T163). Thus, it is evident from the consultative examiners that plaintiff's substance abuse would reoccur if she ceased using methadone, which in turn would significantly interfere with claimant's ability to function. Therefore, I recommend that on remand, this aspect of ALJ Harvey's opinion be clarified.

**\*9** Plaintiff also argues that ALJ Harvey "recognizes some of the side effects of [her] use of methadone, but does not consider them as necessary factors in assessing her overall functional abilities. Rather, he uses them against her only in a DA & A sense." Plaintiff's Memorandum of Law [10], p. 8. This argument is not supported by the record. In ALJ Harvey's decision he clearly accounted for plaintiff's limitations associated with plaintiff's methadone use in making his RFC determination. For example, he found that "[d]ue to methadone dependence, [he] has occasional limitations in the ability to perform certain activities within a schedule, maintain regular attendance, be punctual within customary tolerance, and complete a normal workday and workweek. Due to methadone dependence, the claimant can only work in a job with a minimal amount of stress" (T20). Therefore, this argument is rejected.

### D. ALJ Harvey's RFC Determination is Flawed

Plaintiff argues that ALJ Harvey erred in finding that she could perform sustained work based upon her self-described activities and her prior work history. Plaintiff's Memorandum of Law [10], Point III. In response, the Commissioner argues that ALJ Harvey properly assessed plaintiff's credibility. Commissioner's Reply Memorandum of Law [11], Point 2.

ALJ Harvey found that if plaintiff stopped "the substance use", she had the RFC to "lift/carry/push/pull 100 pounds occasionally and 50 pounds frequently, sit 2 hours in and 8 hour day and stand/walk 6 hours in an 8 hour day. She would have occasional limitations in the ability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods.

The claimant can only work in a job with a moderate amount of stress" (T22). In reaching this RFC determination, ALJ Harvey made the following assessment: "The claimant's daily activities include cleaning, doing laundry, making beds, sweeping, and mopping. The claimant cleans all of the windows in the building in which she resides. She shops, carries packages, and attends church. She is able to bathe/dress herself. The claimant's allegations of disability are inconsistent with her activities of daily living" (T22–23).

"[A] claimant need not be an invalid to be found disabled' under the Social Security Act". *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule". SSR 96–8P, 1996 WL 374184, *1 (S.S.A.).

ALJ Harvey "failed to take into account that, even if the Plaintiff does perform the activities stated in his opinion ..., other evidence in the record more than suggests he does not perform them on a regular and continuing basis-the standard which would allow an ALJ to use daily activities to negatively impact his credibility." *Reinard v. Astrue,* 2010 WL 2758571, *8 (W.D.N.Y.2010) (Telesca, J.). For example, plaintiff testified that washing the windows takes 20 minutes a day, but two days a week she is unable to wash the windows (T510, 511). Her testimony also makes clear that she did not shop ("Q. Do you shop? A. If I have to") or sweep ("Q. Do you sweep? A. Yes, I try to") on a sustained basis (T502). She also testified that she lies down from approximately 12:00 p.m. to 5:00 p.m. everyday because of pain and fatigue (T511).[6] Thus, the mere fact that plaintiff is able to perform some activities when her condition allows her to do so is not inconsistent with plaintiff's claim that she is disabled from regular and continuous employment.

**\*10** "[A]n ALJ's failure to make a specific finding about the claimant's ability to maintain employment can be a basis for reversal. *Watson v. Barnhart,* 288 F.3d 212, 218 (5th Cir.2002); *Singletary v. Bowen,* 798 F.2d 818, 823 (5th Cir.1986). However, an ALJ need not 'make a specific finding regarding the claimant's ability to maintain employment in every case.' *Frank v. Barnhart,* 326 F.3d 618, 619 (5th Cir.2003). A separate finding is not required 'absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ

did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC.' " *Daniels v. Commissioner, Social Security Administration,* 2010 WL 3119184, *2 (N.D.Tex.2010).

Given the lack of a work history since 1988(T42) and medical evidence that her depression and post traumatic stress disorder could significantly interfere with her ability to function on a daily basis (T163 [Plaintiffs "psychiatric and substance abuse problems ... may significantly interfere with the claimant's ability to function on a daily basis"]), I conclude that ALJ Harvey was obligated to provide some explanation for plaintiff's ability to maintain employment.

Plaintiff also argues that ALJ Harvey substituted his opinion for medical expert opinion when he concluded that "the concluded that the medical evidence does not support the Plaintiff's allegations about his *[sic]* limitations". Plaintiff's Memorandum of Law [10], Point IV. In response, the Commissioner argues that "the medical evidence in this case supported a finding that plaintiff would not be disabled but for her alcohol and drug abuse" and that her medical records indicate that her "alcohol and drug use caused or significantly worsened her mental health symptoms". Commissioner's Memorandum of Law [11], p. 4–5.

It is well settled that "[a]n ALJ must rely on the medical findings contained within the record and cannot make his own diagnosis without substantial medical evidence to support his opinion." *Goldthrite v. Astrue,* 535 F.Supp.2d. 329, 339 (W.D.N.Y.2008) (Telesca, J.); *Gilbert v. Apfel,* 70 F.Supp.2d 285, 290 (W.D.N.Y.1999) (Larmier, J.); *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998).

The medical evidence presented in the record fails to assess plaintiff's mental impairments separate from her methadone, drug and alcohol use. Dr. Ryan's report found that plaintiff's symptoms of dysphoric mood, insomnia, irritability and auditory hallucinations were related to her drug and alcohol use and withdrawal (T195). However, there does not appear to be any medical assessment in the record of the limitations associated solely with plaintiff's depression and post traumatic stress disorder absent any underlying drug, alcohol and methadone use.

The RFC determination is reserved for the commissioner. *See* 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2). However, "an ALJ's RFC assessment is a medical determination that must be based on probative medical evidence of record .....

Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." *Lewis v. Commissioner of Social Security,* 2005 WL 1899399, *3 (N.D.N.Y.2005).

**\*11** Thus, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence. Where the 'medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) ... [the Commissioner may not] make the connection himself.' " *Deskin v. Commissioner of Social Security,* 605 F.Supp.2d 908, 912 (N.D.Ohio 2008). *See Isaacs v. Astrue,* 2009 WL 3672060, \* 11 (S.D.Ohio 2009) ("The ALJ rendered her RFC finding for medium work without reference to any medically determined RFC opinion bridging the raw medical data to specific functional limitations. Because there is no medical source opinion supporting the ALJ's finding that the plaintiff can perform 'medium' work, the Court concludes the ALJ's RFC determination is without substantial support in the record").

In light of the non-adversarial nature of a benefits proceeding, where there is a gap in the record, the ALJ must affirmatively develop evidence to fill it. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). This duty exists whether or not plaintiff is represented by counsel. *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). "Although it is the claimant's obligation to prove her disability and provide all relevant medical evidence, '[i]f the evidence does not give the ALJ 'sufficient medical evidence about [the claimant's] impairment to determine whether [the claimant is] disabled,' a consultative exam may be ordered, at SSA's expense.' " *Aristizabal v. Astrue,* 2009 WL 4666035, *1 (E.D.N.Y.2009).

Although I recognize that "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment", this is not such a case. *Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d 15, 17 (1st Cir.1996). Given the absence of evidence in the record of plaintiff's functional limitations arising solely from her mental impairments, I conclude that ALJ Harvey should have ordered a consultative psychological examination or attempted to contact plaintiff's treating physicians to complete the record in order to make a proper RFC determination. *See Hopper v. Commissioner*

*of Social Security,* 2008 WL 724228, *11 (N.D.N.Y.2008) ("Since there was little to no evidence in the record to determine Hopper's RFC properly, the ALJ should at least have attempted to contact Hopper's treating physicians.... Additionally, the ALJ could have employed a state agency medical consultant rather than a disability analyst to render an assessment of Hopper's RFC. The record reveals that the ALJ made no such attempt to obtain the opinions of any treating physicians or other medical sources by way of letters requesting the information nor by subpoena"); *Hogan v. Astrue,* 491 F.Supp.2d 347, 354–355 (W.D.N.Y.2007) (Larimer, J.) ("The ALJ found that plaintiff retained the RFC to perform less than the full range of sedentary work. In reaching this conclusion, the ALJ did not cite to a medical opinion in the record. It is unclear whether the ALJ relied on the opinions of plaintiff's treating physicians, or the opinions of the examining and consulting physicians. In fact, there is very little in the record regarding plaintiff's ability to perform basic work activities. In this respect, the ALJ needs to further develop the record ... because the ALJ failed to cite to any medical opinion to support his RFC findings, the Court is unable to determine if the ALJ improperly selected separate findings from different sources, without relying on any specific medical opinion"). Without this additional medical evidence ALJ Harvey, as a layperson, could not bridge the gap between plaintiff's depression and post traumatic stress disorder and the functional limitations that flow from these impairments without the overlay of plaintiff's methodone, alcohol and drug use.

**\*12** Therefore, I recommend that this case be remanded to the Commissioner to conduct a proper analysis of plaintiff's RFC in the absence of his alcohol and drug use.

### E. ALJ Harvey Did Not Err in Failing to Obtain a Vocational Expert

Having concluded that ALJ Harvey improperly determined plaintiff's RFC in the absence of his drug and alcohol use, I need not analyze plaintiff's argument at Step Five that ALJ Harvey erroneously utilized the Medical Vocational Guidelines ("Grids" or "Guidelines") instead of procuring the testimony of a vocational expert to "accurately depict" plaintiff's occupational limitations. Plaintiff's Memorandum of Law [10], Point VI. However, in the event that my recommendation finding ALJ's RFC determination to be flawed, I would find that ALJ Harvey did not err in failing to contact a vocational expert.

As explained by the Second Circuit: "If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations' then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.... Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate. By the use of the phrase 'significantly diminish' we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp v. Bowen,* 802 F.2d 601, 605–606 (2d Cir.1986).

ALJ Harvey found that "[i]f the claimant stopped substance abuse, the claimant's ability to perform work at all exertional levels would be compromised by nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels. Absent the claimant's methadone dependence, a finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical–Vocational Guidelines. There is not a significant erosion of the claimant's occupational base, pursuant to SSR 85–15" (T23).

Pursuant to SSR 85–15, which provides guidance on using the Grid when a claimant has solely non-exertional limitations, instructs that "the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base". 1985 WL 56857, *4 (S.S.A.).

***13** Based upon ALJ Harvey's RFC, which found that plaintiff only had *"occasional* limitations" in this regard (T22

(emphasis added)), I find that ALJ Harvey did not err in failing to contact a vocational expert.

## CONCLUSION

For these reasons, I recommend that defendant's motion for a judgment on the pleadings [8] be denied, and that plaintiff's cross-motion for a judgment on the pleadings [10] be granted in part, and denied in part, and that the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by November 12, 2010 (applying the time frames set forth in Fed.R.Civ.P. 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision. *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure of the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), may result in the district judge's refusal to consider the objection.

## SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 4703599

Footnotes

1    Bracketed references are to the CM/ECF docket entries.

2    References to "T" are to the certified transcript of the administrative record filed by defendant.

3    "A GAF between 51 and 60 indicates 'moderate symptoms' ... or 'moderate difficulty in social, occupational, or school functioning.' ". *Kohler v. Astrue,* 546 F.3d 260, 261 n. 1 (2d Cir.2008) (*quoting* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 32 (4th ed.2000)).

4    "[A] GAF of 31 to 40 signifies 'some impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood' ". *See Paduani v. Commissioner of Social Security,* 2010 WL 1816262, *3 (E.D.N.Y.2010) (*quoting* American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders,* 34 (4th ed.2000)).

5    I assume that she is referring to 20 C.F.R. §§ 416.935 and 404.1535 ("How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability").

6    *Compare with Schacht v. Barnhart,* 2004 WL 2915310, *11 (D.Conn.2004) ("The evidence of her significant child care responsibilities, during which time she had custody of her niece while raising her own son as well despite her migraines, reasonably supports a finding that the Plaintiff could work on a regular and continuing basis under the limitations set forth in the ALJ's RFC finding").

---

**End of Document**                                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1499227
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Stacy DONNELLY, Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 13–CV–7244 (AJN)(RLE).
|
Signed March 31, 2015.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

ALISON J. NATHAN, District Judge.

**\*1** Before the Court is Magistrate Judge Ronald Ellis's Report and Recommendation ("Report" or "R & R") dated March 13, 2015, Dkt. No. 22, addressing the parties' respective motions for summary judgment on the pleadings. Judge Ellis recommended that Plaintiff's motion be granted in part and that the case be remanded for further administrative proceedings. The Court presumes familiarity with the factual and procedural background of this case as set forth in Judge Ellis's Report.

District courts may designate magistrate judges to hear and determine certain dispositive motions and to submit proposed findings of fact and a recommendation as to those motions. 28 U.S.C. § 636(b)(1). Any party wishing to object to a magistrate judge's report and recommendation must do so within fourteen days after being served with a copy of the report and recommendation. *Id.* If a party submits a timely objection to a report and recommendation, the district court reviews *de novo* those portions to which the party objected. *Id.; see also Norman v. Astrue,* 912 F.Supp.2d 33, 39 (S.D.N.Y.2012). Otherwise, "[w]here no 'specific written objection' is made, the district court may adopt those portions 'as long as the factual and legal basis supporting the findings and conclusions set forth ... are not clearly erroneous or contrary to law.' " *Norman,* 912 F.Supp.2d at 39 (quoting *Eisenberg v. New England Motor Freight, Inc.,* 564 F.Supp.2d 224, 226–27 (S.D.N.Y.2008)). Because neither party filed an objection to Judge Ellis's Report within the

requisite fourteen days, the Court reviews his entire Report for clear error.

Upon review of Judge Ellis's thorough and well-reasoned Report, the Court finds no clear error. Thus, Judge Ellis's Report is adopted in its entirety as the opinion of the Court. *See, e.g., Beller v. Astrue,* No. 12 CV 5112(VB), 2013 U.S. Dist. LEXIS 79541, at \*2–3, 2013 WL 2452168 (S.D.N.Y. June 5, 2013). As stated in Judge Ellis's Report, because the administrative law judge did not consult a vocational expert in her discussion of jobs in the economy that Plaintiff can perform, remand for further administrative proceedings is appropriate.

Therefore, Plaintiff's motion is GRANTED in part, and the case is hereby REMANDED for further administrative proceedings. This resolves Dkt. Nos. 14 and 19. The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

### REPORT AND RECOMMENDATION

RONALD L. ELLIS, United States Magistrate Judge.

**To the HONORABLE ALISON J. NATHAN, United States District Judge:**

### I. INTRODUCTION

Plaintiff Stacy Donnelly ("Donnelly") commenced this action under the Social Security Act ("Act"), 42 U.S.C. 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits. On June 20, 2014, Donnelly filed a motion for judgment on the pleadings (Pl's Mem. Law Supp. Pl's Mot. Judgment Pleadings ("Pl.Mot.") at 7) seeking the reversal of the Commissioner's final decision and remand solely for the calculation of benefits, or alternatively, to remand the case for reconsideration of the evidence. (Pl. Mot. at 7.) Donnelly argues that the record supports the conclusion that she is disabled and does not have the residual functional capacity to work. (Pl. Mot. at 7–8.) The Commissioner filed a cross-motion for judgment on the pleadings on October 1, 2014, (Defs Mem. Law Supp. Comm'rs Cross–Mot. Judgment Pleading ("Def.Mot.") at 2), and on October 17, 2014, Donnelly filed a reply. (Reply Mem. Law Further Supp. Pl's Mot. Judgment Pleadings and Opp'n Def. Cross–

Mot. Pleadings ("Pl.Reply") at 2.) For the reasons that follow, I recommend that Donnelly's motion be **GRANTED IN PART**, and that the case be **REMANDED** for further administrative proceedings.

## II. BACKGROUND

### A. Procedural History

**\*2** Donnelly applied for disability insurance and Supplemental Security Income benefits, on August 26, 2009. (Pl. Mot. at 7.) Her applications were denied on November 3, 2009 (*Id.* at 7.) On November 6, 2009, Donnelly filed a request for a hearing that was ultimately held before Administrative Law Judge ("ALJ") Gitel Reich on September 2, 2010. (Tr. of Administrative Proceeding ("Tr .") at 142.) The ALJ denied Donnelly's application for Social Security Disability benefits on November 12, 2010, finding that Donnelly was not disabled under the Act. (Tr. at 103.) Donnelly requested review by the Appeals Council on November 22, 2010. (*Id* . at 165.) On May 25, 2012, the Appeals Council granted review and remanded the case. (*Id.* at 119.) Specifically, the Appeals Council asked the ALJ to evaluate Donnelly's mental impairments, give further consideration to her residual functional capacity and, if warranted, consult a vocational expert to provide examples of jobs she can perform. (Tr. at 9.)

On September 13, 2012, Donnelly reappeared before ALJ Reich. (*Id.* at 9.) ALJ Reich denied Donnelly's applications for Social Security Disability benefits on October 25, 2012, finding that Donnelly was not disabled under the Act. (*Id.* at 6.) Donnelly sought review by the Appeals Council, but her request was denied. (*Id.* at 1.) The ALJ's decision became the Commissioner's final decision. Donnelly filed this action on November 8, 2012. (*Id.* at 4.)

### B. ALJ Hearing I

### 1. Donnelly's Testimony

Donnelly was born on June 20, 1981. (Pl. Mot. at 8.) She is the mother of an autistic boy. (*Id.*) After graduating from high school, Donnelly worked as a retail sales assistant for six years and as a makeup artist for four years. (Tr. at 238.) In 2008, she was diagnosed with papillary thyroid cancer. (Tr. at 13.) She had the right lobe of her thyroid removed on July 16, 2008. (*Id.* at 14.) The cancer, however, had spread to her left lobe, and it was removed on August 19, 2008. (*Id.*) After her thyroidectomy, Donnelly received radiation therapy. (Pl.

Mot. at 8.) She had a full body radioactive scan in November 2008 and again in November 2009. (Tr. at 14.) Both scans showed no further metastases [1] . (*Id.*) Nonetheless, after the surgeries and treatments, Donnelly complained of fatigue, palpitations upon exertion, lightheadedness, weight lost, and swelling of the hands and feet. (Tr. at 111.) Her illness began to significantly interfere with her ability to work such that she had to stop completely by July 16, 2008. (Tr. at 237; Pl. Mot. at 8.) Donnelly receives annual radiation therapy and takes daily medications which causes bleeding of the mouth and dry skin. (Pl. Mot. at 8.)

Aside from thyroid cancer, Donnelly also suffers from major depression and moderate, recurrent post-traumatic stress disorder for which she attends weekly psychotherapy and monthly psychiatric sessions. (Pl. Mot. at 9.) She takes Seroquel for depression but it causes fatigue. (*Id.*) Additionally, Donnelly suffers from frequent migraines for which she takes Inderal daily. (Tr. at 37.) Inderal shortens the duration of her headaches but causes fatigue. (Pl. Mot. at 9.)

**\*3** Donnelly is the sole caretaker of her autistic son, who was three and a half years old at the time of the hearing. Her only means of income was welfare and her son's SSI. (Tr. at 3; Pl. Mot. at 8.)

### 2. Vocational Expert's Testimony

No vocational expert testified at this hearing. ALJ Reich stated that she relied on the Medical–Vocational Guidelines in her evaluation of the medical record. (Tr. at 114.) Along with the Medical–Vocational Guideline, the ALJ also considered Donnelly's residual functional capacity, age, education, and work experience. (*Id.* at 113.) The ALJ concluded that Donnelly's "additional limitations have little or no effect on the occupational base of unskilled sedentary work." (*Id.* at 114.) Most importantly, ALJ Reich found Donnelly's "residual functional capacity for sedentary work [was] not significantly compromised by her mental limitations ... or hazardous environment restriction." (*Id.*)

### 3. Medical Evidence

### a. St. Luke'sRoosevelt Hospital

Donnelly began outpatient weekly psychotherapy at St Luke's–Roosevelt Hospital Women's Health Program in May 2009. (Tr. at 36.) She was diagnosed with posttraumatic stress disorder and major depressive disorder. (Tr. at 428.)

(1) Elizabeth Katcher, M.A

Donnelly's primary therapist, Elizabeth Katcher, a psychology extern, completed a Medical Impairment Form on November 1, 2010. (Tr. at 514–15.) Katcher found that Donnelly had "unlimited" and "very good ability" to follow work rules and could "function independently." (*Id.* at 516.) She noted, however, that Donnelly "demonstrated a limited capacity to deal with stress in her life since being diagnosed with thyroid cancer" and that her illness "had significantly affected her ability to concentrate and pay attention." (*Id.*)

Katcher determined that Donnelly's ability to deal with work stress and maintain attention and concentration was markedly impaired. (Tr. at 516.) She maintained that Donnelly was markedly impaired in her ability to behave in an emotionally stable manner and relate predictably in social situations, observing that she "is often tearful and depressed, and has some difficulty regulating her affect. Her emotions appear to be somewhat volatile, ranging from depressed and tearful to irritable and frustrated to anxious and worried." (Tr. at 517.)

Donnelly complained to Katcher she had little energy and had difficulty completing her daily and necessary tasks. (Tr. at 518.) She also informed Katcher that she had problems sleeping and remaining alert throughout the day. (*Id.*)

(2) Dr. Collette Haward

Dr. Collette Haward completed a Medical Impairment Form for Donnelly on August 31, 2012. (Tr. at 610–13.) Although Dr. Haward noted that Donnelly was able to manage her affairs in her own best interest, follow work rules, relate to co-workers, use judgment, interact with supervisor, and function independently, she found that Donnelly's ability to deal with work stresses was markedly impaired. (Tr. at 611–13.) She also found that Donnelly's ability to "demonstrate reliability" was "markedly impaired." (*Id.*)

(3) Carole Srinivasan, Ph.D.

**\*4** In a September 19, 2011 therapy session with Carole Srinivasan, Ph.D., Donnelly scored a fifty-four on the Beck Depression Inventory,[2] which is in the range of severe depression. (Tr. at 600.) Prior to this visit, Donnelly experienced significant heart palpitations which prompted her doctors to lower the dosage of her depression medication. (*Id.*) Donnelly reported that her depression worsened following the change in her medication. (*Id.*) She felt more anxious, slept less (two hours each night) and had no appetite.

(*Id.*) She had suicidal thoughts and actions and on one occasion even went as far as taking out the pills she would use, but pictures and thoughts of her son stopped her from going through with the suicide. (*Id.*)

In her exploration of Donnelly's medical and mental health history, Dr. Srinivasan found that Donnelly had a history of neglect and psychological disorders. (Tr. at 600.) Donnelly's mother was diagnosed with schizophrenia and her fraternal twin sister was diagnosed with autism and was living in an adult assisted living facility. (Tr. at 599–600.)

On September 6, 2012, Dr. Srinivasan completed a Medical Impairment Form. (Tr. at 614–17.) She found Donnelly's ability to deal with work stresses and demonstrate reliability markedly impaired, but determined that Donnelly could manage benefits in her own best interest. (*Id.*)

**b. New York Presbyterian Hospital**

Donnelly has a history of throat issues. She had frequent sore throats and throat infections. (Tr. at 329.) She also had trouble breathing and her voice changed because of the size of her tonsils. (*Id.*) When these problems did not go away, she had an ultrasound of her right thyroid on March 26, 2008. (Tr. at 326.) A follow-up ultrasound on May 7, 2008, found that the right thyroid node had increased in size since the prior scan. (Tr. at 358.) On July 16, 2008, a right thyroid biopsy revealed that Donnelly had Papillary Carcinoma, Nuclear Grade II. (Tr. at 323.) After the removal of her right node, subsequent scans showed that the cancer had spread to the left thyroid, (Tr. at 321.), and it was removed on August 19, 2008. (*Id.*)

The thyroidectomy was followed by oral radioactive iodine therapy, which commenced on November 13, 2008. (Tr. at 339.) Ninety-six hours after the iodine therapy, Donnelly had a full body scan which found no evidence of the cancer. (Tr. at 338.) A follow-up ultrasound on May 4, 2009, was also negative. (Tr. at 336–37.) Donnelly had another whole body scan on November 2009, which was also negative. (Tr. at 14.)

On August 19, 2009, Donnelly's endocrinologist, Dr. Mona Parikh, an internist at New York Presbyterian ("NYP"), completed a "Treating Physician Wellness Plan Report." She indicated that Donnelly's hormones were "still not correct" and were "symptomatic." (Tr. at 365.) Based upon her evaluation of Donnelly's medical file and her own examination, Dr. Parikh determined Donnelly was "unable to work for at least twelve months." (Tr. at 365.) She opined

that Donnelly was unemployable "because she needs to have regular body scans and her medicines titrated [3] ." (Tr. at 14.)

### c. Consultative Evaluation

(1) Michael Alexander, Ph.D.

**\*5** Dr. Michael Alexander examined Donnelly in September 2009. (Tr. at 15.) He found no evidence of panic or manic-related symptoms. (Tr. at 367.) He determined that her remote memory skills, cognitive functions, insight and judgment were all "good". (*Id.* at 368.) He noted that Donnelly lived and took care of her son alone. She could follow and understand simple directions and could perform simple tasks independently. (*Id.*) Although Donnelly exhibited psychiatric problems, Dr. Alexander concluded that they were not significant enough to impede her ability to function on a daily basis. (*Id.*) He diagnosed Donnelly with depression and recommended she continue to get psychiatric treatment. (*Id.* at 368–69.) Dr. Alexander determined that Donnelly's prognosis was "good". (Tr. at 369.)

(2) Dr. Brian Hamway

Brian Hamway, M.D., an internist, completed a medical consultative examination of Donnelly on September 29, 2009. (Tr. at 14.) He determined that Donnelly's heart palpitations were caused by excessive dosage of Synthroid, a medication she takes to replace her missing thyroid hormones. (*Id.*) Dr. Hamway determined Donnelly's prognosis to be "good" and concluded that she had "no limitations based on the medical evaluation done today." (*Id.* at 373.)

(3) Dr. M. Husain

On October 19, 2009, state agency consulting physician, Dr. M. Husain, completed a Physical Residual Functional Capacity ("PRFC") Assessment of Donnelly finding frequent impairment in climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. at 376.) He found no communicative or environmental limitations. (*Id.*) However, after considering Donnelly's "history of dizziness, low weight (BMI of 17.8) and [blood pressure] on the lower side of normal with background of [thyroid cancer]" and consulting Dr. Hamway's evaluation, Dr. Husain concluded light physical residual functional capacity. (Tr. at 378.)

On November 3, 2009, Dr. Husain repeated his previous conclusion that Donnelly had light physical residual function

capacity and added that she had heights and machinery limitations. (Tr. at 411.)

(4) T. Harding, Ph.D.

On October 20, 2009, T. Harding, Ph.D. completed a Mental Residual Functional Capacity ("MRFC") Assessment evaluating Donnelly for major depression. (Tr. at 396, 398.) Relying on Dr. Hamway's medical examination and the medical notes from St. Luke's, Dr. Harding concluded that Donnelly "retains the mental capacity to do a job with simple tasks." (Tr. at 398.) Dr. Harding noted that Donnelly's "symptoms were relieved by psychotropic medication." (*Id.* at 15.)

(5) Dr. Irun Bhan

Donnelly's primary care physician, Dr. Irun Bhan, completed an assessment of Donnelly on September 12, 2012. (Tr. at 628.) Dr. Bhan diagnosed Donnelly with migraines and noted that her MRI was consistent with the diagnosis. (*Id.* at 625.) Although Donnelly had daily, frequent headaches for which a cure was unlikely, Dr. Bhan believed she could find better control with a change in her medications. (*Id.* at 626.) Dr. Bhan determined that Donnelly's impairments could be expected to last at least twelve months. (*Id.*) While experiencing a migraine, Donnelly would not be able to perform basic work activities and would need frequent breaks. (Tr. at 627.) Dr. Bhan found Donnelly would not be able to work a typical workday as she would need at least two unscheduled breaks throughout the day. (*Id.*) Dr. Bhan opined that because of her migraines, Donnelly would need to lie down for at least two hours each break period. (Tr. at 14.) Nonetheless, Dr. Bhan concluded that Donnelly was capable of low stress work. (*Id.*)

### 4. ALJ Gitel Reich's Findings

**\*6** Following a hearing on September 2, 2010, ALJ Reich issued a decision on November 12, 2010, finding that Donnelly was not disabled under the Act, and was not entitled to disability benefits. (Tr. at 103.) To support her decision, ALJ Reich noted that the record showed Donnelly was only mildly restricted in her daily living activities, had moderate difficulties in her social functioning, and had moderate difficulties with concentration, persistence or pace. (Tr. at 109.) Furthermore, since the body scans showed her cancer had not spread since her radioactive treatment, Donnelly's cancer did not meet the requirements of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 108.)

ALJ Reich also considered Donnelly's mental impairments. Here, too, she found they did not meet the medical criteria listed in the Act. (*Id.*) After reviewing Donnelly's physicians' notes and those from the consultative examinations, ALJ Reich found that Donnelly had "the residual functional capacity to perform sedentary work ... except that her non-exertional limitations reduce her residual functional capacity to simple work." (Tr. at 109.) Those limitations were further curtailed by Donnelly's history of dizziness which prevented her from working at heights or around machinery. (*Id.*)

ALJ Reich noted that Donnelly's past work as a makeup artist and retail sales assistant required her to stand beyond the sedentary level and concentrate beyond the level of simple work. (*Id.* at 110.) Thus, she concluded that Donnelly could not perform her past work, but that there were a significant number of jobs in the national economy she could perform. (Tr. at 113.)

**5. Appeals Council Review**
On May 25, 2012, the Appeals Council granted Donnelly's request for review. (Tr. at 119.) The Council remanded the case, finding that the ALJ had failed to provide an evaluation of Donnelly's mental impairment and to indicate the weight given to each physician under the treating physician rule. (Tr. at 9.) In particular, the Appeals Council noted that the ALJ did not specify the weight given to Dr. Mona Parikh's opinion. (*Id.* at 120.)

The Appeals Council ordered the ALJ to evaluate Donnelly's "mental impairment providing specific findings and appropriate rationale for each functional area and to evaluate the treating source opinions and explain the weight given to each opinion." (Tr. at 9.) It also instructed the ALJ, if appropriate, to "obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (Tr. at 121.) The expert would be required to "identify examples of appropriate jobs and to state the incidence of such jobs in the national economy." (*Id.*)

**C. ALJ Hearing II**

**1. Donnelly's Testimony**
Donnelly reappeared before ALJ Reich on September 13, 2012. (Tr. at 70.) Donnelly was still taking Synthroid, a synthetic hormone, for her thyroid cancer. (*Id.* at 76.) She was still experiencing fatigue as a side effect of the medication

and the thyroidectomy. (Tr. at 77.) Donnelly also complained that the medication made her dizzy. (Tr. at 78.) Every three months Donnelly had to visit the hospital to check her thyroid level and the dosage of her medication. (*Id.* at 77) Donnelly had heart palpitations which worsened when she walked up and down stairs. (*Id.* at 81.)

**\*7** By the second hearing, Donnelly's younger sister had moved in with her, and helped care for Donnelly's son and with household chores. (Tr. at 84–85.) Donnelly had very few social interactions, she had few friends, and rarely went out. (Tr. at 86.) She spent her day alone at home, lying on the couch and occasionally watching television. (*Id.* at 87–88.)

**2. Vocational Expert's Testimony**
In lieu of testimony from a vocational expert, ALJ Reich said she relied on the Medical–Vocational Guideline as a framework to determine whether Donnelly was eligible for benefits. (Tr. at 20.) After consulting the medical record, including the notes from Donnelly's physicians, ALJ Reich determined that Donnelly could perform unskilled work requiring limited contact with people and that "her non-exertional limitations [did] not significantly limit the range of unskilled light work she [could] perform." (*Id.*) She concluded that Donnelly's non-exertional limitations did not "have more than a slight effect on her occupational base." (*Id.*)

**3. ALJ's Findings on Remand**
On October 25, 2012, ALJ Reich again denied Donnelly's claims. (Tr. at 6.) She found Donnelly had not worked since July 16, 2008, the date of her alleged onset of disability. (Tr. at 11.) ALJ Reich determined that Donnelly had severe impairments from her thyroidectomy "with continuing hormonal treatment, migraine headaches, and depressive disorder." (*Id.*) The ALJ concluded that these impairments were not severe enough to prevent Donnelly from gainful employment and were not on the list of impairments "that meets or medically equal severity of one listed" in 20 C.F.R. Part 404, Subpart P, App.1. (*Id.*)

ALJ Reich reviewed the assessments of several medical professionals. She gave greater weight to Dr. Srinivasan's assessment of Donnelly than to Katcher's, noting that Katcher is not a psychologist or a psychiatrist. (*Id.* at 18–19.) In addition, ALJ Reich gave some weight to the consultative examiners and the State agency medical consultants. (Tr. at 19.) She disagreed, however, with consultative examiner

Dr. Brian Hamway who assessed Donnelly as able to work with no limitation. (*Id.*) ALJ Reich concluded that Donnelly's residual functional capacity for sedentary, simple work and her history of fatigue prevent her from doing her past work. (*Id.*) In determining what type of work Donnelly can perform, ALJ Reich relied on Social Security Ruling 83–10 which "presume[s] that the claimant is able to perform unskilled jobs at the pertinent exertional levels." (Tr. at 20.) Applying this rule to Donnelly's case, ALJ Reich concluded that Donnelly "is still capable of performing unskilled work requiring only occasional contact with people, her non-exertional limitations do not significantly limit the range of unskilled light work she can perform." (*Id.*) ALJ Reich found Donnelly was not disabled under § 216(i) and 223(d) of the Act. (*Id.*)

### 4. Appeals Council Review

**\*8** On September 10, 2013, the Appeals Council denied Donnelly's request for review of ALJ Reich's October 25, 2012 decision. (Tr. at 1.) Under the rules of review, the Appeals Council found no grounds to reexamine the ALJ's decision. (*Id.*) Thus, the ALJ's October 25, 2012 decision became the Commissioner's final decision. (*Id.*)

### III. DISCUSSION

### A. Standard of Review

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *42 U.S.C. §§ 405(g), 1383(c) (3.)* Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 447 (2d Cir.2012) (per curiam) (citing *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996)); *accord Mathews v. Eldridge,* 424 U.S. 319, 339 n. 21, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citing *42 U.S.C. § 405(g).)* Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987.) First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. *42 U.S.C. § 405(g); Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999) (citing *Johnson,* 817 F.2d at 986); *accord Brault,* 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *42 U.S.C. § 405(g.)* If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir.2004) (quoting *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984)); *accord Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008.) This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR.") *See,* e.g., *Kohler,* 546 F.3d at 265 (regulation); *Schaal v. Callahan,* 933 F.Supp. 85, 93 (D.Conn.1997) (SSR.) In such a case, the court may remand the matter to the Commissioner under sentence four of *42 U.S.C. § 405(g),* especially if deemed necessary to allow the ALJ to develop a full and fair record to explain her reasoning. *Crysler v. Astrue,* 563 F.Supp.2d 418, 428 (N.D.N.Y.2008) (citing *Marlone v. Apfel,* 70 F.Supp.2d 145, 148 (N.D.N.Y.1999).)

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault,* 683 F.3d at 447 (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009).) The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *accord Brault,* 683 F.3d at 447. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to have to conclude otherwise." *Brault,* 683 F.3d at 448 (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir.1994)) (emphasis omitted.)

**\*9** To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." *42 U.S.C. §§ 423(d) (5)(B), 1382c(a)(3) (H)(i.)* The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." *42 U.S.C. §§ 405(b)(l.)* While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir.2010) (quoting *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983)), the ALJ may

not ignore or mischaracterize evidence of a person's alleged disability. *See Erickson v. Comm'r of Soc. Sec.,* 557 F.3d 79, 82–84 (2d Cir.2009) (mischaracterizing evidence); *Kohler v. Astrue,* 546 F.3d 260, 269 (2d Cir.2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart,* No. 01 Civ. 1120(DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala,* 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand.) The ALJ must discuss the "the crucial factors in any determination ... with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue,* 753 F.Supp.2d 250, 269 (S.D.N.Y.2010) (quoting *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).)


**B. Determination of Disability**

**1. Evaluation of Disability Claims**
Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(l.) The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a) (3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d) (2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations-if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Gonzalez v. Apfel,* 61 F.Supp.2d 24, 29 (S.D.N.Y.1999.) While the

claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 123 (2d Cir.2012.)

**\*10** The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4.) At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d.) If the claimant fails to prove this, however, the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5.)

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010); *see also* S.S.R. 96–9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis.) The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier,* 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b.)

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-part process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier,* 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier,* 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier,* 606 F.3d at 49 (citing *Marcus v. California,* 615 F.2d 23, 27 (2d Cir.1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence);

*Briscoe v. Astrue,* No. 11 Civ. 3509(GWG), 2012 WL 4356732, at *16–19 (S.D.N.Y. Sept.25, 2012) (reviewing an ALJ's credibility determination.) In determining whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which claimant could perform." *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir.1998) (citation omitted.)

## 2. Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s.)" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir.2008) (discussing the "treating physician rule of deference.") A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2.) An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess,* 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

**\*11** Second, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart,* 323 F.Supp.2d 542, 545 (S.D.N.Y.2004) (citing *Infante v. Apfel,* No. 97 Civ. 7689(LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001).) This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard,* No. 02 Civ. 4523(SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker,* 548 F.Supp. 481, 486 (S.D.N.Y.1981).)

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004) (citing 20 C.F.R. § 404.1527(c)(2).) These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of

the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c) (3–6.)

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.".) Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran,* 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.".) Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.,* 361 Fed. Appx. 197, 199 (2d Cir.2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion.) The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo,* 142 F.3d at 81.

## C. Issues on Appeal

## 1. ALJ Reich Properly Applied the Treating Physician Rule

Donnelly argues that the ALJ failed to properly evaluate the medical record in giving inadequate weight to her treating physicians, Dr. Irun Bhan and Dr. Parikh. (Pl. Mot. at 23–25.) The ALJ stated:

> Dr. Bhan's opinion can only be accorded some, but not great weight. This physician is not a specialist in any of the claimant's medical conditions and does not have an extensive treating relationship with her having seen her only three times in one and one-half years. The balance of the record does not support the severity of the migraines as described in his report. The evidence shows that medications are decreasing the frequency of the claimant's headaches and provide some relief. Finally, Dr. Bhan indicates that stress is an

> aggravating factor for the claimant's
> migraines and her stress level is
> likely decreasing due to better coping
> skills as noted by Dr. Srinivasan. The
> additional help the claimant is now
> receiving at home should also decrease
> stress and therefore lead to a decrease
> in the frequency and/or severity of the
> claimant's migraines. (Tr. at 18.)

**\*12** The ALJ properly weighed Dr. Bahn's assessment. Dr. Bahn had only treated Donnelly three times over a period of one and a half years. (Tr. at 18.) Donnelly points to the Commissioner's regulation which states the Commission "may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals to be your treating sources if the nature and frequency of the treatment or evaluation is typical for your condition(s)" to argue for his inclusion. (Pl. Mot. at 24 quoting 20 C.F.R. § 404.1502.) However, as the Commissioner notes, this rule gives the ALJ the discretion to consider a treating source. It does not require that the ALJ find the source to be a treating source, and does not dictate how such source should be weighed. (Def. Mot. at 20.) The ALJ may properly consider the frequency and length of treatment in assessing what weight to give the treating source. (Def. Mot. at 20 citing 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c) (2)(i).) Given the limited number of visits with Dr. Bhan, the ALJ had support in the record for the weight given and articulated reasons for her decision.

In her rebuttal of the Commissioner's claim, Donnelly asserts that Dr. Bhan is a board certified internist and points to Taber's Cyclopedic Dictionary which defined internal medicine as "the medical specialty concerned with the overall health and well-being of adults." Taber's Cyclopedic Medical Dictionary 1259 (19th ed.2001). Donnelly argues that Bhan is thus qualified to treat and assess her migraines. (Pl. Mot. at 23.) Donnelly disputes the frequency and range of treatment she received from Dr. Bhan. (Pl. Mot. at 24.) She maintains that as an attending physician at the N.Y. Presbyterian AIM clinic, where Donnelly received most of her medical care, Dr. Bhan's chart on Donnelly is N.Y. Presbyterian's chart, and thus contains the bulk of her medical records. (Id.) Donnelly wants the court to infer that, while there were but three specific contacts with Dr. Bhan, he had access to her entire file and was in a supervisory role at the medical center and thus Donnelly's contacts with him should not be evaluated as three limited visits, but as part of the larger care she received

from New York Presbyterian. (Id.) These inferences are not part of the record and Donnelly points to no part of the record to support these assertions. The ALJ may properly rely on the evidence in the record to support her conclusions. Donnelly provides no precedent for this assertion and has no legal basis why it should be accepted.

Donnelly's three visits with Dr. Bhan do not constitute sufficient contact to warrant Dr. Bhan's opinion being afforded additional weight as Donnelly's treating physician. In *Garcia v. Barnhart,* the court found that infrequent visitation to a treating source was a deciding factor in providing the source little weight. *Garcia v. Barnhart,* No. 01 Civ. 8300(GEL), 2003 U.S. Dist. Lexis 159, at \*26, 2003 WL 68040 (S.D.N.Y.(Jan.7, 2003) (found the ALJ must consider all the factors required by the regulation in assigning weight to a treating source, including length and nature of visits.) Courts in other jurisdictions have reached similar conclusions. The Sixth Circuit found that "a single visit does not constitute an ongoing treatment relationship ... depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Kornecky v. Comm'r of Soc. Sec.,* 167 Fed. Appx. 496, 506–07 (6th Cir.2006) and *Coulson v. Comm'r of Soc. Sec,* 2011 U.S. Dist. LEXIS 104389, 19 (W.D.Mich.2011) (finding a single examination was insufficient to warrant treating physician status and the treating source's opinion should not receive great weight.) Although this decision is not binding on the Court, the Court finds the language persuasive

**\*13** Donnelly also argues that the ALJ should not have given limited weight to the assessment of her treating endocrinologist, Dr. Parikh. (Pl. Mot. at 25.) The ALJ limited Dr. Parikh's opinion based on her finding that "periodic adjustment of medication and the need for regular diagnostic tests do not establish inability to function in the workplace on a sustained and competitive basis." (Id.) Dr. Parikh stated that Donnelly was unable to work for at least twelve months and cited the need for a whole body scan in November and the need for continual adjustments of her medications as support. (Tr. at 365.) Dr. Parikh found Donnelly still symptomatic but only cited those factors as support and listed no vocational limitations. (Tr. at 365, Def. Mot. at 20.) The Commissioner correctly notes that the weight of the medical record does not support Dr. Parikh's findings. (Tr. at 18.) In her testimony, Donnelly said she only goes to the hospital once every three months to adjust her medication and her ongoing treatment regimen consisted of follow up

appointments every six months, yearly radiation treatments, and body scans. (Def. Mot. at 21.) The Second Circuit has interpreted 20 C.F .R. §§ 404.1527(d)(2), 416.927(d)(2), the treating physician rule, to mean the ALJ must give controlling weight to the treating physician's opinion unless the opinion is not supported by the record. *Byam v. Barnhart,* 336 F.3d 172, 183 (2d Cir.2003) and *Rodriguez v. Barnhart,* 2004 U.S. Dist. LEXIS 25914, 19 (S.D.N.Y 2004). Where that opinion is contradicted by the record, it is within the ALJ's discretion to limit its weight. (*Id.*) Furthermore, relying on *Snell v. Apfel,* the Commissioner argues that Dr. Parikh's determination that Donnelly is disabled was reserved for the Commission and cannot itself be determinative. (Def. Mot. at 21 relying on *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999).) ALJ Reich gave the proper weight to Dr. Parikh's opinion.

## 2. The ALJ Erred in not Including Testimony from a Vocational Expert

At step four of the evaluation process, ALJ Reich found Donnelly incapable of performing her past relevant work. (Tr. at 19.) Citing two Second Circuit cases, Donnelly argues that ALJ was required to include the testimony of a vocational expert to identify the jobs which exist in the economy that she can perform. (Pl. Mot. at 28–29, referring to *Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir.1986), and *Rosa v. Callahan,* 168 F.3d 72, 82 (2d Cir.1999).) Donnelly notes that ALJ Reich did not take testimony from a vocational expert but relied only on the Medical–Vocational Guidelines at step five of the evaluation process. (Pl. Mot. at 29.) She challenges the ALJ's decision to not take any vocational expert testimony to support her belief that there exist jobs in the national economy Donnelly can perform. (*Id.*)

In *Bapp,* the Second Circuit established that a vocational expert's testimony is required whenever the claimant's non-exertional limitations significantly restricted the range of work he or she can perform. *Bapp v. Bowen,* 802 F.2d 601, 606 (2d Cir.1986). In contrast, when the claimant's non-exertional [4] limitations are either nonexistent or not significant, then a vocational expert's testimony is not required. In the latter situation, the ALJ is free to rely solely on the Medical–Vocational Guidelines. *Benson v. Astrue,* 2011 U.S.Dist. LEXIS 116831, *33, *35 (S.D.N.Y.2011). *See also Ortiz v. Sec'y of Health & Human Serv.,* 890 F.2d 520, 523 (1st Cir.1989). Since the ALJ found Donnelly to be significantly impaired, and was limited to sedentary work with the additional limitation of not working with heights or machinery, a vocational expert's testimony was required.

*14 ALJ Reich found Donnelly had non-exertional restrictions, and that those limitations reduced her "residual functional capacity to simple work." (Tr. at 109.) ALJ Reich concluded, however, that Donnelly's non-exertional limitations "do not significantly limit the range of unskilled light work she can perform. Her non-exertional limitations do not, therefore, have more than a slight effect on her occupational base." (Tr. at 20.)

Donnelly's non-exertional impairments include dizziness which impacts her ability to work with machinery and heights. (Tr. at 13.) ALJ Reich found these impairments restricted Donnelly's ability to perform the full range of employment indicated by the medical vocational guidelines. (Tr. at 20.) She could do sedentary work but was further limited only to those that did not require her to work around machinery or heights. In such a case, a vocational expert's testimony is required. *See Roma v. Astrue,* 468 Fed. Appx. 16, 20 (2d Cir.2012).

On Appeal, Donnelly contended that the lack of vocational expert testimony or its equivalent as grounds for granting her motion. (Pl Mot. at 28.) She maintained that by the ALJ's own assessment, she "has an RFC of less than sedentary capacity." (*Id.*) To properly evaluate the combined effect of her RFC and her non-exertional limitations, Donnelly argued that the ALJ should have consulted a vocational expert or equivalent at the fifth step of the analysis to determine what jobs exist in the economy which she could perform. (*Id.* at 28–29.) These impairments constitute severe impairments within the meaning of the Act since they resulted in more than minimal limitations on Donnelly's ability to perform basic work-related activities. (Tr. at 11.)

The ALJ properly completed the five-step analysis. At step four, ALJ Reich established Donnelly was impaired and proceeded to step five in determining whether her impairment prevents her from employment. While ALJ Reich found Donnelly was unable to continue her past work, she concluded that Donnelly was capable of employment so long as it did not require her to have too many interactions with people and did not require her to work with machinery or heights. Nonetheless, the ALJ did not provide examples of such work and the Commissioner did not meet his burden of proof to establish such a job exist in the economy. As the court explained in *Pareja v. Barnham* explained:

> When a claimant is incapable of the full range of a certain category of work, such as sedentary work, he 'must be

evaluated on an individualized basis since the medical-vocational grid used by the ALJ does not apply to claimants who cannot do sedentary work ... **the Commissioner's burden can be met only by calling a vocational expert to testify as to plaintiff's ability to perform some particular job.**

(*Pareja v. Barnham,* 2004 U.S. Dist. LEXIS 5156, 18 (S.D.N.Y.2004).) (Emphasis added.)

The Court agrees. Since ALJ Reich found Donnelly could not perform the full range of sedentary work, a vocational expert should have been used. In *Rodriguez,* the Second Circuit emphasized that the ALJ has an affirmative duty to develop the record. *Rodriguez,* 2004 U.S. Dist at 20. Failure to develop the record may be grounds for remand. *Washington v. Colvin,* 2015 U.S. Dist. LEXIS 22030, 36 (S.D.N.Y.2015). The lack of vocational expert testimony is a failure to develop the record. An action may be remanded where a gap exists in the record. *Rosa,* 168 F.3d at 83. Thus, the lack of vocational expert testimony is grounds to remand this case for further development of the record.

### 3. ALJ Reich Properly Evaluated Donnelly's Credibility

**\*15** Donnelly argues the ALJ improperly evaluated her credibility. (Pl. Mot. at 29.) She maintains that the ALJ's assessment of her credibility does not comport with the requirement of 20 C.F.R. § 404 .1529(c)(4), (*Id.* at 30.), which she contends directs the ALJ to evaluate her credibility based on the evidence not the ALJ's own RFC assessment. (*Id.*) Donnelly argues that SSR 96–7p makes it clear that the ALJ must evaluate the claimant's credibility prior to making an RFC assessment. (*Id.*)

The Commissioner asserts that the statute does not require that the claimant's statement of pain or other symptoms alone as conclusive evidence of disability. (Def. Mot. at 22.) Instead, the ALJ must consider what objective, medical evidence is in the record in determining whether disability exists. (*Id.* at 23.) In her discussion of Donnelly's credibility, ALJ Reich noted that, while Donnelly's "medically determinable impairments could reasonably be expected to cause the alleged symptoms ... [Donnelly's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ... residual functional capacity assessment." (Tr. at 17.) Thus, ALJ Reich relied on the medical record in her assessment of Donnelly's credibility.

The ALJ properly evaluated Donnelly's credibility. She relied on objective, medical records and found that some of Donnelly's statements were contradicted by the medical records. (Tr. at 17.) She then inferred those comments were not credible. (*Id.*) It is within the discretion of the ALJ to evaluate the credibility of claimant's testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of the symptoms alleged. *See Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999) and *Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984). Also, the ALJ's determination should be afforded deference because she heard Donnelly's testimony and observed her demeanor. *See also Tejada v. Apfel,* 167 F.3d 770, 776 (2d Cir.1999). (Def. Mot. at 23.)

ALJ Reich's determination of Donnelly's credibility is not only supported by the record but also Donnelly's own statements. In her testimony, Donnelly complained of difficulties with attention and concentration, but was able to read, to watch television, and to do puzzles with and to read to her autistic son. (Tr. at 34, 90.) The medical record shows that Donnelly was attentive with "good" to "fair" concentration. In addition, Donnelly was able to participate in a wide range of daily activities including taking care of her autistic son. (Def. Mot. at 24.) Her symptoms did not impair her to the point where she could not take care of her household and her son.

### 4. The Case Should Be Remanded For Further Administrative Proceedings

Donnelly requests a judgment on the pleadings, or alternatively, for the Court to remand the case for reconsideration of the evidence. (Pl. Mot. at 7.) A court should order remand to determine payment of benefits only where the record contains "persuasive proof of disability" and remand for further evidentiary proceedings would serve no further purpose. *Schall v. Apfel,* 134 F.3d 496, 504 (2d Cir.1998) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987)). Remand for further administrative proceedings is appropriate "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir.1999). As discussed above, the ALJ did not consult a vocational expert in her discussion of jobs in the economy Donnelly can perform. This warrants further administrative proceeding.

## IV. CONCLUSION

**\*16** For the reasons outlined above, I recommend that Donnelly's motion be **GRANTED IN PART,** and that the case be **REMANDED** for further administrative proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served to all adversaries, and a copy shall be delivered to the chambers of the Honorable Alison J. Nathan, 40 Foley Square, 2102, and the undersigned, 500 Pearl Street, 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas c. Arn,* 474 U.S. 140, 149–150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. 636(b) (1)(c) (West Supp.1995); Fed.R.Civ.P. 72(a), 6(a), 6(d.)

Filed March 13, 2015.

**All Citations**

Slip Copy, 2015 WL 1499227

### Footnotes

1    Metastasis is the spread of cancer cells to other parts of the body. American Heritage Dictionary 1104 (4th ed.2000).

2    Beck Depression Inventory (BDI) is a multiple choice self-report inventory assessment, widely used by mental health professionals to measure the severity of depression. The score is assessed as follows: A 0–9 score signifies minimal depression; 10–18 mild depression, 19–29 moderate depression and 30–63 severe depression. http://www.apa.o rg/pi/ about/publications/caregivers/practice - settings/assessment/tools/beck-depression.aspx

3    Titrate is the process by which doctor's determine the concentration of the medicine. AMERICAN Heritage Dictionary 1814 (4th ed.2000).

4    Non-exertional impairments are non-strength limitations which affects the claimant's mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling and environmental restrictions. 61 FR 34478.

---

2015 WL 3915959
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leo GREGORKA; and Eve Gregorka, Plaintiffs,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 6:13–CV–1408 (GTS/TWD).
|
Signed June 25, 2015.

**Attorneys and Law Firms**

Leo Gregorka and Eve Gregorka, Little Falls, NY, pro se.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY, Office of General Counsel, Social Security Administration, Emily M. Fishman, Esq., of Counsel, New York, NY, for Defendant.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** The above matter comes to this Court following a Report–Recommendation by United States Magistrate Judge Thérèse Wiley Dancks, filed on May 28, 2015, recommending that the Commissioner's decision denying benefits be affirmed with regard to Social Security income benefits ("SSI") but reversed with regard to disability insurance benefits ("DIB"). (Dkt. No. 14.) No objections to the Report–Recommendation have been filed and the time in which to do so has expired. After carefully reviewing all of the papers herein, including Magistrate Judge Dancks' thorough Report–Recommendation, the Court can find no error in the Report–Recommendation, clear or otherwise. As a result, the Report–Recommendation is accepted and adopted in its entirety; and the case is remanded to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 20) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that the Commissioner's decision is *AFFIRMED* with regard to the denial of SSI benefits but *REVERSED* with regard to the denial of DIB benefits; and it is further

**ORDERED** that this matter is *REMANDED* to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

### *REPORT AND RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This matter was referred to the undersigned for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Oral argument was not heard. For the reasons discussed below, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to supplemental security income ("SSI") benefits but remand the disability insurance benefits ("DIB") claim to the Commissioner for further proceedings.

### I. BACKGROUND AND PROCEDURAL HISTORY

On June 9, 2011, Thomas Leo Gregorka ("Mr.Gregorka") submitted applications for SSI and DIB. (Dkt. No. 15–2 at 21.) The applications were denied on December 13, 2011. *Id.* On January 19, 2012, Mr. Gregorka filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* Mr. Gregorka died on April 1, 2012. *Id.* Mr. Gregorka was fifty-eight years old when he died. *Id.* at 30.

Plaintiffs Leo and Eve Gregorka, the parents of Mr. Gregorka, filed a substitution of party to proceed with the hearing requested by their son. (Dkt. No. 15–2 at 21.) They did not, however, wish to appear at the hearing in person. *Id.* Thus, the ALJ based his decision on the record alone. *Id.*

**\*2** On June 19, 2012, the ALJ issued a decision finding that Mr. Gregorka was not disabled. (Dkt. No. 15–2 at 21–31.) Plaintiffs filed a request for review by the Appeals Council (Dkt. No. 15–2 at 16) and submitted additional evidence (Dkt. No. 15–2 at 5). On September 5, 2013, the Appeals Council issued separate decisions on Mr. Gregorka's SSI claim and his DIB claim. (Dkt. No. 15–2 at 1–4, 8 .) The Appeals Council dismissed the request for review of the SSI claim, finding that Plaintiffs were not proper parties pursuant to Social Security regulations. (Dkt. No. 15–2 at 8.) The Appeals Council denied the request for review of the DIB claim, finding that there was no basis for changing the ALJ's decision. (Dkt. No. 15–2 at 2, 3.)

Plaintiffs commenced this action on November 12, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a claimant seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In addition, the claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R.

§ 416.920(a)(4) (2015). Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir.2014.) "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

**\*3** The claimant bears the burden of proof regarding the first four steps. Kohler v. As true, 546 F.3d 260, 265 (2d Cir.2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.1996)). If the claimant meets his or her burden of proof, the burden shifts to the Commissioner at the fifth step to prove that the claimant is capable of working. Id.

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Featherly v. Astrue, 793 F.Supp.2d 627, 630 (W.D.N.Y.2011) (citations omitted); Rosado v. Sullivan, 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart,* 717 F.Supp.2d 241, 248 (N.D.N.Y.2010); [1] *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly,* 793 F.Supp.2d at 630; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

## III. THE ALJ'S DECISION

Here, the ALJ found at step one that Mr. Gregorka was not engaged in any substantial gainful activity from September 27, 2008, to April 1, 2012. (Dkt. No. 15–2 at 23.) At step two, the ALJ found that Mr. Gregorka suffered from the severe conditions of hypertensive and arthroscopic cardiovascular disease, chronic obstructive pulmonary disease, degenerative disc disease of the cervical and lumbar spine, and physical residuals from chronic alcohol abuse, including seizures, near syncope, and tremor. *Id.* at 23–24. The ALJ found that Mr. Gregorka did not have any severe mental impairment, granting "great weight" to the medical opinion of a non-examining agency medical consultant and "little weight" to the opinion of consultative psychologist Dennis Noia, Ph .D. *Id.* at 25. At step three, the ALJ found that none of Mr. Gregorka's impairments met or medically equaled a listed impairment. *Id.* at 25–26. At step four, the ALJ found that Mr.

Gregorka had the RFC to perform medium work, except that he needed to avoid climbing ladders or scaffolds and should avoid working at heights or around dangerous machinery. *Id.* at 26. Based on that RFC, the ALJ found that Mr. Gregorka was not able to perform any past relevant work. *Id.* at 29. At step five, however, the ALJ found that Mr. Gregorka could perform jobs that exist in significant numbers in the national economy. *Id.* at 30. Accordingly, the ALJ found that Mr. Gregorka was not disabled. *Id.* at 30–31.

## IV. PLAINTIFFS' FAILURE TO FILE A BRIEF

**\*4** This Court's General Order 18 sets forth the briefing schedule in Social Security cases. After Plaintiffs failed to comply with General Order 18, the undersigned issued an order of June 9, 2014, which directed Plaintiffs to file their brief within forty-five days after service of Defendant's brief. (Dkt. No. 17.) Despite this, Plaintiffs filed neither papers opposing Defendant's motion nor a request to enlarge the time within which to oppose Defendant's motion.

In the usual civil case, a plaintiff's failure to comply with court orders would subject the complaint to dismissal under Federal Rule of Civil Procedure 41(b). In addition, other Districts in the Second Circuit have held that where a Social Security plaintiff files a complaint but fails to file a brief on the merits, the complaint is conclusory and insufficient to defeat a motion for judgment on the pleadings. *Winegard v. Barnhart,* No. 02–CV–6231 CJS, 2006 U.S. Dist. LEXIS 31973, at \*27–28, 2006 WL 1455479, at \*9–10 (W.D.N.Y. Apr.5, 2006); *Feliciano v. Barnhart,* Civ. No. 04–9554 KMW AJP, 2005 U.S. Dist. LEXIS 14578, at \*34–36, 2005 WL 1693835, at \*10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart,* Civ. No. 01–4059 LTS JCF, 2004 U.S. Dist. LEXIS 3689, at \*6–7, 2004 WL 439495, at \*3 (S.D.N.Y. Mar.9, 2004).

In this District, however, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." (General Order No. 18 at 4.) General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.*

In a case such as this, where the plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiffs' failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence.

## V. DISCUSSION

### A. SSI Claim

The ALJ denied Mr. Gregorka's claim for both SSI and DIB on the merits. (Dkt. No. 15–2 at 21–31.) The Appeals Council dismissed Plaintiffs' request for review of the ALJ's decision regarding SSI on the grounds that Plaintiffs were not eligible survivors for underpayment of SSI under the agency's regulations. *Id.* at 8. In their complaint, Plaintiffs explicitly challenge the denial of "Title II benefits (Social Security Disability)." (Dkt. No. 1 at 1.) The complaint does not explicitly challenge the denial of SSI benefits under Title XVI. Defendant argues that to the extent that the complaint can be construed as asserting an SSI claim, that claim is moot and was properly dismissed by the Appeals Council. (Dkt. No. 18 at 8–10.) Defendant is correct.

 **\*5** Agency regulations drastically limit the categories of individuals who can recover benefit underpayments on behalf of a deceased individual. 20 C.F.R. § 416.542(b)(4). Surviving parents can recover only if the deceased underpaid recipient was a disabled or blind child when the underpayment occurred. 20 C.F.R. § 416.542(b)(2)-(3). A "child" is an individual under the age of eighteen or an unmarried individual under the age of twenty-two who is attending school. 20 C.F.R. § 416.1856. Here, Mr. Gregorka was fifty-seven years old when he applied for SSI. (Dkt. No. 15–2 at 21, 30.) Accordingly, Plaintiffs are not the surviving parents of a disabled child pursuant to agency regulations. Therefore, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to recover SSI benefits.

### B. DIB Claim

Defendant concedes that remand is appropriate regarding Plaintiffs' DIB claim. (Dkt. No. 18 at 10–14.) Specifically, remand is appropriate because it is not clear from the Appeals Council's decision whether it considered four medical assessments by Mr. Gregorka's treating physician that were submitted as new evidence. (Dkt. No. 15–2 at 5; Dkt. No. 15–9 at 59–66.) Those assessments related to the period on or before the ALJ's decision and contradicted the ALJ's RFC finding. (Dkt. No. 15–9 at 59–66.) The Appeals Council was thus required to consider it. 20 C.F.R. § 404.970(b). Accordingly, it is recommended that the Court remand this matter to the Commissioner for further proceedings regarding Plaintiff's DIB claim.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), [2] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 87 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. ,. 892 F.2d 15, 16 (2d Cir.1989)*); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: May 28, 2015.

**All Citations**

Slip Copy, 2015 WL 3915959

---

Footnotes

1    On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the district judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Comm'r of Soc. Sec.,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Ross v. Barnhart,* 717 F.Supp.2d 241 (N.D.N.Y.2010). The Court has used the title listed by Westlaw.

2      Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1806779
United States District Court,
W.D. New York.

Gary Lee GROSS, Plaintiff,
v.
Michael J. ASTRUE,[1] Commissioner
Of Social Security, Defendant.

No. 12–CV–6207P.
|
Signed May 7, 2014.

## Attorneys and Law Firms

Kenneth R. Hiller, Law Offices of Kenneth Hiller, Amherst, NY, for Plaintiff.

Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, Vernon Norwood, Social Security Administration, New York, NY, for Defendant.

## DECISION & ORDER

MARIAN W. PAYSON, United States Magistrate Judge.

### PRELIMINARY STATEMENT

**\*1** Plaintiff Gary Lee Gross ("Gross") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 15).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket 11, 12). For the reasons set forth below, this Court finds that the decision of the Commissioner is not supported by substantial evidence in the record. Accordingly, the Commissioner's decision is vacated, and this claim is remanded for further administrative proceedings consistent with this decision.

## BACKGROUND

### I. *Procedural Background*

Gross applied for benefits on March 13, 2009, alleging he had been disabled since March 8, 2009 due to degenerative disc disease, back injury and depression. (Tr. 176–82, 211).[2] On August 18, 2009, the Social Security Administration denied Gross's claim for disability benefits, finding that he was not disabled. (Tr. 71). Gross requested and was granted a hearing before Administrative Law Judge Susan Wakshul (the "ALJ"). (Tr. 79, 93, 111–15). The ALJ conducted a video conference hearing on August 30, 2010. (Tr. 27, 29). Gross was represented at the hearing by his attorney, Kelly Laga, Esq. (Tr. 29, 92). In a decision dated September 23, 2010, the ALJ found that Gross was not disabled and thus was not entitled to benefits. (Tr. 14–22). On February 23, 2012, the Appeals Council denied Gross's request for review of the ALJ's decision. (Tr. 1–4). Gross commenced this action on April 18, 2012 seeking review of the Commissioner's decision. (Docket # 1).

### II. *Non–Medical Evidence*

#### A. *Gross's Application for Benefits*

Gross was born on March 17, 1962 and is now 52 years old. (Tr. 471). Gross attended high school in a regular class setting through the tenth grade, when he dropped out. (*Id.*). Gross served in the Navy from 1979 through 1980 and was honorably discharged. (Tr. 473). Gross subsequently obtained his GED in 1982. (Tr. 471).

Gross's previous work history includes employment as a telemarketer, food service employee, delivery truck driver, taxi driver, dispatcher and officer manager. (Tr. 35–38). From approximately 1995 through 2000, Gross worked in the food service industry, first as a cook, then as a kitchen manager and finally as an assistant manager. (Tr. 35–38, 197, 282). Gross was also employed as a telemarketer for approximately six months. (*Id.*). From approximately May 2000 through July 2001, Gross was employed as a delivery truck driver refilling vending machines. (Tr. 282). During the period July 2001 to March 2008, Gross was employed in the taxicab industry. (*Id.*). Initially, Gross drove the cabs. Gross later worked as a dispatcher and then as an office manager. (Tr. 197). As an office manager, Gross's responsibilities included dispatching taxicabs, coordinating pickup and drop off times, billing, and handling customer and client calls. (Tr. 226). According to

Gross, his duties required him to stand approximately half an hour per day and to sit approximately seven and a half hours per day. (Tr. 227). The job required very limited climbing, stooping, kneeling, crouching, or crawling. (*Id.*). During a typical workday, Gross was required occasionally to lift fifty pounds and frequently to lift ten pounds. (*Id.*). According to Gross, he stopped working in 2008 because his frequent absences were interfering with his job responsibilities. (Tr. 35). He has not worked since March 2008. (Tr. 35, 171).

 **\*2** When Gross applied for disability benefits, he lived with his wife and two children. (Tr. 186). Gross reported that his daily activities included eating breakfast, attending appointments with his doctors and physical therapist, watching television and using the computer. (Tr. 187). According to Gross, he feeds the family pets with assistance from his wife and children and can perform light household cleaning. (Tr. 187, 189). Gross's wife does the majority of the shopping and cooking, although Gross is able to make simple meals for lunch. (Tr. 188, 190). Gross leaves the house primarily to attend medical appointments or physical therapy. (Tr. 189).

According to Gross, prior to the onset of his reported disabilities, he was able to perform household tasks like cleaning and cooking, but is unable to do so now due to his inability to sit or stand for extended periods. (Tr. 187). In addition, Gross reports that he can no longer ride a bicycle, play sports, lift heavy objects or go bowling—limitations that have caused him to lose friends. (Tr. 187, 191). Gross's impairments also interrupt his sleep, and he currently sleeps for approximately two to three hours at a time. (Tr. 187).

Gross reports that he needs reminders to take his medications, but is able to pay bills, handle a savings account and use a checkbook. (Tr. 188, 190). According to Gross, he reads, watches television and uses the computer daily, but easily loses interest. (*Id.*). Since the onset of his impairments, he has experienced increased irritability, is argumentative and has difficulty remaining focused. (Tr. 192). Gross reports that his impairments have resulted in depression and he worries that they are adversely affecting his relationship with his family. (Tr. 193).

Gross's impairments have limited his ability to walk, and he uses a cane for assistance. (Tr. 192). According to Gross, he experiences a constant ache in his right hip, both knees, both ankles and his lower back. (Tr. 194). Gross reports that sitting, walking, lying down and bending exacerbate his pain. (Tr.

195). At the time he filed for disability, Gross was not taking medication to manage the pain because his prescription had run out. (*Id.*).

After the initial denial of benefits, Gross supplemented his disability application on August 26, 2009. (Tr. 242–51). According to that application, he experienced deepening depression, which caused his physician to modify his medication. (Tr. 243). In addition, Gross began attending Alcoholics Anonymous due to his worsening depression. (*Id.*). Gross reported that he was undergoing testing for lupus, a possible heart condition and joint disease. (*Id.*). Gross's physical limitations have become more severe and he now requires a shower chair and a quad cane. (*Id.*). According to Gross, he needs assistance when taking a shower and dressing. (Tr. 250). Further, Gross no longer assists with any household chores, nor drives because he experiences dizzy spells and blurred vision. (*Id.*).

### B. *The Disability Analyst's RFC Assessment*
 **\*3** On July 29, 2009, disability analyst E. Sousa ("Sousa") completed a physical residual functional capacity ("RFC") assessment. (Tr. 477–82). Sousa opined that Gross could occasionally lift twenty pounds and frequently lift ten pounds. According to Sousa, Gross could stand or sit for six hours during an eight-hour workday and had no limitations in his ability to push or pull. (Tr. 478). In addition, Sousa opined that Gross could occasionally climb ladders, ropes or scaffolds and could occasionally balance, stoop, kneel, crouch and crawl. Finally, Sousa noted that Gross had no manipulative, visual, environmental or communicative limitations. (Tr. 480). Based upon this assessment of Gross's limitations, Sousa opined that Gross retained the ability to perform light work. (Tr. 479).

### III. *Medical Evidence*
Gross was in a motor vehicle accident in 1991 and has experienced degenerative disc or joint disease since that event. (Tr. 518). Between 1992 and the latter part of 2006, Gross's medical records primarily reflect emergency room visits relating to back and hip problems. (Tr. 330–62). In August 1991, Gross visited the Mercy Medical Center complaining of pain in his right hip. (Tr. 358, 360). Gross reported an inability to put pressure upon his right hip and difficulty walking. (Tr. 358). An examination and x-ray of the hip were negative for fractures or calcium build-up. (Tr. 358, 360).

In September 1998, Gross visited the emergency department at the Genesee Hospital complaining of lower back pain and muscle spasms. (Tr. 331). Gross was prescribed ibuprofen and valium and was given a note to excuse him from work for one week. (Tr. 331–32). On July 4, 2000, Gross visited the Bristol Regional Medical Center ("Bristol") complaining of a pulled back muscle. (Tr. 352). According to Gross, he had injured his back while attempting to move a refrigerator. (*Id.*). Gross reported pain in his back and his right hip, along with pain and numbness in his legs. (*Id.*). Gross was prescribed medication and instructed to follow-up with his personal physician if the symptoms did not resolve. (*Id.*).

Approximately one and one-half months later, Gross returned to Bristol complaining of a right ankle injury. (Tr. 351). Gross reported that he had injured his ankle while playing basketball. (*Id.*). Gross was prescribed motrin and was instructed to use crutches and ice and to follow-up with his primary physician if the symptoms persisted. (*Id.*). The following morning, Gross returned to have his ankle re-checked and for x-rays. (Tr. 349). The x-rays were negative for fractures. (Tr. 350). Approximately four months later, on December 18, 2009, Gross reportedly re-injured his ankle when he slipped on ice. (Tr. 347). Again, x-rays were negative for a fracture, and Gross was prescribed ibuprofen and instructed to rest, ice and elevate his ankle. (*Id.*).

In January 2001, Gross returned to Bristol reporting of chest pain. (Tr. 339). After a series of tests, including blood work and chest x-rays, Gross was instructed to take Mylanta and Zantac and to follow-up with his primary care physician. (Tr. 341–45). Finally, on July 3, 2001, Gross returned to Bristol with complaints of pain in his back and right leg. [3] (Tr. 337).

**\*4** On November 15, 2006, Gross began treatment at Highland Family Medicine. [4] (Tr. 321). During that visit, Gross reported that he had not received medical care for the past seven years because he did not have medical insurance. (*Id.*). Gross reported that he had suffered back pain for many years. (*Id.*). Gross also expressed concern regarding his cholesterol, blood pressure and his weight. (*Id.*). The treatment plan addressed hypertension, hyperlipidemia, morbid obesity and dietary education. (*Id.*). With respect to Gross's history of back pain, his previous treatment records were requested and he was instructed to follow-up with his primary care physician, Dr. Lois Vantol ("Vantol"). (Tr. 316, 322). Gross returned for two appointments in November 2006 in order to follow-up on his lab results. (Tr. 318– 320). During his visit on November 29, 2006, Gross reported

that his back had "slipped out" over the weekend, which caused him to miss a day of work. (Tr. 318). Gross was instructed to continue with his hypertension medication and dietary modifications. (*Id.*). In addition, smoking cessation was discussed. (*Id.*).

During his next appointment on December 20, 2006, Gross reported that he was going to physical therapy for his back pain. (Tr. 317). According to Gross, he believed that he had overworked himself during his physical therapy session, resulting in pain radiating to his hip and leg. (*Id.*). Gross's hypertension appeared to be controlled by medication, and he was instructed to continue his weight loss and smoking cessation attempts. (*Id.*).

Gross's next appointment with Vantol was on March 9, 2007. (Tr. 316). The purpose of the visit was to refill his prescriptions and to follow-up on his back pain. (*Id.*). Gross reported that he had been performing physical therapy exercises at home and had not experienced any significant back pain since his last appointment. (*Id.*). Gross continued to lose weight and was instructed to try Nicoderm patches and Buprorion to assist him with his efforts to stop smoking. (*Id.*).

During a July 27, 2007 appointment, Gross reported ongoing chest pain, left arm numbness, a facial droop and garbled speech. (Tr. 314–15). Based upon these symptoms, Gross was transported to the Highland Hospital Emergency Department for blood work, monitoring and potential head imaging. (*Id.*). He had a follow-up visit at Highland Family Medicine on August 4, 2007. (Tr. 413–14). The treatment notes indicate that Gross was diagnosed with Bell's palsy, was placed on steroids, which improved the facial droop symptoms, and did not require any further treatment. (*Id.*). Gross's thyroid levels were low and required further testing. (*Id.*). Gross reported little success in his efforts to quit smoking. (*Id.*).

Gross's next appointment was on December 3, 2007. At that time, Gross reported acute back pain. (Tr. 408–09). According to Gross, his back pain had worsened over the past three months and had radiated to his left hip. (*Id.*). Gross reported that he had recently been laid off from work, which was causing stress and increased tobacco use. (*Id.*). In addition, Gross no longer had any insurance coverage. (*Id.*). Gross requested a new prescription for his hypertension medication. (*Id.*). Gross was instructed to apply heat to his back and to resume his physical therapy stretches to alleviate his back pain. (*Id.*).

**\*5** Gross apparently did not receive any treatment for the next seven months. (Tr. 406–07). Gross's next appointment was on July 3, 2008, during which he complained to Vantol about back pain that he had been experiencing for the last three months. (*Id.*). Gross reported experiencing muscle spasms in his lower back and tingling in his legs if he remained seated for extended periods. (*Id.*). Gross reported that an MRI conducted fifteen years earlier revealed degenerative joint disease. (*Id.*). According to Gross, in the past his back symptoms had been alleviated with physical therapy. (*Id.*). According to Gross, he lost his job because his employer needed someone who could perform physical labor. (*Id.*). Gross also reported difficulty sleeping and increased irritability. (*Id*.). Vantol prescribed medication for the back pain and ordered x-rays. (*Id.*). In addition, Vantol discussed treatment options for Gross's reported depression, but Gross declined treatment. (*Id.*). Vantol also ordered a lipid profile to monitor Gross's hyperlipidemia. (*Id.*).

Gross had a follow-up appointment with Vantol on July 17, 2008. (Tr. 401–02). During that appointment, Vantol discussed the results of the back x-rays taken on July 9, 2008. (Tr. 325–26, 401). According to the radiology reports, those x-rays revealed mild degenerative changes in multiple areas of the thoracic spine and moderate degenerative changes at L5–S1. (Tr. 325–26). Gross reported that the medications were not relieving his back pain and that he had applied for disability. (Tr. 401). Gross indicated that he continued to experience pain in his back and that it radiated to his right leg with occasional numbness or tingling in the entire leg. (*Id.*). Vantol ordered an MRI of Gross's back, and opined that Gross needed temporary disability, but was not likely permanently disabled. (Tr. 402). Vantol also prescribed Lipitor for hyperlipidemia and recommended that Gross quit smoking. (*Id.*). Vantol prescribed Zoloft for his depression. (*Id.*).

On July 23, 2008, Gross underwent an MRI of his lumbar spine. (Tr. 399–400). The MRI revealed posterior central disc herniation at L3–L4 and L4–L5 and mild narrowing of the proximal neural foramina bilaterally at L5–S1 with no significant spinal stenosis. (Tr. 400). In addition, there were endplate degenerative changes throughout the lumbar spine. (*Id.*). The impression was mild degenerative changes throughout the spine, most prominent from L3–L4 though L5–S1. (*Id.*). In addition, the MRI revealed a potential renal cyst. (*Id.*).

On August 12, 2008, Gross returned to Highland Family Medicine for a follow-up appointment with Vantol. (Tr. 397–98). During the visit, Gross told Vantol that he had previously attempted physical therapy for his back pain, but had discontinued after approximately six weeks because it caused increased pain. (*Id.*). In addition, Gross reported that he was discouraged about his unemployment. (*Id.*). Vantol reviewed the MRI results and referred Gross to physical therapy and VESID for job retraining. (Tr. 398). In addition, Vantol referred Gross to behavioral health services ("BHS") for his depression. (*Id.*).

**\*6** Gross's next appointment was on August 27, 2008. (Tr. 395–96). During that appointment, Gross reported continued back pain that required him to change positions frequently. According to Gross, his depression was not responding to medication. (*Id.*). Vantol prescribed Flexeril for Gross's back and encouraged him to go to physical therapy. Vantol instructed Gross to continue his medications to treat his depression and Vantol contacted BHS to instruct them to contact Gross. (*Id.*).

Approximately seven months later, on March 12, 2009, Gross returned to Vantol complaining of low back and hip pain. (Tr. 393–94). Gross reported that he did not go to physical therapy or to VESID, expressing his belief that he should be on disability. (*Id.*). Gross reported that he was able to perform housework. (*Id.*). Gross's hypertension appeared controlled, he continued to take medication and denied any chest pains or shortness of breath. (*Id.*). Gross reported drinking approximately four to six beers every night. (*Id.*). Vantol noted that Gross had missed his follow-up appointments with her, as well as with BHS and a physical therapist. (*Id.*). Gross explained that his mother had been in a nursing home over the previous eight months and had recently passed away. (*Id.*). According to Gross, these developments made it difficult for him to manage his appointments. (*Id.*). Vantol noted that Gross had gained twenty-one pounds and that he was not interested in quitting smoking. (*Id.*). Vantol referred Gross to physical therapy to address his ongoing back pain and to BHS to address his depression. (*Id.*). In addition, Vantol referred Gross to Strong Recovery to address his alcohol abuse. (*Id.*).

On March 31, 2009, Gross had a physical therapy appointment at Strong Health. (Tr. 369). During that intake appointment, Gross reported that he had chronic low back pain stemming from a motor vehicle accident several years earlier. (Tr. 372). Gross described the pain as a constant sharp,

shooting pain that worsened when sitting, standing or lying. (*Id.*). Gross used a cane to ambulate and reported some relief with heat and massage. (*Id.*). Gross attended two additional physical therapy appointments on April 6 and 9, 2009. (Tr. 370).

On April 21, 2009, Gross had another appointment with Vantol. (Tr. 388–89). Gross reported that he continued to have back and hip pain and was experiencing pain in his left knee. (Tr. 388). Gross missed his previous two physical therapy appointments, but intended to return for additional therapy. (*Id.*). Gross requested narcotic medication to manage his pain. (*Id.*). According to Gross, he did not contact Strong Recovery, but reported that he had decreased his alcohol consumption to approximately one beer every other day. (*Id.*). Gross indicated that he still was very depressed. (*Id.*). According to Vantol, Gross had not followed-up on the referral to BHS. (*Id.*). Vantol noted that Gross's hypertension was not controlled and thus increased his dosage of Lisinopril. (Tr. 389). Vantol ordered x-rays of Gross's hips and knees, but did not consider Gross a good candidate for narcotic medication and declined to prescribe them. (*Id.*). Vantol instructed Gross to continue taking Sertraline for his depression and again referred him to BHS. (*Id.*). In addition, Vantol encouraged Gross to quit drinking alcohol and smoking. (*Id* .).

**\*7** On the morning of May 16, 2009, Gross awoke with facial, arm and leg weakness and numbness on the left side of his body. (Tr. 427–28). Gross was admitted to Strong Memorial Hospital to undergo testing for a possible ischemic infarct. (*Id.*). Gross underwent an MRI of his head and a transthoracic echocardiogram. (Tr. 428, 434). The MRI was negative for ischemic lesions, and the echocardiogram was normal. (*Id.*). Upon discharge, he was diagnosed with transient hemiparesis of unclear etiology. (Tr. 428). He was instructed to follow-up with Vantol. (*Id.*).

On May 22, 2009, x-rays were taken of Gross's hip and knees. (Tr. 430–34). The x-ray of the hips revealed mild or minimal tricompartmental degenerative change. (*Id.*). Similarly, the x-rays of the knees revealed mild degenerative change. (*Id.*).

On August 7, 2009, state examiner Dr. Lynn Lambert ("Lambert") conducted a consultative psychiatric evaluation of Gross. (Tr. 471–76). During the evaluation, Gross reported that he was unemployed and had left his prior employment due to frequent absences, low frustration tolerance, mood swings and daily alcohol consumption. (Tr. 471). He also

reported difficulty sleeping and fluctuating appetite. (Tr. 472). With respect to his depressive symptoms, Gross reported dysphoric moods, crying spells, loss of interest, concentration disturbance, diminished self esteem, feelings of worthlessness, low energy, psychomotor and emotional agitation, low frustration tolerance and unpredictable mood swings. (*Id.*). Regarding his cognitive symptoms, Gross reported difficulty concentrating, poor short term memory and episodic planning difficulties. (*Id.*).

Gross reported a long term alcohol addiction, particularly during the period from 1982 to 1991 when he was drinking approximately one case of beer a day. (*Id.*). According to Gross, he was currently consuming approximately four alcoholic beverages every day. (*Id.*). Gross had recently been referred to Strong Memorial Hospital's Outpatient Chemical Dependency Program and anticipated attending outpatient treatment groups three times per week. (Tr. 472–73).

Gross reported that he had difficulty cooking, shopping and performing household chores due to his short term memory loss, general loss of interest and low energy level. (Tr. 474). According to Gross, he had a good relationship with his wife and children, but did not participate in social activities. (*Id.*). In addition, Gross reported that he no longer engaged in hobbies, particularly reading, due to loss of interest. (*Id.*).

Lambert opined that Gross had fluent speech, coherent and goal-oriented thought processes, anxious and labile affect, dysthmic mood, clear sensorium, intact attention and concentration, mildly impaired memory, and between average and high-average cognitive functioning. (Tr. 473–74). Lambert noted that Gross was able to perform all counting, calculations and serial 3s exercises. (Tr. 474). Lambert assessed that Gross's insight was fair and his judgment was fair to not good as a result of his continued drinking. (*Id.*). According to Lambert, Gross would be moderately challenged to maintain a regular schedule, learn new tasks, perform complex tasks independently, relate adequately with others and appropriately deal with stress. (*Id.*). Lambert opined that the moderate limitations resulted from Gross's daily consumption of alcohol, coupled with his mood instability and fluctuations, low frustration tolerance and stress regulation problems—all of which interfered with his planning and functioning. (*Id.*). According to Lambert, Gross's prognosis was both fair and not good despite his above-average intellect and supportive spouse. (Tr. 476). Lambert opined that his prognosis was inhibited by his

long history of active alcoholism and potentially untreated psychiatric mood disorder. (*Id.*).

**\*8** On August 17, 2009, agency medical consultant Dr. M. Apacible ("Apacible") completed a mental RFC assessment and a Psychiatric Review Technique. (Tr. 483–500). Apacible concluded that Gross suffered from mood disorder, not otherwise specified, and that bipolar disorder should be ruled out, but that Gross's impairments did not meet or equal a listed impairment. (Tr. 490). In addition, Apacible determined that Gross suffered from active alcohol dependence. (Tr. 495). Apacible opined that Gross had mild limitations in activities of daily living and in his ability to maintain concentration, persistence or pace and moderate limitations in his ability to maintain social functioning. (Tr. 497).

Apacible concluded that Gross suffered from moderate limitations in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; complete a normal workday or workweek and perform at a consistent pace without an unreasonable number of interruptions; respond appropriately to others; and, independently set realistic goals or make plans. (Tr. 483–84). According to Apacible, Gross appeared able to understand, remember and carry out simple instructions, interact appropriately with others, make simple work-related decisions and deal with some degree of stress. (Tr. 485). Accordingly, Apacible opined that Gross was able to perform all of the requirements of unskilled or semi-skilled work. (*Id.*).

On August 25, 2009, based upon Vantol's referral, Gross was examined by Dr. Mark Mirabelli ("Mirabelli") for an opinion regarding Gross's joint complaints. (Tr. 518–19). Upon examination, Mirabelli noted that Gross had a mild limp when walking and was unable to perform tiptoe or heel walking. (*Id.*). In addition, Mirabelli noted that Gross had an intention tremor caused by either static or intended movements, which was particularly noticeable in both of his hands. (*Id.*). Mirabelli opined that mild osteoarthritis was present, but not likely the cause of Gross's multiple joint pains. (*Id.*). Mirabelli instructed Gross to follow-up as needed with Vantol. (*Id.*). A few days later, on August 28, 2009, Gross had a follow-up appointment with Vantol. (Tr. 588–89). During that visit, Gross reported that he was participating in alcohol abuse treatment at Strong Recovery and had experienced a few episodes of brief, sharp chest pains. (*Id.*). Gross also indicated that his medications were not relieving

his joint pains and that he continued to have depressive symptoms despite his new prescription for Effexor. (*Id.*). Vantol referred Gross to a cardiologist to assess the chest pains. (*Id.*).

On September 1, 2009, Gross was evaluated by Dr. Sandeep Singh ("Singh") at the Highland Cardiology Clinic. (Tr. 507–09). Singh assessed that Gross had suffered from atypical chest pains and had multiple cardiac risk factors. (Tr. 508). He recommended a coronary angiogram and a carotid ultrasound. (Tr. 509). The carotid ultrasound was performed the same day and revealed mild bilateral nonobstructive plaquing with good antograde flow in the bilateral vertabral arteries. (Tr. 510–11). On September 2, 2009, Gross underwent a left heart catheterization, which revealed that Gross suffered from mild to moderate, non-obstructive, one vessel coronary artery disease with normal left ventricular systolic function. (Tr. 539–40).

**\*9** On September 9, 2009, Gross returned for a follow-up visit with Singh. (Tr. 505–06). Singh diagnosed Gross with mild, non-obstructive coronary heart disease and opined that the atypical chest pains might be related to gastroesophageal reflux disease. (*Id.*). Singh also noted that Gross's hyperlipidemia was not controlled. (*Id.*). Singh recommended that Gross discontinue Simvastatin and start taking Crestor for his high cholesterol. (*Id* .). In addition, Singh prescribed Pantoprazole for Gross's chest pain. (*Id.*).

On September 14, 2009, Gross went to the emergency room at Strong Memorial Hospital because of knee pain. (Tr. 573). According to treatment records, Gross reported that he fell the previous evening. (*Id.*). Gross was able to ambulate and to drive himself to the emergency room. (*Id.*). Gross was diagnosed with osteoarthritis in his knee and was instructed to follow-up with his primary care physician. (Tr. 583–85, 592–93).

On September 25, 2009, Gross had an appointment with Vantol. (Tr. 586–87). Gross reported that he continued to experience depression, but had not been able to see a psychiatrist through Strong Recovery. (Tr. 586). According to Gross, he continued to drink approximately six beers per day. (Tr. 587). Vantol noted that Gross was wearing Neoprene braces on both knees and recommended a follow-up appointment for knee injections. (*Id.*). He also instructed Gross to slowly discontinue Sertraline and to begin taking Venlafaxine for his depression. (*Id.*). Vantol indicated that

she would contact BHS to attempt to facilitate an appointment with a psychiatrist. (*Id.*).

Gross also attended alcohol treatment sessions in August and September 2009. (Tr. 608–625). The records reflect that Gross began attending group sessions on August 20, 2009. (Tr. 615). On September 15, 2009, a treatment plan to address Gross's addiction was formulated. (Tr. 615–19). At the time, Gross was diagnosed with active alcohol and nicotine dependence and major depressive disorder, and determined to have a Global Assessment of Functioning ("GAF") of 50. (Tr. 615). The treatment plan called for Gross to attend group sessions three times a week and individual sessions once a month. (*Id.*). Gross was eventually discharged from the program for failing to attend group sessions due to his medical complications. (Tr. 612). At the time of discharge, Gross had attended eleven group sessions and one individual session. (Tr. 608).

On April 22, 2010, Gross began treatment with a new primary care physician, Dr. Andrew Davidson ("Davidson") at the University of Rochester Medical Center. (Tr. 654–56). Gross told Davidson that he had obtained a new primary care physician on the advice of his attorney. (Tr. 654). Gross informed Davidson that he had stopped taking his medications due to a loss of insurance coverage approximately three months ago. (*Id.*). The main concerns that Gross discussed with Davidson were knee pain and depression. Gross reported that he was in group therapy at Strong Behavioral Health and that he was currently drinking approximately two beers per day. (*Id.*). In addition, Gross expressed concern regarding "a long standing tremor in his hands." (*Id.*). Davidson referred Gross to an orthopaedic physician to address Gross's ongoing knee pain and noted his intent to contact Strong Behavioral Health to convey Gross's request for more individual therapy sessions. (Tr. 655). Finally, Davidson noted that he would address Gross's hand tremor issues during the next appointment. (Tr. 656).

 *10 On May 6, 2010, Gross had an appointment with Mary Jo LaVilla ("LaVilla"), a nurse practitioner in the gastrointestinal clinic. (Tr. 657–59). LaVilla recommended that Gross discontinue use of Alka–Seltzer to treat his gastrointestinal pain and begin using Prevacid. (Tr. 658). In addition, LaVilla scheduled Gross for testing to evaluate whether he suffers from peptic ulcer disease and to rule out colonic neoplasm. (*Id.*).

On May 12, 2010, Gross attended an appointment with Singh. (Tr. 660). Gross reported that he had not experienced chest pains or shortness of breath. (*Id.*). According to Gross, he had experienced increased snoring and difficulty breathing. (*Id.*). Singh referred Gross for a sleep evaluation. (Tr. 661).

On May 19, 2010, Gross had a follow-up appointment and was examined by Ellen Ingram ("Ingram"), a nurse practitioner. (Tr. 662–63). Gross reported continued depression and reiterated his request for individual therapy. (Tr. 662). Gross reported that he continued to consume one or two alcoholic beverages approximately three times each week. (*Id.*). Gross reported continued pain in his legs, knees and back. (*Id.*). Upon examination, Ingram noted a potential functional limitation on Gross's left-side and ordered a quad cane to assist Gross's ambulation. (Tr. 663).

On May 26, 2010, Gross attended an appointment with Dr. Geetanjali Rajda ("Rajda"), a doctor at Sleep Insights, and ultimately underwent a sleep study. (Tr. 525–34). The results of the study were evaluated by Dr. Ken Plotkin ("Plotkin"). According to Plotkin, Gross may suffer from obstructive breathing, periodic limb movement disorder and insomnia. (Tr. 534).

On June 9, 2010, Gross was evaluated by Dr. Allen D. Boyd ("Boyd"), an orthopedic doctor. (Tr. 664–65). Boyd reviewed x-rays of Gross's hips and knees and noted no significant abnormalities. (Tr. 664). The x-rays of the hips suggested moderate osteoarthritis on the right side and mild osteoarthritis on the left side. (Tr. 646). The x-rays of the knees suggested mild bilateral degenerative changes. (*Id.*). Boyd opined that Gross's pain symptoms likely stemmed from an issue with his lumbar spine, and he referred Gross to a spine specialist. (*Id.*).

Gross had a follow-up appointment with Ingram on June 29, 2010. (Tr. 666–67). Ingram noted that Gross continued to experience pain in his back, knees and legs and noted that the orthopedist believed the pain was radiating from the spine and had referred Gross to a specialist. (Tr. 666). Ingram also noted that Gross reported continued mood swings and had an appointment scheduled with BHS in August. (Tr. 666–67). Ingram advised Gross to continue his medications, attend his upcoming appointments and to follow-up in one month. (Tr. 667).

On August 12, 2010, Davidson completed a physical RFC assessment questionnaire for Gross. (Tr. 670–74). According

to Davidson, he had conducted two office visits with Gross during the previous four months. (*Id.*). Davidson indicated that Gross suffers from coronary artery disease, morbid obesity, lower back pain and osteoarthritis—all of which were expected to last more than one year. (*Id.*). Davidson indicated that Gross suffers pain, fatigue and weakness, including severe pain in his back and legs that is worsened by both activity and inactivity. (*Id.*). Davidson opined that he did not believe that Gross was a malingerer and noted that Gross also suffers from depression and anxiety. (*Id.*).

 **\*11** With respect to employment, Davidson indicated that Gross would frequently experience pain during a typical workday, but would be capable of a low stress job. (*Id.*). According to Davidson, he believed that Gross could sit for approximately thirty minutes and stand for approximately five minutes without needing a break. (*Id* .). In addition, Davidson believed that Gross would be able to stand or walk for less than two hours in a workday and would be able to sit approximately four hours in a workday. (*Id.*). According to Davidson, Gross would need to be able to walk for approximately fifteen minutes every thirty minutes; shift at will from sitting to standing; use an assistive device; take unscheduled breaks continuously throughout the workday; and, elevate his legs by ninety-percent during those breaks. (*Id.*). With respect to exertional limitations, Davidson opined that Gross should rarely lift ten pounds or less and should never lift more than ten pounds. (*Id.*). According to Davidson, Gross could not perform any jobs that required any stooping, crouching, squatting or climbing ladders, and should rarely be required to twist or climb stairs. (*Id.*). Davidson also indicated that Gross has limitations in reaching, fingering and handling and could only use his hands, fingers and arms twenty-five percent of the workday. (*Id.*). Finally, Davidson opined that Gross's impairments would cause him to be absent more than four days per month. (*Id.*).

### IV. *Proceedings Before the ALJ*

At the administrative hearing, Gross testified that he had not graduated from high school, but had obtained a GED. (Tr. 52). He was currently living with his wife and three children. (*Id.*). According to Gross, although he had a driver's licence, he could not drive due to drowsiness caused by sleep apnea and medication usage. (Tr. 34).

Gross testified that he was last employed in March of 2008. (Tr. 35). At that time, he was the office manager for a taxi company. (*Id.*). According to Gross, he quit his employment after discussions with the company's owner

concerning Gross's absences from work. (*Id* ). Gross testified that he was unable to fulfill his responsibilities and came to a mutual decision with his employer that it would be best if he resigned. (*Id.*). Prior to his employment with the taxi company, Gross worked as a truck driver, but stopped because he could not satisfy the heavy lifting requirements. (Tr. 35–36). Gross also worked in the food service industry as a cook, a server, and an assistant manager. (Tr. 36–37). According to Gross, he could no longer perform any of his previous jobs because of the constant pain he experiences in his back, hips, knees, ankles and legs. (Tr. 38).

Gross testified that he was receiving treatment from his primary care physician, a cardiologist and a gastroenterologist. (Tr. 39–40). Gross testified that he was not currently receiving treatment for his depression, but was on a waiting list at Strong Behavioral Health and hoped to commence treatment soon. (Tr. 43). Gross testified that he had attended alcohol counseling at Strong Behavioral Health, but had stopped attending when he lost his insurance coverage. (Tr. 44). According to Gross, his new primary care physician, Davidson, did not believe that Gross's current level of alcohol consumption warranted treatment. (*Id.*).

 **\*12** At the time of the hearing, Gross was taking medications to control his cholesterol, high blood pressure, osteoarthritis and heartburn, as well as muscle relaxants and antidepressants. (Tr. 40–42). Gross also testified that he had recently begun taking medication to treat leg problems interfering with his sleep. (Tr. 43). According to Gross, the medications for his depression caused drowsiness and difficulty with concentration. (Tr. 44). Gross testified that he has difficulty reading a book or watching television because he cannot sustain attention for longer than five to ten minutes. (Tr. 44, 46–47). Gross testified that he had attempted physical therapy to address the pain in his back and knees, but that it did not provide any relief. (Tr. 45). He also testified that he uses a quad cane to assist him in walking and a shower chair. (*Id.*).

With respect to his alcohol use, Gross testified that before his children were born, he consumed approximately twenty-four beers per day, but that he has reduced his consumption to approximately one to two beers per week. (Tr. 45–46). Gross also testified that he smokes cigarettes. (Tr. 55).

Gross testified that he experiences pain in his lower back, both knees and both ankles. (Tr. 47). According to Gross, he experiences pain daily—generally at a level of 7 on a scale of

1 to 10, and less frequently, perhaps once or twice per week, at a level of 4 or 5. (*Id.*). Gross testified that maintaining a static position for any length of time worsens his pain and activities like walking or lifting also aggravate his pain. (*Id.*). Further, Gross testified that he cannot stoop, squat, kneel, crouch or crawl because he is unable to rise from those positions without assistance. (Tr. 48). According to Gross, his medications do not relieve the pain. (Tr. 47–48).

Gross testified that his impairments have inhibited his relationships with his friends and he no longer attends events outside of his home. (Tr. 48–49). According to Gross, he leaves his house to go to his medical appointments and occasionally to go grocery shopping with his wife. (Tr. 48). He sometimes has trouble with those outings because his mood swings can cause him to cry. (*Id.*). Gross testified that he also has difficulty attending events that require him to sit for an extended period of time or traveling in the car for more than thirty to forty-five minutes. (Tr. 51, 55).

Gross testified that he typically wakes four to six times during the night and is awake for approximately twenty minutes. (Tr. 49). According to Gross, he is responsible for waking his children and getting them ready for school. (*Id.*). He usually takes his medication at 9:00 a.m. and needs a nap by 11:00 a.m. (*Id.*). Gross testified that he sleeps until approximately 1:30 p.m. and then attempts to fill his time until his wife and children arrive home at 3:00 p.m. (Tr. 49–50). Gross testified that he tries to assist with the household chores, but often can perform a task for only five or ten minutes before needing a break. (Tr. 51).

**\*13** With respect to personal hygiene, Gross testified that he requires his cane and shower chair in the bathroom to assist his stability and movement. (Tr. 52–53). In addition, he needs assistance from his wife to shower approximately fifty percent of the time and requires assistance from his children to dress twenty to thirty percent of the time. (Tr. 53). According to Gross, their assistance is necessary because bending and reaching are difficult for him. (*Id.*).

A vocational expert, Beth Kopar ("Kopar"), also testified during the hearing. (Tr. 56). The ALJ first asked Kopar to identify the exertional levels associated with Gross's previous employment. (Tr. 57). According to Kopar, with the exception of Gross's employment as a dispatcher, all of his prior positions required medium exertion. (Tr. 56–57). The ALJ then asked Kopar whether any of the skills that Gross had acquired in those positions would be transferable

to positions with a light or sedentary exertion level. (Tr. 57–58). According to Kopar, two of the positions were transferrable to positions with light exertional levels, but none were transferable to sedentary positions. (Tr. 58). Further, Kopar testified that the skills would not be transferable if the individual were limited to simple, routine, repetitive tasks. (*Id.*).

The ALJ then asked whether a person of the same age as Gross, with the same education and vocational profile, who was limited to a light RFC, and who could only occasionally climb, balance, stoop, kneel, crouch or crawl, would be able to perform any of the work that Gross previously performed. (Tr. 59). Kopar opined that such a person, if also limited to semi-skilled work, could perform Gross's previous jobs as a telemarketer and a dispatcher. (*Id.*). Further, Kopar opined that if the person were limited to unskilled work, they could not perform Gross's previous jobs, but would be able perform other regional and national jobs including ticket seller, laundry folder and order caller. (Tr. 59–61). According to Kopar the ticket seller position, DOT 211.467–030, had over one million positions in the national economy and 50,000 positions in New York State. (Tr. 59). Further, Kopar testified that the laundry folder position, DOT 369.687–018, had over 100,000 positions in the national economy and 200,000 positions in New York State. [5] (Tr. 60). Finally, according to Kopar, the order caller position, DOT 209.667–014, had over 500,000 positions in the national economy and 1,000 positions in New York State. (*Id.*). The ALJ asked whether those same positions would be available if the person performing them required the ability to sit or stand as needed throughout the day. (*Id.*). Kopar testified that based upon her experience, those same positions would be available, but the number would be reduced by half. (Tr. 60, 64).

The ALJ then asked Kopar whether a person with the above-identified characteristics and limitations would be able to perform those same positions if they also needed to use an assistive device for balance, could not drive and needed to avoid hazards, including heights and machinery. (*Id.*). Kopar opined that a person with those limitations would be limited to sedentary work and would not be able to perform either Gross's past work or the three positions that she had identified. (Tr. 60–61, 63). However, according to Kopar, such a person could perform the positions of order clerk and telephone quotation clerk, both of which were unskilled, sedentary positions. (Tr. 61). According to Kopar, the position of order clerk, DOT 209.567–014, had over 300,000 positions nationwide and 13,000 positions in New York State. (*Id.*). The

position of telephone quotation clerk, DOT 237.367–046, had over 100,000 positions nationwide and approximately 1,500 positions in New York State. (Tr. 61–62).

**\*14** Kopar also testified that for unskilled, entry level positions, employees are typically limited to absences of one-half day per month and permitted two fifteen-minute and one thirty-minute break during the workday. (Tr. 63). According to Kopar, an employee who required more breaks or absences, or was repeatedly off task would not be able to maintain competitive employment. (*Id.*).

### DISCUSSION

### I. *Standard of Review*

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh 'g granted in part and denied in part,* 416 F.3d 101 (2d Cir.2005); *see also Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998) ("it is not our function to determine *de novo* whether plaintiff is disabled [;] ... [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo,* might have found otherwise." *Matejka v. Barnhart,* 386 F.Supp.2d 198, 204 (W.D.N.Y.2005) (citing *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3) (A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (*per curiam* ). The five-steps are:

**\*15** (1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker,* 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] ... [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.' " *Butts v. Barnhart,* 388 F.3d at 383 (quoting *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir.1998)).

### A. *The ALJ's Decision*

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 14–22). Under step one of the process, the ALJ found that Gross had not engaged in substantial gainful activity since March 8, 2009, the alleged onset date. (Tr. 16). At step two, the ALJ concluded that Gross has the severe impairments of degenerative disc disease, obesity, hypertension, coronary artery disease, sleep apnea, degenerative joint disease of the right hip and left knee and substance abuse, but that Gross's depression was nonsevere. (Tr. 17). At step three, the ALJ determined that Gross does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Id.). At step four, the ALJ concluded that Gross has the RFC to perform sedentary work with certain restrictions. (Id.). Specifically, the ALJ determined that Gross's capacity was limited to simple, routine, and repetitive tasks and that he could only occasionally balance, stoop, kneel, crouch, crawl or climb ramps, stairs, ladders, ropes, or scaffolds and required the ability to sit and stand as needed. (Id.). In making this assessment, the ALJ considered the effect of Gross's hypertension and obesity on his capacity to work. (Tr. 19). Finally, the ALJ determined that Gross was unable to perform past work, but that—considering his age, education, work experience, and RFC—jobs existed in significant number in the national economy that Gross could perform. (Tr. 20). Accordingly, the ALJ found that Gross is not disabled. (Tr. 21).

## B. *Gross's Contentions*

Gross contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and that the ALJ applied the wrong legal standard in assessing Gross's credibility. (Docket # 12–1). First, Gross maintains that the ALJ impermissibly failed to conduct a function-by-function analysis of Gross's mental limitations. (Id. at 9–11). This error was not harmless, Gross maintains, because it caused the ALJ to overlook Gross's workplace limitations. (Id.). Second, Gross contends that the ALJ's physical RFC assessment was not supported by substantial evidence. (Id. at 11–17). According to Gross, when conducting the physical RFC assessment, the ALJ impermissibly failed to give controlling weight to the opinion of his treating physician. (Id. at 11–13). In addition, Gross contends that the ALJ's physical RFC assessment was not supported by any medical opinion, but was improperly based upon her interpretation of medical records that contain no discussion of Gross's functional limitations. (Id . at 13–15). Gross asserts that the error was compounded by the ALJ's failure to make a function-by-

function assessment of Gross's exertional limitations. (Id. at 15–17). Next, Gross argues that the ALJ did not apply the appropriate legal standards in assessing his credibility. (Id. at 17–20). Finally, Gross contends that the testimony of the vocational expert cannot provide substantial evidence at step five because it was based upon an RFC that did not fully account for Gross's limitations. (Id. at 20–21).

## II. *Analysis*

### A. *RFC Assessment*

**\*16** An individual's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, \*2 (July 2, 1996)). In making the RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue,* 631 F.Supp.2d 200, 221 (N.D.N.Y.2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue,* 2009 WL 1940539, \*9 (N.D.N.Y.2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd,* 380 F. App'x 231 (2d Cir.2010).

Gross challenges the ALJ's physical RFC determination on the grounds that she failed to give controlling weight to the opinion of his treating physician, Davidson. (Docket # 12–1 at 11–13). According to Gross, his treating physician's opinion is the only medical opinion of his physical limitations contained in the record. Thus, Gross maintains, the ALJ's physical RFC determination is not supported by any medical opinions of record. (Id. at 13–15). Finally, Gross contends that the ALJ failed to conduct a function-by-function analysis of both his physical and mental limitations. (Id. at 9–11, 15–17). This failure, according to Gross, caused the ALJ to overlook his physical inability to sit or stand for extended periods of time and his mental inability to deal with changes in the work setting, use judgment or interact with coworkers or supervisors. (Id.).

### 1. *Medical Opinions of Record*

I turn first to Gross's contentions that the ALJ erred by failing to accord Davidson's opinion controlling weight and that, by

rejecting Davidson's opinion, the ALJ created a gap in the record that resulted in an RFC assessment unsupported by any opinion from a medical source.

Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.,* 361 F. App'x 197, 199 (2d Cir.2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence"). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). The ALJ must explicitly consider:

(1) the frequency of examination and length, nature, and extent of the treatment relationship,

**\*17** (2) the evidence in support of the physician's opinion,

(3) the consistency of the opinion with the record as a whole,

(4) whether the opinion is from a specialist, and

(5) whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.,* 361 F. App'x at 199. The regulations also direct that the ALJ should "give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart,* 362 F.3d at 32 (alterations in original) (quoting 20 C.F .R. § 404.1527(c)(2)).

In her decision, the ALJ accorded "little weight" to Davidson's assessment of Gross's capacity to work on the grounds that Davidson had only two appointments with Gross prior to making his assessment. (Tr. 20). In addition, the ALJ concluded that Davidson's opinions regarding Gross's hand, finger and arm limitations were not supported by the record, which only reflected impairments involving Gross's back, hips and knees. (*Id.*). Further, although not noted by the ALJ, Davidson's records indicated that Gross commenced treatment with Davidson on the advice of his lawyer. (Tr. 654).

Judged under relevant caselaw, it is unclear whether Davidson may be considered a treating physician because his assessment indicates that he treated Gross only on two occasions prior to rendering his opinion. *See Patterson v. Astrue,* 2013 WL 638617, \*8 (N.D.N.Y.) ("three examinations by [a physician] over the course of four months ... does not constitute the type of 'ongoing relationship' that is required for finding that s/he is plaintiff's treating physician under the relevant regulations") (citing 20 C.F.R. §§ 404.1502, 416.902), *report and recommendation adopted,* 2013 WL 592123 (N.D.N.Y.2013); *Cascio v. Astrue,* 2012 WL 123275, \*3 (E.D.N.Y.2012) (ALJ reasonably determined "that two isolated visits, approximately one year apart, did not constitute an 'ongoing treatment' relationship rising to the level necessary for [the physician] to qualify as a treating physician"); *Rylee v. Astrue,* 2010 WL 3039602, \*7 (S.D.Ala.2010) ("[t]he treating physician rule does not apply to a physician who bases his opinions of a claimant's limitations on a limited number of visits"); *Seaton v. Astrue,* 2010 WL 2869561, \*8 (N.D.N.Y.2010) ("the ALJ's finding that ... two visits did not constitute an 'ongoing treatment relationship' is reasonable and shall not be disturbed by this [c]ourt"); *Redmond v. Astrue,* 2009 WL 2383026, \*7 (N.D.N.Y.2009) (finding doctor was not treating physician whose opinion was entitled to controlling weight, noting it "appear[ed] that he only examined [p]laintiff on one occasion"); *Sapienza v. Shalala,* 894 F.Supp. 728, 733 (S.D.N.Y.1995) ("[t]he administrative record provides substantial support for the ALJ's conclusion that [physician] was not a treating physician[;][t]he record indicates that [he] had examined [plaintiff] only once"). In addition, treatment notes indicate that Gross switched primary care physicians on the advice of his attorney approximately four months prior to the administrative hearing (Tr. 654), which may undercut the contention that Davidson had an ongoing treatment relationship with Gross at the time of the hearing. *Austin v. Astrue,* 2010 WL 7865079, \*10 (D.Conn.2010) ("[t]he Commissioner ... will not find an ongoing treating relationship where the sole source of the medical relationship arises out of a need to obtain a report in support of a disability claim"). In any event, I need not reach the issue of whether the ALJ should have accorded Davidson's opinion controlling weight because I agree with Gross that the ALJ's rejection of Davidson's opinion created an evidentiary gap in the record which requires remand.[6] *Suide v. Astrue,* 371 F. App'x 684, 689–90 (7th Cir.2010) ("it is not the ALJ's evaluation of [the treating physician's] reports that requires a remand in this case[;] ... it is the evidentiary deficit left by

the ALJ's rejection of his reports—not the decision itself—that is troubling"); *see House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y.2013) (ALJ's proper rejection of treating physician opinion nonetheless necessitated remand because absence of any other medical assessment created evidentiary gap).

**\*18** "[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue,* 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted,* 2010 WL 4703591 (W.D.N.Y.2010). Accordingly, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities ... [,] [the Commissioner] may not make the connection himself." *Deskin v. Comm'r of Soc. Sec.,* 605 F.Supp.2d 908, 912 (N.D.Ohio 2008) (internal quotation omitted). Although under certain circumstances, particularly where the medical evidence shows relatively minor physical impairment, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment," *House v. Astrue,* 2013 WL 422058 at *4 (internal quotation omitted), I conclude that those circumstances are not present here.

Without Davidson's opinion, the record is devoid of any opinion from a medical source assessing Gross's physical limitations. Although there are many treatment notes in the record, including those from both primary care physicians and specialists, the records generally contain bare medical findings and do not address or shed light on how Gross's impairments affect his physical ability to perform work-related functions. Indeed, the only opinion as to Gross's physical limitations was provided by Sousa, a non-treating, non-examining agency employee who does not qualify as an acceptable medical source. *See Collins v. Astrue,* 2012 WL 2573264, *3 n. 5 (W.D.N.Y.) (agency consultant is not an acceptable medical source), *report and recommendation adopted,* 2012 WL 2573261 (W.D.N.Y.2012); *Hilsdorf v. Comm'r of Soc. Sec.,* 724 F.Supp.2d 330, 348 n. 10 (E.D.N.Y.2010) (RFC assessment by agency disability analyst not entitled to weight).

After discounting Davidson's opinion, the ALJ determined that Gross retained the physical RFC to perform sedentary work with postural limitations and the ability to sit or stand as needed. (Tr. 17). The ALJ primarily reached this conclusion through her own interpretation of various MRIs and x-ray reports contained in the treatment records. (Tr. 18). Under these circumstances, I conclude that the ALJ's physical RFC assessment is not supported by substantial evidence. *See Suide v. Astrue,* 371 F. App'x at 690 ("[w]hen an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion, ... and she is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record") (internal quotations and citations omitted); *House,* 2013 WL 422058 at *4 ("[b]ecause there is no medical source opinion supporting the ALJ's finding that [plaintiff] can perform sedentary work, the court concludes that the ALJ's RFC determination is without substantial support in the record and remand for further administrative proceedings is appropriate"); *Dailey v. Astrue,* 2010 WL 4703599 at *11 ("[w]ithout this additional medical evidence[,] [the ALJ], as a layperson, could not bridge the gap between plaintiff's [impairments] and the functional limitations that flow from these impairments"); *Walker v. Astrue,* 2010 WL 2629832, *7 (W.D.N.Y.) (same), *report and recommendation adopted,* 2010 WL 2629821 (W.D.N.Y.2010); *Lawton v. Astrue,* 2009 WL 2867905, *16 (N.D.N.Y.2009) ("[t]he record in this [case] contains no assessment from a treating source quantifying plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination"); *Deskin v. Comm'r of Soc. Sec.,* 605 F.Supp.2d at 913 ("a remand is necessary to obtain a proper medical source opinion to support the ALJ's residual functional capacity finding").

**\*19** "As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations ..., to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Id.* at 912. Accordingly, I conclude that remand is appropriate to allow the ALJ to obtain a physical RFC assessment or medical source statement from an acceptable medical source concerning Gross's physical capabilities.

## 2. *Function–by–Function Assessments*

Gross argues that the ALJ failed to conduct a function-by-function assessment of his mental capabilities [7] as required by Social Security Ruling 96–8p. That ruling provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her

work-related abilities on a function-by-function basis.... Only after that may RFC be expressed in terms of the exertional levels of work." SSR 96–8p, 1996 WL 374184 at *5. Such work-related functions include "mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors." *Cichocki v. Astrue,* 729 F.3d 172, 176 (2d Cir.2013) (*per curiam* ) (citing 20 C.F.R. §§ 404.1545, 416.945; SSR 96–8p, 1996 WL 374184 at *5–6). The function-by-function assessment is meant to ensure that the ALJ does not overlook an individual's particular limitations or restrictions which "could lead to an incorrect use of an exertional category." *Id.* (citing SSR 96–8p, 1996 WL 374184 at *4).

An ALJ's failure to express a claimant's RFC in a function-by-function analysis does not necessarily mandate remand so long as the RFC is otherwise supported by substantial evidence. *Id.* at *4 ("[w]e decline to adopt a *per se* rule[;] ... [w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed"); *Campbell v. Astrue,* 465 F. App'x 4, 6 (2d Cir.2012) (summary order) ("while the ALJ did not expressly discuss [claimant's] ability to perform each of the functions ... [,] substantial evidence supports the ALJ's overall RFC determination"); *Koch v. Colvin,* 2013 WL 3244789, *5 (W.D.N.Y.2013) ("district courts in this Circuit are divided whether [a function-by-function] analysis is required ... [,] [b]ut the Second Circuit recently held that such an analysis is unnecessary"); *Murphy v. Astrue,* 2013 WL 1452054, *6 (W.D.N.Y.2013) (substantial evidence supported RFC assessment and remand was not required "although the ALJ did not methodically walk through each 'function' "); *Lloyd v. Astrue,* 2013 WL 690499, *4 (W.D.N.Y.2013) ( "[t]here is no dispute that the ALJ did not conduct an explicit function-by-function assessment in his decision[,][b]ut that is not, *ipso facto,* cause for remand"). Although remand is not automatic, it would be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki v. Astrue,* 729 F.3d at 177.

*20 The ALJ did not conduct a function-by-function analysis of Gross's mental capabilities, but she discussed the medical records and the testimony as they pertained to Gross's mental capabilities. The ALJ noted that despite Gross's allegations of depression, Gross had not received any mental health treatment for depression. (Tr. 16). Further, the ALJ recounted Gross's testimony that he found it difficult to concentrate, but that he was not certain whether his difficulties were attributable to depression or medication. (Tr. 16–17). Finally, the ALJ noted that Gross continued to consume alcohol and had not completed a substance abuse program. (*Id.*). Based upon the absence of medical records reflecting ongoing treatment for depression, the ALJ determined that the evidence did not support a threshold finding that Gross's depression qualified as a medically determinable impairment that significantly limited his ability to perform work-related activities. (Tr. 17). In addition, the ALJ discussed the results of a consultative psychiatric examination conducted by Lambert. (Tr. 16–17, 20). Lambert opined that despite Gross's above-average intellect and significant work and home experience, he likely would have moderate limitations in his ability to maintain a regular schedule, learn new tasks, perform complex tasks independently, relate adequately with others and appropriately deal with stress. (Tr. 475–76).

Gross argues that the ALJ did not make any findings concerning his ability to deal with changes in the work setting, use judgment, or interact with coworkers or supervisors. (Docket # 12–1 at 10–11). A review of the ALJ's decision belies this contention. After reviewing the record evidence, the ALJ concluded that Gross was able to perform simple, routine and repetitive tasks. These limitations are consistent with the ALJ's assessment that Gross's depression was not severe and Gross's testimony that he has difficulty concentrating and maintaining focus. (Tr. 23). Accordingly, although the ALJ did not conduct a function-by-function assessment, I conclude that the ALJ discussed Gross's mental capabilities and work-related functions and limitations and that her RFC assessment is supported by substantial evidence. *See Carrigan v. Astrue,* 2011 WL 4372651, *7–8 (D.Vt.) (failure to conduct function-by-function assessment of mental capabilities harmless where ALJ's decision discussed the claimant's work-related functions and limitations and where substantial evidence supported RFC assessment), *report and recommendation adopted,* 2011 WL 4372494 (D.Vt.2011); *see also Moore v. Astrue,* 2013 WL 935855, *7–8 (N.D.N.Y.2013) (ALJ properly concluded plaintiff's depression was non-severe where plaintiff "failed to present

any medical evidence demonstrating mental impairments ... [and thus] failed to establish a colorable impairment[,] ... to the extent that any failure to comply with the mechanics of the special technique could be found, it is harmless error").

**B.** *Credibility Assessment*

**\*21** Gross also contends that the ALJ applied the wrong legal standard when assessing his credibility. According to Gross, the ALJ's credibility finding must be rejected because it is improperly based upon a comparison of Gross's statements about his symptoms against the ALJ's own RFC determination. (Docket # 12–1 at 18). Specifically, the ALJ stated, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 18). Contrary to Gross's position, an ALJ's use of language such as that quoted above does not automatically mandate reversal. *See, e.g., Luther v. Colvin,* 2013 WL 3816540, *7–8 (W.D.N.Y.2013) (ALJ properly assessed plaintiff's subjective complaints despite language in opinion that the alleged symptoms were inconsistent with her own RFC assessment); *Briscoe v. Astrue,* 892 F.Supp.2d 567, 585 (S.D.N.Y.2012) ("[r]ead in context, however, this statement does not indicate that the RFC assessment was a basis for a finding of lack of credibility"). *But see Patterson v. Astrue,* 2013 WL 638617 at * 14 (ALJ's credibility analysis flawed where ALJ concluded that plaintiff's 'statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment' "). Here, the ALJ specifically stated that she assessed Gross's statements concerning the intensity, persistence and limiting effects of his symptoms "[a]fter careful consideration of the evidence." (Tr. 18).

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue,* 2011 WL 2446371, *4 (E.D.N.Y.2011). First, the ALJ must determine whether the evidence shows that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.R .F. § 404.1529(c)). The relevant factors for the ALJ to weigh include: "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's

pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

**\*22** The ALJ assessed Gross's subjective complaints in the context of a comprehensive review of the entire medical record. In doing so, the ALJ considered evidence relating to the factors identified above and concluded that Gross had been non-compliant with prescribed treatment, including referrals to physical therapy and behavioral health services, continued to smoke and consume alcohol, had failed to complete a substance abuse program and continued to perform some of his activities of daily living. As discussed above, however, the medical evidence is incomplete because it does not contain an assessment by an acceptable medical source of Gross's physical capabilities. On remand, the ALJ should consider whether any additional evidence adduced during the proceedings alters her assessment of Gross's credibility in light of the evidence as a whole. *Larsen v. Astrue,* 2013 WL 3759781, *2 (E.D.N.Y.2013) ( "the [c]ourt notes that to the extent that the ALJ, on remand, reevaluates the evidence ..., the ALJ should also consider whether that re-evaluation alters the assessment of the plaintiff's credibility in light of the evidence as a whole"). When making this determination, the ALJ should carefully weigh each of the factors set forth in 20 C.F.R. § 416.929(c)(3).

**C.** *Vocational Expert Testimony*

Gross contends that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. Having determined that substantial evidence does not exist to support the ALJ's RFC determination, I likewise determine that "because th[e] RFC determination forms the underpinning of the vocational expert's testimony, the conclusion that there are available jobs that [Gross] is capable of performing is not supported by substantial evidence." *Patterson,* 2013 WL 638617 at * 15 (remanding "so that the ALJ may, following a reevaluation of plaintiff's credibility and RFC, again conduct a step-five determination").

### III. *Remand*

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the cause for a rehearing.' " *Butts,* 388 F.3d at 385 (quoting 42 U.S.C. § 405(g)). In this matter, I have concluded that remand is warranted because there is an evidentiary gap in the record. Under such circumstances, a remand for further development of the record, as opposed to calculation of benefits, is warranted. *Gibson v. Barnhart,* 212 F.Supp.2d 180, 183 (W.D.N.Y.2002) (remand for further development of the record appropriate where a gap in the record existed; "[o]nly where the [c]ourt has no apparent basis to conclude that a more complete record might support the Commissioner's decision may it opt simply to remand for a calculation of benefits"). Accordingly, I conclude that a remand pursuant to sentence four of 42 U.S.C. § 405(g) is appropriate. On remand, the Commissioner should obtain an assessment of Gross's physical capabilities from an acceptable medical source.

### CONCLUSION

**\*23** For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 11**) is **DENIED,** and Gross's motion for judgment on the pleadings (**Docket # 12**) is **GRANTED in part and DENIED in part.** This matter is remanded to the Commissioner for further administrative proceedings consistent with this decision.

### IT IS SO ORDERED.

### All Citations

Slip Copy, 2014 WL 1806779, 202 Soc.Sec.Rep.Serv. 508

Footnotes

1     After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

2     The administrative transcript shall be referred to as "Tr.\_."

3     The notes for this visit are mostly illegible.

4     The transcript contains notes from Strong Memorial Hospital and Highland Family Medicine. (Tr. 300–329, 379–422). The two sets of treatment notes are virtually identical in substance. (*Compare* Exhibit 2F *with* 9F).

5     Obviously, Kopar's testimony was either inaccurate or inaccurately transcribed.

6     Although I do not reach the issue of whether the ALJ provided "good reasons" for the limited weight accorded to Davidson's assessment, I note that the ALJ apparently overlooked at least two treatment notes supporting Davidson's conclusions that Gross may suffer from tremors in his hands. (Tr. 519, 654).

7     Gross also contends that the ALJ failed to conduct a function-by-function assessment of his physical capabilities. I need not reach this issue in view of my conclusion that the ALJ's physical RFC assessment is not supported by substantial evidence and must be reevaluated on remand.

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 551783
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kim Hubbard, Plaintiff,
v.
Commissioner of Social Security, Defendant.

6:14-CV-1401 (GTS/WBC)
|
Signed 01/14/2016

**Attorneys and Law Firms**

KIM HUBBARD, PRO SE, 270 Day Ave., Rome, NY 13440.

DANIEL R. JANES, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, Counsel for Defendant, 26 Federal Plaza – Room 3904, New York, NY 10278.

### *REPORT and RECOMMENDATION*

William B. Mitchell Carter, U.S. Magistrate Judge

**\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Kim Hubbard ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is Defendant's unopposed motion for judgment on the pleadings. (Dkt. No. 17.) For the reasons set forth below, it is recommended that Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on July 20, 1982. (T. 88.) She completed four years of college. (T. 109.) Generally, Plaintiff's alleged disability consists of diabetes, attention deficit hyperactivity disorder ("ADHD"), back impairments, and anxiety. (T. 108.) Her alleged disability onset date is September 22,

2010. (T. 60.) Her date last insured is June 30, 2015. (*Id.*) She previously worked as a customer service representative, medical records scanner, processor, waitress, and child care provider. (T. 109.)

### B. Procedural History

On February 25, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 60.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On March 11, 2013, Plaintiff appeared, pro se, before the ALJ, David J. Begley. (T. 25–59.) The ALJ advised Plaintiff of her right to be counseled by an attorney or representative, but Plaintiff waived that right. (T. 28–29.) On June 5, 2013, ALJ Begley issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 7–24.) On September 22, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1–4.) Thereafter, Plaintiff, again appearing pro se, sought judicial review in this Court. On November 19, 2014, the Court issued Plaintiff a copy of this Court's General Order 18, governing the procedural rules with respect to Social Security appeals. (Dkt. No. 3.) At that time the Court also issued Plaintiff a copy of the Pro Se Handbook and Notice. (Dkt. No. 4.)

Pursuant to General Order 18, plaintiffs are notified that "the failure to file a brief as required by this order will result in the consideration of this appeal without the benefit of plaintiff's arguments and may result in a decision heavily influenced by the commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order 18 at 4.

Plaintiff failed to file a brief by the April 27, 2015 deadline and because of her pro se status, the Court granted an extension to June 1, 2015. (Dkt. No. 14.) Plaintiff failed to file a brief by June 1, 2015 and the Court directed Defendant to file her brief. (Dkt. No. 15.) As of the date of this report and recommendation, Plaintiff has not filed a brief.

### C. The ALJ's Decision

**\*2** Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 12–24.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2015 and Plaintiff had not engaged in substantial gainful activity since September 22, 2010. (T. 12.) Second, the ALJ found that Plaintiff had the

severe impairments of diabetes mellitus, hyperthyroidism, degenerative disc disease of the lumbar and cervical spine, left wrist tendinitis, left wrist carpal tunnel syndrome (status post release), right wrist capsulitis, panic disorder, and ADHD. (*Id*.) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 12-13.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except Plaintiff:

> [could] not climb ladders, ropes, or scaffolds; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl; work [was] limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions, with few, if any, work-place changes, and only occasional interaction with coworkers and supervisors; [and] no regular interaction with the general public.

(T. 13–14.) [1] Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 20–21.)

## II. DEFENDANT'S BRIEFING ON HER MOTION FOR JUDGMENT ON THE PLEADINGS

In support of her motion for judgment on the pleadings, Defendant makes four arguments. First, Defendant argues Plaintiff knowingly and voluntarily waiver her right to representation. (Dkt. No. 17 at 11–12 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ's RFC finding was supported by substantial evidence. (*Id*. at 12–14.) Third, Defendant argues the ALJ's step five finding was supported by substantial evidence. (*Id*. at 14.) Fourth, and lastly, Defendant argues Plaintiff failed to meet her burden. (*Id*. at 14–15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990). Rather,

the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).

**\*3** "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984).

### A. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982).

## IV. ANALYSIS

In a civil case, the Court may dismiss an action where, as here, "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order...." *Fed.R.Civ.P. 41(b); Storey v. O'Brien,* No. 10–3303, 2012 WL 1889408, at *1 (2d Cir. May 25, 2012). Further, other districts in the Second Circuit have dismissed Social Security appeals, sua

sponte, due to a pro se plaintiff's failure to prosecute. *See Gonzalez v. Commissioner of Social Security,* No. 09–CV–10179, 2011 WL 2207574, at *2 (S.D.N.Y. June 2, 2011), *see also Winegard v. Barnhart,* No. 02–CV–6231, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr. 5, 2006). However, the Court declines to do so in this case.

**\*4** In this District, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order No. 18 at 4. General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where Plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence. *See Gregorka v. Comm'r of Soc. Sec.,* No. 6:13–CV–1408, 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015).

After a careful review of the administrative record on appeal, the Court recommends the Commissioner's determination be affirmed, for the reasons stated in Defendant's memorandum of law, that (1) the Plaintiff knowingly and voluntarily waived her right to representation, (2) the ALJ's RFC finding was supported by substantial evidence, (3) the ALJ's step five finding was supported by substantial evidence, and (4) Plaintiff failed to meet her burden. (Dkt. No. 17 at 11–15 [Def.'s Mem. of Law.])

### A. Plaintiff Knowingly and Voluntarily Waived Her Right to Representation

Although plaintiffs do not have a constitutional right to counsel at a Social Security hearings, they do have a statutory and regulatory right to be represented if they chose to obtain counsel. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. Here, the Commissioner sent Plaintiff an acknowledgement

letter explaining the hearing process and advising her of her right to representation, as well as the availability of free legal services. (T. 77–78.) At the hearing, the ALJ again reviewed with Plaintiff her right to have representation and Plaintiff knowingly waived that right. (T. 28–30.) Therefore, the Commissioner and ALJ complied with their obligations to inform Plaintiff of her right to counsel and Plaintiff knowingly and voluntarily waived her right.

### B. The ALJ's RFC Determination

A plaintiff's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ's RFC determination was supported by substantial evidence, specifically, the medical source opinions of consultative examiners Dennis Noia, M.D. and Pamela Tabb, M.D.

An ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.*, No. 08–CV–1005, 2010 WL 2776978 at *4 (N.D.N.Y. June 7, 2010).

Dr. Noia performed a psychiatric consultative exam on April 30, 2012. At that time he observed Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate. (T. 205.) He further observed her speech was normal, her thought process was normal, her mood was calm, and her affect was congruent. (T. 206.) Dr. Noia observed Plaintiff's attention and concentration were intact, her recent and remote memory skills were "mildly to moderately" impaired; and her intellectual functioning was average. (*Id.*) In a medical source statement, Dr. Noia opined Plaintiff was capable of understanding and following simple instructions and directions; capable of performing simple and some complex tasks; capable of maintaining attention and concentration; could regularly attend to a routine and maintain a schedule; capable of making appropriate decisions; able to relate to and interact moderately well with others; and Plaintiff had some difficulty dealing with stress. (T. 206–207.) [2]

**\*5** Dr. Tabb performed a physical consultative exam on April 30, 2012. At that time she observed Plaintiff appeared in no acute distress, had a normal gait, could walk on heels and toes, needed no help changing for exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 209.) Dr. Tabb observed Plaintiff's cervical spine and lumbar spine showed full flexion, extension, later flexion bilaterally and full rotary movement bilaterally. (T. 210.) Dr. Tabb observed Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) Dr. Tabb observed Plaintiff had mild tenderness in the medial aspect of her left wrist. (*Id.*) In a medical source statement Dr. Tabb opined Plaintiff had mild restrictions for performing activities involving repetitive movement of the left wrist. (T. 211.) [3]

In making his physical RFC determination, the ALJ also relied on objective medical imaging from March of 2012 which indicated "very minimal" degenerative change and "mild" disc space narrowing in the mid thoracic spine. (T. 200.) Medical imaging from March of 2012 indicated degenerative disc disease with "mild" multilevel bulging in the lumbar spine. (T. 201.) Medical imaging of Plaintiff's cervical spine revealed "mild" disc desiccation with "minimal" disc bulging at multiple levels.

The ALJ thoroughly discussed all the medical evidence in the record and his RFC determination was supported primarily by the consultative examiners, Drs. Noia and Tabb. In addition to Dr. Tabb's opinion, the ALJ's physical RFC determination was supported by Plaintiff's treating physicians who reported Plaintiff had normal gait and stance, appeared in no acute distress, ambulated well, and had negative straight leg raises. (T. 182–185, 192–197.)

Plaintiff's orthopedic surgeon, Gregory Shankman, M.D., completed a medical source statement in August of 2007, which the ALJ discussed in his opinion but ultimately rejected. Dr. Shankman opined Plaintiff's pain was "too severe for her to work" and she was "totally and permanently disabled." (T. 161.) Dr. Shankman further opined Plaintiff could not walk for more than five minutes without pain, could not sit for more than five minutes without severe pain, and could not sleep for more than a few hours without pain. (*Id.*) He opined Plaintiff could not lift or carry more than ten pounds. (*Id.*) The ALJ properly assigned Dr. Shankman's opinion "limited weight" because there were no records to support his opinion, Plaintiff's own allegations of limitations were not as restrictive as Dr. Shankman's, and the opinion predated Plaintiff's alleged onset date by over three years. Therefore, for the reasons stated herein, and for the reasons provided in Defendant's brief, the ALJ's RFC determination was supported by substantial evidence.

## C. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

**\*6** "The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.,* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.,* see 20 C.F.R. § 416.929(c)(3)(i)-(vii). Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue,* 534 F. App'x 71, 75 (2d Cir.2013) (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

Here, the ALJ properly applied the Regulations in his credibility analysis. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (T. 15.) The ALJ provided an accurate synopsis of Plaintiff's testimony. (T. *Id.*) The ALJ discussed objective medical evidence and opinion evidence which he found to be inconsistent with Plaintiff's statements. (T. 15–18.) The ALJ discussed Plaintiff's activities of daily living, treatment she received for her impairments including medication, and aggravating factors. (T. 15.) Therefore, for the reasons stated herein, the ALJ properly adhered to the Regulations in making his credibility determination and substantial evidence supports the ALJ's credibility determination.

## D. The ALJ's Step Five Determination

At step five of the sequential process, the ALJ considered Plaintiff's age, education, and RFC, to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform. 20 C.F.R. § 404.1569. In making his determination, the ALJ relied on the testimony of a vocational expert ("VE"). (T. 5658.) At the hearing the VE testified that based on a hypothetical individual with Plaintiff's age, education, and RFC, there were jobs that existed in significant numbers in the national economy which she could perform. (T. 56–57.) Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record). **ACCORDINGLY**, based on the findings above, it is

**\*7 RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993)

(citing *Small v. Secretary of Health* and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2016 WL 551783

Footnotes

1    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

2    Plaintiff did not undergo mental health treatment. In November of 2011, during an evaluation by her orthopedic provider, Plaintiff denied depression and anxiety. (T. 183.) In December of 2011, Plaintiff complained to her primary care provider of "slight depression." (T. 177.) A prescription history indicated Plaintiff was prescribed Alprazolam for her anxiety by Scott Brehaut, M.D. (T. 167.)

3    In June of 20120, subsequent to Plaintiff's examination by Dr. Tabb, she underwent CTS release surgery. (T. 255.)

**End of Document**                                                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 833968
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Toni Jo McCONNELL, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendants.

No. 6:03-CV-0521.
|
March 27, 2008.

**Attorneys and Law Firms**

Conboy, McKay, Bachman & Kendall, LLP, Peter L. Walton, Esq., of Counsel, Watertown, NY, for Plaintiff.

Hon. Glenn T. Suddaby, United States Attorney for the Northern District of New York, William H. Pease, Assistant United States Attorney, of Counsel, Syracuse, NY, for Defendant.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff, Toni Jo McConnell, brings this matter pursuant to 42 U . S.C. § 405 for review of the decision by the Commissioner of Social Security to deny her application for disability insurance benefits. This action was referred to the Hon. Randolph F. Treece, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation, filed on December 18, 2007, recommends that the Commissioner's decision denying Social Security benefits be affirmed and finds that the ALJ's conclusions were supported by substantial evidence. Plaintiff has filed objections to the Report-Recommendation.

## I. BACKGROUND

### a. Procedural History

The Social Security Administration first denied Plaintiff's claim on September 21, 2000. Admin. Transcript [hereinafter Tr.] at 90. On September 26, 2000, Plaintiff filed a timely

request for reconsideration. This was denied on December 18, 2000. Tr. at 94-95. On December 29, 2000, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). *Id.* at 98. The hearing occurred on August 22, 2001 before ALJ John M. Lischak. *Id.* at 30-87. ALJ Lischak rendered a decision on December 7, 2001, concluding that Plaintiff suffered from severe impairments, specifically, "degenerative changes of the cervical spine and hypothyroidism with enlarged thyroid glands." *Id.* at 15-21. The ALJ concluded that, although Plaintiff could not return to her prior job as a factory worker, she did have a residual functional capacity (RFC) that allowed her to perform "light" or "sedentary" work. *Id.* The Appeals Council affirmed ALJ Lischak's decision and Plaintiff filed this action seeking review. *Id.* at 5.

### b. ALJ's Analysis

In his analysis, the ALJ cited the five-step evaluation process set forth in 20 C.F.R. § 404.1520. In the first step, the ALJ determines whether the claimant has engaged in "substantial gainful activity" since the alleged onset of the disability. 20 C.F.R. § 404.1520(a)(4)(i). If not, the next inquiry is whether the claimant suffers from a medically determinable "severe" impairment established by medical evidence including signs, symptoms and laboratory findings. *Id.* at § 404.1520(a)(4)(ii); § 404.1528. Symptoms alone, however, are not sufficient. *Id.* at § 404.1528. Severity is defined as significantly limiting an individual's physical or mental ability to do basic work activities. *Id.* at § 404.1521(a). Should the claimant be suffering from a medically determinable severe impairment, the third step is to determine whether the impairment is listed, or is equal to any listing, in Appendix I, which specifies over 100 medical conditions that would prevent an individual from performing "substantial gainful activity ." *Id.* at § 404.1520(a)(4)(iii); § 404.1525(a). If so, the individual is considered "disabled" under the Act and the inquiry ends. *Id.* If not, the inquiry continues to the last two steps to determine whether the claimant has the RFC to perform any past relevant work or other jobs that exist in the national economy, considering the claimant's age, education and work experience. *Id* . at § 404.1520(a)(4)(iv)-(v); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

**\*2** In this case, ALJ Lischak determined that Plaintiff had not engaged in "substantial gainful activity" since she stopped working on March 6, 2000. Tr. 16. In the second step, the ALJ found that Plaintiff suffered from "degenerative changes of the cervical spine and hypothyroidism with enlarged thyroid glands" and characterized them as severe impairments under the Act. *Id.* at 17. The ALJ found that Plaintiff's bilateral

carpal tunnel syndrome (CTS) was not severe. *Id.* Despite details of a knee injury in the record, the ALJ did not consider or mention it in his findings. *Id.* Finally, because those impairments found to be severe were not listed in Appendix I, the ALJ continued the inquiry and determined that, although Plaintiff could not return to her prior job as a factory worker, she did have an RFC that allowed her to perform "light" or "sedentary" work. *Id.* at 17-19.

## II. STANDARD OF REVIEW

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner applied the correct legal standards and whether his or her findings were supported by substantial evidence. *Knapp v. Apfel,* 11 F.Supp.2d 235, 237 (N.D.N.Y.1998) (citing *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997); *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982)); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991) (citing *Havas v. Bowen,* 804 F.2d 783, 785 (2d Cir.1986); *Wagner v. Secretary of HHS,* 906 F.2d 856, 860 (2d Cir.1990)). Substantial evidence is defined as "more than a mere scintilla" and requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938) (internal citations omitted)).

## III. DISCUSSION

### a. Severity of Plaintiff's Carpal Tunnel Syndrome

Plaintiff contends that the ALJ erroneously failed to characterize her CTS and knee impairment as severe. Courts have held that this step is limited to "screen[ing] out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). As stated above, severity turns on a claimant's ability to do "basic work activities," which include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ...." 20 C.F.R. §§ 404.1521(a), (b). The plaintiff, at this point, has the burden of showing that

the impairments "cause[ ] functional limitations" such that she cannot engage in these activities. *Burger v. Barnhart,* 476 F.Supp.2d 248, 254 (W.D.N .Y.2007) (citing *Rivera v. Harris,* 623 F.2d 212, 215-16 (2d Cir.1980); *Levos v. Secretary of Health and Human Services,* 516 F.Supp. 273, 275 (S.D.N.Y.1981)). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe. *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995).

**\*3** ALJ Lischak concluded that although Plaintiff had a history of bilateral CTS, her surgeries in 1998 corrected the problem. Tr. at 17. He further noted that Plaintiff was no longer receiving treatment for her wrists. *Id.* He, thus, determined that Plaintiff's CTS was "non-severe" under the Act. *Id.*

Plaintiff began treatment for CTS in 1998 with Dr. Powell, a physician from the North Country Orthopaedic Group (NCOG). *Id.* at 146. Dr. Powell determined that Plaintiff would likely receive relief from a bilateral carpal tunnel release. *Id.* at 147. She underwent surgeries of both wrists in May and July of 1998. *Id.* at 148.

In August of 1998, Plaintiff returned to Dr. Powell for treatment after falling and contusing her left hand. *Id.* at 149. Dr. Powell found swelling and tenderness and concluded that while Plaintiff's CTS had "settled down," he wanted her to strengthen the hand before "she [went] back to full duty." *Id.* at 149. In September, Dr. Powell considered it "safe for her to return to her work." *Id.*

On August 3, 1999, Plaintiff returned complaining of pain in her wrists. Dr. Powell noted, however, that the exam of her wrist was "very benign." *Id.* at 150. On October 19, 1999, Dr. Fish, an orthopedist at NCOG, examined Plaintiff's wrist after she complained of soreness in her right hand after wrestling with her son. *Id.* at 151. Dr. Fish found tenderness and placed Plaintiff's arm in a short arm cast for four to six weeks, and concluded that Plaintiff could continue working during this time. *Id.* Given the injury, Dr. Fish stated that Plaintiff had "reasonably good wrist range of motion." *Id.* On November 12, 1999, Plaintiff's exam reflected "no appreciable tenderness in wrist" and by November 24, 1999, Plaintiff had "full range of motion" and no complaints. *Id.* at 152. Similarly, an assessment completed by Dr. Sloan, a consultive orthopedist, on July 27, 2000 also indicated that

Plaintiff had "good range of motion" in the wrists and hands. *Id.* at 183.

While Plaintiff testified before ALJ Lischak that her ability to do housework was somewhat limited, especially vacuuming and activities that required heavy lifting, she stated that she could perform many activities, such as doing dishes, cooking, driving, laundry, and small home repairs such as changing light bulbs. *Id.* at 65-66. Furthermore, it appears that the pain caused by these activities is not necessarily caused by Plaintiff's CTS. After a visit in August of 1999, Dr. Peckham could not determine whether Plaintiff's symptoms were coming from her neck or from "residual CTS." *Id.* at 150. Given Plaintiff's apparent recovery from her surgeries and injuries, the fact that she was told she could return to work, and her own assessment of her abilities, the Court concludes that ALJ Lischak's finding that Plaintiff's CTS was not sufficiently severe is supported by substantial evidence.

### b. Severity of Plaintiff's Knee Impairment

**\*4** Plaintiff also contends that the ALJ erroneously failed to consider Plaintiff's knee impairment. Plaintiff was first treated for a knee injury on September 28, 2000 after hearing three pops in her left knee while wrestling with her son. *Id.* at 192. The physical exam demonstrated slight hyperextension, but this appeared symmetrical. *Id.* The x-rays showed no obvious fractures and a normal alignment. *Id.* Dr. Peckham of NCOG recommended no specific treatment, as the injury seemed to be getting better on its own. *Id.* On November 17, 2000, an MRI suggested "some degenerative changes in her menisci," but did not indicate a significant tear that would require surgery. *Id.* at 195. Dr. Peckham also suggested possibly undergoing further treatment if Plaintiff did not improve symptomatically. *Id.*

Just because Plaintiff injured her knee does not, alone, justify characterizing the impairment as severe. *Coleman,* 895 F.Supp. at 53. The record lacks any evidence that Plaintiff's knee injury impaired her ability to perform basic work activities. Rather, Plaintiff testified that she was able to stoop, crouch, kneel, crawl and climb stairs and small step ladders. Tr. at 60-61. Plaintiff testified that these activities might cause pain in her neck, but did not mention her knee. Thus, the Court concludes that ALJ Lischak's failure to consider Plaintiff's knee impairment was not in error.

### c. ALJ's Assessment of Plaintiff's Residual Functional Capacity

### 1. Treating Physician Rule

Plaintiff asserts that ALJ Lischak erred by failing to give controlling weight to a conclusion made by one of her treating physicians (Dr. Peckham of NCOG) that Plaintiff should be on "total disability" and, instead, adopted the agency physician's conclusions regarding Plaintiff's RFC. Plaintiff's Objs. at 8-9.

In his analysis, ALJ Lischak found that Dr. Peckham's conclusion that claimant should be on "total disability" could not be given substantial weight because it was not supported by objective medical evidence. Tr. at 18. He further reasoned that the determination of whether a claimant is "disabled" can only be made by an ALJ. *Id* .

ALJ Lischak, thus, adopted the Agency physicians' conclusions that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk up to six hours per day and sit up to six hours per day, push and/or pull twenty pounds occasionally and ten pounds frequently, reach in all directions on a limited basis, and climb, balance, stoop, kneel, crouch or crawl occasionally. Tr. at 17. Based on this assessment, ALJ Lischak determined that while Plaintiff could not perform "past relevant work," she could perform "light" and "sedentary" work, based on her RFC, age, experience and educational background. *Id.* at 19.

In determining a claimant's RFC, the ALJ can consider medical opinions regarding the "nature and severity" of a claimant's impairments, the claimant's residual abilities despite these impairments, and any physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). The Treating Physician Rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2). Therefore, when a treating physician's opinion is "well-supported by medically acceptable ... diagnostic techniques and is not inconsistent with the other substantial evidence in ... the record," the rule dictates that these opinions will be controlling. *Id.* If the opinion is not given controlling weight, the ALJ may determine how much weight it should be afforded by looking at: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the extent of support from relevant evidence; 4) the consistency with the whole record; 5) the specialization of the treating physician; and 6) other factors. 20 C.F.R. § 404.1527(d)(2).

**\*5** Furthermore, the ultimate determination of whether a person meets the statutory definition of disabled is left with the Commissioner; the ALJ is under no duty to afford controlling weight to any opinion that makes such a determination. 20 C.F.R. § 416.927(e)(1).

Dr. Peckham's conclusion that Plaintiff should be on "total disability" must be taken in light of the context in which it was made. First, it was stated in an addendum to his physician's notes within the context of being treated for her knee. Tr. at 194. Further, it appears the note was made only after Plaintiff was advised by another physician that she should go back to work. *Id.* This suggests that Dr. Peckham's comment was intended to be temporary in nature and was not meant to refer to Plaintiff's overall condition.

Furthermore, the record lacks any medical opinions from treating physicians regarding Plaintiff's abilities despite her impairments. Plaintiff's assertion that "not one physician who actually examined plaintiff concluded that she could return to work" must also be taken in context. Plaintiff's Objs. at 8. First, the only treating physician that suggested that Plaintiff not go to work was Dr. Peckham, and this was in light of Plaintiff's knee injury, which appears to have resolved itself as there is no indication of a continuing problem after November, 2000. Second, Plaintiff's job at the time of her treatments required heavy lifting and substantial walking and standing. Tr. at 40-44. In his assessment, ALJ Lischak essentially agreed with Plaintiff that she could not return to her job due to the severity of her condition. Finally, and possibly most dispositive, is the fact that Dr. Peckham refused to fill out a Residual Capacity Form. Tr. at 237. This form, supported by objective medical evidence, would have given ALJ Lischak more of an opportunity to assess Plaintiff's ability to perform basic work activities. Recognizing this, ALJ Lischak kept the record open for submission of this type of evidence. Tr. at 30-31. However, when Dr. Peckham was unwilling to fill it out, he was left with the medical opinion of the agency physicians, Drs. Manley and Siddiqi, regarding Plaintiff's abilities. The record lacks any other medical opinions indicating Plaintiff's abilities to perform basic work activities.

Finally, Plaintiff's testimony regarding her ability to perform daily activities suggests that she can perform "light" or "sedentary" work. On May 22, 2001, Dr. Peckham concluded that Plaintiff's thyroid condition was "under control" and that specific diagnosis, treatment or etiology

were undetermined. Tr. at 206. Dr. Sloan's examination, upon which the agency physicians relied, suggested "some decreased range of motion" in the cervical spine and "limited range of motion" in the shoulders. *Id.* at 184. There was "some" and "mild" tenderness in the cervical and thoracic spine, respectively. This assessment does not suggest that Drs. Manley and Siddiqi were unreasonable in determining Plaintiff's capabilities or that ALJ Lischak was unreasonable in determining that Plaintiff had the capacity to perform "light" or "sedentary" work. Thus, the Court agrees with Magistrate Judge Treece's conclusion that ALJ Lischak's decision to not give Dr. Peckham's conclusion about Plaintiff's "total disability" controlling weight, but rather to adopt the agency physicians' RFC assessment was supported by substantial evidence from Dr. Peckham, Dr. Sloan and the agency physicians.

## 2. Plaintiff's Credibility

**\*6** The ALJ also has discretion to determine a claimant's or other witnesses' credibility regarding the claimant's subjective complaints of pain. *Mimms v. Heckler,* 750 F.2d 180, 185-86 (2d Cir.1984). After assessing the claimant's testimony, the objective medical evidence, and other factors, the ALJ may accept or reject a claimant's subjective testimony. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2007); *Martone v. Apfel,* 70 F.Supp.2d 145, 151 (N.D.N.Y.1999). When a claimant's testimony is rejected, the ALJ must specify reasons for doing so such that a reviewing court can determine whether those reasons were legitimate and supported by substantial evidence. *Martone,* 70 F.Supp.2d at 151 (citing *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987)).

The Plaintiff correctly asserts that the ALJ may not *ignore* subjective allegations of pain which are supported by the establishment of a "medically determinable impairment which could reasonably be expected to th[at] type of pain." *Diaz v. Bowen,* 664 F.Supp. 725, 730 (S.D.N.Y.1987) (citing *Marcus v. Califano,* 615, F.2d 23, 27-28 (2d Cir.1979)). However, the ALJ does not have to accept these allegations without exception. Rather, the ALJ balances the objective medical evidence, the claimant's daily activities, medical opinions and other evidence. *See Diaz,* 664 F.Supp. at 730 (citing *Losco v. Heckler,* 604 F.Supp. 1014, 1018 (S.D.N.Y.1985); *Martone,* 70 F.Supp.2d at 151).

In considering Plaintiff's symptoms, ALJ Lischak compared Plaintiff's subjective complaints to the objective medical evidence, along with Plaintiff's testimony regarding her

ability to do daily activities, and concluded that Plaintiff's complaints were not fully credible. Tr. at 18. ALJ Lischak cited to Social Security Ruling 96-7p which specifies the factors to consider when determining a claimant's credibility. *Id.* These include 1) the claimant's daily activities; 2) the location, duration, frequency and intensity of the pain or other symptoms; 3) aggravating factors; 4) the type, dosage, effectiveness and side effects of medication; 5) treatments other than medication used to relieve pain or other symptoms; and 6) measures other than treatment used to relieve the pain or other symptoms. *Id.* ALJ Lischak reasoned that Plaintiff 1) was able to perform a wide range of daily activities; 2) experienced no adverse side effects from medications; 3) attempted physical therapy only for a brief period; and that 4) even Dr. Peckham could not determine a specific diagnosis or etiology for Plaintiff's symptoms. *Id.* The Court finds that ALJ Lischak's conclusion that Plaintiff's subjective allegations were not consistent with the record or the objective medical evidence was reasonable and supported by substantial evidence.

### d. ALJ's Use of Medical-Vocational Grid Guidelines

Once it is determined that a claimant cannot perform past relevant work, the Medical-Vocational Guidelines (Grids) are used to determine whether a claimant can perform other jobs that exist in the national economy, based upon her RFC, age, education and experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Grids, however, can be relied upon exclusively only when the claimant is suffering solely from exertional impairments. *Id.* If the claimant suffers from non-exertional limitations, i.e. reaching, handling, stooping, climbing, crawling or crouching, the Agency may require the use of a vocational expert if these impairments "significantly limit" the range of work a claimant can perform. *Bapp v. Bowen,* 802 F.2d 601, 605-06 (2d Cir.1986); 20 C.F.R. § 404.1569a(c)(1)(vi). This occurs when the non-exertional impairment imposes an "additional loss of work capacity beyond a negligible one." *Bapp,* 802 F.2d at 606 (quoted in *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996). When it is found that the individual cannot perform the "full range of sedentary work," an individualized assessment may be required to determine whether he/she is "disabled." 20 C.F.R. Pt. 304, Subpint. P, App. 2, § 201.00(h)(3).

**\*7** ALJ Lischak found that Plaintiff's RFC was consistent with the ability to perform jobs at the "light" and "sedentary" exertional levels and that her non-exertional limitations did not "significantly erode the number of unskilled jobs available" to her. Tr. at 19. He rendered her not "disabled"

after considering her age of 44 years ("younger person" per the Grids), her ninth grade education, and her past experience as a factory laborer. *Id* .

In this case, Plaintiff asserts that she cannot perform the full range of "sedentary" work. As such, Plaintiff claims that ALJ Lischak was required to make an "individualized assessment" whether she was disabled rather than relying solely on the Grids. Plaintiff's Objs. at 20. Plaintiff, however, incorrectly assumes that *any* inability to perform "sedentary" work requires a departure from the Grids. Rather, the "inability to perform a full range of sedentary work does not necessarily equate with a finding of 'disabled.' " 20 C.F.R. Pt. 404, Subpint. P, App. 2, § 201.00(h)(3). Thus, ALJ Lischak's conclusion that Plaintiff's non-exertional limitations "do not significantly erode the number of unskilled jobs available" is supported by objective medical evidence and Plaintiff's testimony as to her ability to perform routine daily tasks. ALJ Lischak, thus, correctly applied the Grids in this case.

Plaintiff next contends that she suffers from many non-exertional limitations, such as an inability to 1) sit for any length of time without changing positions, 2) elevate her arms for more than five minutes, or 3) turn her head without pain, that combined with her exertional limitations, require a departure from the Grids. Plaintiff's Objs. at 20-21. The non-exertional limitations [1] evident from the RFC assessment [2] limit her ability to reach in all directions and limit climbing, balancing, stooping, kneeling, crouching and crawling to an occasional basis. However, these limitations merely specify the extent to which Plaintiff can perform these activities and do not necessarily preclude Plaintiff's abilities to perform "sedentary" work. Given Plaintiff's age, education, work experience, RFC, testimony of her ability to do certain daily activities, and the finding that Plaintiff's subjective allegations were not fully credible, the Court finds that ALJ Lischak's conclusion that Plaintiff's non-exertional limitations did not significantly limit the range of work she could perform was supported by substantial evidence, did not prevent the application of the Grids in this case and, thus, did not require a vocational expert.

### IV. CONCLUSION

For the foregoing reasons and the reasons asserted by Magistrate Judge Treece in his Report-Recommendation, the Court finds that the ALJ correctly applied the legal standards and his conclusion was supported by substantial evidence.

Thus, the Court holds that Plaintiff is not disabled under the Act and the decision of the Commission is **AFFIRMED**.

**\*8** IT IS SO ORDERED.

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

In this action, Plaintiff Toni Jo McConnell moves, pursuant to 42 U.S.C. § 405(g), for review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits.[1] Based upon the following discussion, this Court recommends that the Commissioner's decision denying Social Security benefits be **affirmed**.

## I. BACKGROUND

### A. Facts

Plaintiff was born on June 20, 1957, and was forty-four years old at the time the Administrative Law Judge (ALJ) rendered his decision. Dkt. No. 3, Admin. Tr. [hereinafter "Tr."] at pp. 16 & 34. Plaintiff completed nine years of schooling, did not receive her general education diploma (GED), and has past work experience as a factory laborer. *Id.* at pp. 16, 36, 112, & 117. The facts set forth in Plaintiffs Brief, under the heading "STATEMENT OF THE CASE" (Dkt No. 9 at pp. 2-12), as supplemented by Defendant's Brief, under the heading "THE ADMINISTRATIVE RECORD" (Dkt. No. 12 at pp. 2-12) are hereby adopted by the Court. Generally, McConnell alleges a disability due to neck, shoulder, and back pain as well as carpal tunnel syndrome (CTS). *Id.* at pp. 16-17 & 111.

### B. Procedural History

On June 7, 2000, McConnell filed an application for disability insurance benefits alleging a disability onset date of March 6, 2000. Tr. at pp. 102-04. The application was denied initially and on reconsideration. *Id.* at pp. 88-93 & 95-97. On August 22, 2001, a Hearing was held before ALJ John M. Lischak, and, on December 7, 2001, the ALJ issued an unfavorable decision against McConnell. *Id.* at pp. 15-21 & 28-87. On February 25, 2003, the Appeals Council concluded there was no basis under the Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the

final determination of the Commissioner. *Id.* at pp. 5-6. Exhausting all her options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), the role of this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Urtz v. Callahan,* 965 F.Supp. 324, 325-26 (N.D.N.Y.1997) (citing, *inter alia, Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B .,* 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen,* 817 F .2d at 986.

### B. Determination of Disability

**\*9** To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d) (1)(A). Furthermore, the claimants physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial

gainful work which exists in the national economy. *Id* . at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520. At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity." *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations. *Id.* at § 404.1520(d). The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience. *Berry v. Schweiker,* 675 F.2d at 467. Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id.* If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity (RFC) [2] to perform his or her past relevant work despite the existence of severe impairments. 20 C.F.R. § 404.1520(e). If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker,* 675 F.2d at 467; 20 C.F.R. § 404.1520(f).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker,* 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.;* 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.,* 910 F.2d 64, 65 (2d Cir.1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education,

past work experience, and transferability of skills. 20 C.F.R. § 404.1520(f); *see also New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990).

### C. ALJ Lischak's Findings

**\*10** McConnell was the only witness to testify at the Hearing. Tr. at pp. 28-87. In addition to such testimony, the ALJ had McConnell's medical records consisting of treatment reports and opinions from various treating, consultive, and/or non-examining physicians, including, 1) Edward N. Powell, M.D., Treating Orthopedic Physician; 2) Michael P. Owen, M.D.; 3) Steven B. Fish, M.D., Treating Physician; 4) Arthur C. Peckham, Jr., M.D., Treating Physician; 5) Jan K. Turcotte, M.D.; 6) Edmund J. Roache, M.D.; 7) Douglas E. Sloan, D.O., Consultative Examiner; 8) C.R. Manley, M.D., Non-Examining Agency Residual Functional Capacity Assessment; 9) Naveed Siddiqi, M.D., NonExamining Agency Residual Functional Capacity Assessment; and 10) Barbara O'Brien, Registered Nurse and Advanced Nurse Practitioner. *Id.* at pp. 146-237.

The ALJ stated that McConnell met the disability requirements for a period of disability and Disability Insurance Benefits and is insured for benefits through the date of the decision. Using the five-step disability evaluation, ALJ Lischak found that 1) McConnell had not engaged in any substantial gainful activity since March 6, 2000, the alleged onset disability date; 2) she has severe medically determinable impairments, namely, degenerative changes of the cervical spine and hypothyroidism with enlarged thyroid glands, but her bilateral CTS is a non-severe impairment; 3) her severe impairments do not meet nor medically equal any impairment listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) she has the residual functional capacity to perform a wide range of light and sedentary work and as such cannot perform her past relevant work as a factor laborer; and 5) utilizing Medical Vocational Rules 202.18 and 201.25, concluded that McConnell is not disabled. *Id.* at pp. 19-21. After reviewing the administrative transcript, the Court finds that the ALJ applied the correct legal standards and his findings are supported by substantial evidence of record.

### D. McConnell's Contentions

Plaintiff contends that the ALJ's decision denying benefits should be reversed because (1) at Step Two, the ALJ erred by finding that her CTS was not severe and when he failed to consider her knee impairment as a severe impairment; (2) the ALJ's RFC assessment is not supported by the medical evidence and in rendering such RFC, the ALJ failed to accord proper weight to her Treating Physicians' opinions as well as her own subjective complaints regarding her symptoms; and (3) at Step Five, the ALJ erred by relying solely upon the Medical-Vocational Grid Guidelines instead of procuring the testimony of a vocational expert. Dkt. No. 9. The Court will consider each of McConnell's contentions.

### 1. Step Two-Severe Impairments

The ALJ found that McConnell's neck, shoulder, and back condition as well as hypothyroidism significantly limited her ability to perform basic work activities and were thus deemed severe impairments. Tr. at p. 17. Plaintiff states that the ALJ erred in his severity evaluation at Step Two by failing to assess her CTS and left knee injury as a severe conditions. Dkt. No. 9, Pl.'s Br. at pp. 17-20.

**\*11** At Step Two, the ALJ must determine whether an individual has an impairment or combination of impairments that are severe. 20 C.F.R. § 404.1520. The Second Circuit has warned that the Step Two analysis may not do more than "screen out *de minimis*" claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995) (quoted in *de Roman v. Barnhart,* 2003 WL 21511160, at \*11 (S.D.N.Y. July 2, 2003)). An impairment is *not severe* at Step Two if it does not significantly limit a claimant's ability to do basic work activities. 20 C.F.R. § 404.1521(a). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); *see also* Social Security Ruling 85-28, 1985 WL 56856, at \*3-4, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A.1985).

If a claimant has multiple impairments, the combined effect of all impairments should be considered "without regard as to whether any such impairment, if considered separately, would be of sufficient severity." *Id.* at § 404.1523; 42 U.S.C. § 423(d)(2) (B); *see also Schulte v. Apfel,* 2000 WL 362025 (W.D.N.Y. Mar. 31, 2000). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* 1999 WL 294727, at \*5 (E.D.N.Y. Mar. 19, 1999) (quoting *Social Security Ruling 85-28, 1985 WL 56856, at \*3, Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A.1985)).

### a. CTS

With regard to Plaintiff's bilateral CTS, ALJ Lischak acknowledged her history of this condition and noted she underwent corrective surgeries in 1998. *Id.* at pp. 17, 148 & 161-67. The ALJ found that the CTS does not significantly limit Plaintiff and there is no evidence that she receives ongoing treatment for the condition. *Id.* at p. 17. Thus, the ALJ stated this impairment was not severe. *Id.*

McConnell's bilateral CTS condition and corrective surgeries predate the alleged onset disability date of March 6, 2000. It appears that McConnell began experiencing symptoms of CTS as early as 1986. *Id.* at pp. 39 & 146-47. On March 19, 1998, Plaintiff was examined by Edward N. Powell, M.D., a physician with the North Country Orthopaedic Group, P.C, who, at the time, was her treating orthopedic physician. *Id.* at p. 146. On examination, McConnell had a positive Tinel's [3] at the elbow and wrists, bilaterally. *Id.* With regard to her wrist complaints, Dr. Powell's impression was double crush syndrome with carpal tunnel bilaterally. *Id.* A Nerve Conduction Study, completed on April 8, 1998, confirmed that Plaintiff suffered from bilateral CTS. *Id.* at p. 147. Thereafter, McConnell underwent right and left carpal tunnel release surgeries on May 14, 1998, and July 7, 1998, respectively. *Id.* at pp. 161-67. Both surgeries were performed without complications and McConnell recovered as expected. *Id.*

**\*12** In August 1998, Plaintiff reported that she fell twice and contused her left hand. *Id.* at p. 149. Dr. Powell found that the CTS settled down and that she would benefit from occupational therapy and anti-inflammatory medication. *Id.* On September 21, 1998, Dr. Powell determined Plaintiff's left hand was better and she could return to work. *Id.* By June 2, 1999, McConnell had full range of motion of her wrists, her scars were well healed, and she displayed a "negative Tinel's excellent grip." *Id.* Though Plaintiff reported she occasionally experienced some numbness, she indicated she did not feel anymore pain. Dr. Powell opined that McConnell had an almost complete resolution of her symptoms and zero percent loss of use. *Id.* Notwithstanding, on August 3, 1999, Plaintiff returned to Dr. Powell stating her neck and wrists were bothering her. *Id.* On examination, Plaintiff had no atrophy, but exhibited some irritability in the ulnar nerves and median nerves bilaterally. *Id.* at pp. 149-50. Finding the wrist exam to be benign, Dr. Powell indicated the difficulty involved in targeting the cause of her symptoms and wondered whether they stemmed from her neck pain. *Id.* at p. 150. Dr. Powell advised Plaintiff to use splints and over-the-counter Aleve for pain relief. *Id.*

On October 19, 1999, Plaintiff was examined by Steven B. Fish, M.D., an orthopedist from the same medical group as Dr. Powell. *Id.* at p. 151. McConnell reported she injured her hand two days earlier when she was wrestling with her son. X-rays revealed a right distal hamate fracture. *Id.* On examination Dr. Fish noted mild swelling, but her wrist range of motion was good. *Id.* He prescribed a short arm cast and told her she could continue working. *Id.* By November 24, 1999, the fracture had healed and Plaintiff had full range of motion of her wrists. *Id.* at p. 152. On January 3, 2000, Plaintiff skipped her appointment with Dr. Fish stating she was doing fine. *Id.* at p. 155. Then, on July 27, 2000, McConnell was examined by Douglas E. Sloan, D.O., a consultive orthopedist. *Id.* at pp. 183-90. On examination, Dr. Sloan found good range of motion of Plaintiff's wrists and hands and noted there was negative bilateral Tinel's sign. *Id.* at pp. 184-85. She further exhibited good grip strength and no sensory or reflex deficits. *Id.* at p. 185.

The mere presence of an impairment or establishment of treatment for an impairment is not enough to support a disability determination. *See, e.g., Burger v. Barnhart, 476 F.Supp.2d 248, 254 (W.D.N.Y.2007).* In reviewing the treatment set forth above, the Court finds there to be a general consensus among the treating and consulting physicians as to the non-limiting effects of Plaintiff's bilateral CTS.

Further support for this conclusion is derived from Plaintiff's subjective statements. At the ALJ Hearing, Plaintiff testified that though she was not one hundred percent after her wrist surgeries, she was feeling a lot better. *Id.* at p. 80. She noted that she sometimes experienced pain in her hands, but such pain only lasted for a few minutes and she is able to do most of her daily activities. *Id.* at pp. 37, 57-63, 65-69, 78-79 & 82-85. In fact, Plaintiff's own account of her daily activities belie her contention that her CTS is a severe impairment. Plaintiff reported that she cooked, washed dishes, dusted, made the beds, swept lightly, did laundry, performed minor household repairs such as changing a lightbulb, took care of her personal hygiene, and tended to her youngest child. *Id.* at pp. 65-67, 131, & 134. Based upon the medical opinions and Plaintiff's subjective statements, the Court finds there is substantial evidence to support the ALJ's conclusion that McConnell's CTS does not affect her ability to perform basic work activities and therefore is not a severe impairment.

### *2. Knee Impairment*

**\*13** Plaintiff argues that the ALJ erred at Step Two when he failed to consider and/or make reference to her left knee impairment. It appears that, in September 2000, during the pendency of Plaintiff's Social Security Application, Plaintiff injured her knee after wrestling with her son. Tr. at p. 192. On September 28, 2000, Plaintiff was examined by Arthur C. Peckham, Jr., M.D., a physician with the North Country Orthopaedic Group, P.C. *Id.* X-rays were taken and Dr. Peckham assessed that there was no evidence of obvious fractures in or about the knee. *Id.* He further indicated that overall alignment and joint spaces were normal. *Id.* At that point, because Dr. Peckham felt Plaintiff's condition was improving on its own, he did not prescribe any form of treatment. *Id.* Also, a sedimentation factor test was not indicative of polymyalgia rheumatica [4]. *Id.* at pp. 192-93. Then, on November 17, 2000, Dr. Peckham examined the results of a magnetic resonance image (MRI) taken of Plaintiff's knee. Based upon his review, Dr. Peckham determined that there was no significant tear and that the knee should just be monitored. *Id.* at pp. 195 & 238. There does not appear to be any further complaints or treatment of this condition thereafter.

Of particular importance with regard to Plaintiff's knee impairment allegation is the absence of any prompting on Plaintiff's behalf to have the ALJ consider her knee impairment as a basis for finding her disabled under the

Act. After receiving notice that her disability claim had been denied initially, McConnell sought reconsideration and completed a "Reconsideration Disability Report," dated October 11, 2000. Tr. at pp. 94 & 125-28. No where in this Report does McConnell mention the knee injury she sustained during the previous month. *See id.* at p. 125 (specifically referencing that her neck, shoulders, hands, feet, and hip conditions have worsened and leaving blank the question regarding whether she has any additional injury that the SSA should be aware of). Included on that Form is a section seeking information regarding her physicians and the reasons for her visits; McConnell listed Dr. Peckham, but stated he treats her every month since March for her neck and shoulder conditions. *Id.* at p. 126. Thus, she did not provide the SSA with information regarding treatment she received with regard to her knee impairment. Then, after her claim had been denied on reconsideration, McConnell submitted a "Request for Hearing by Administrative Law Judge" Form, dated December 29, 2000. *Id.* at p. 98. In support of her request for the Hearing, McConnell indicated she experiences difficulty moving her arms and shoulders and that she has problems with her feet due to her thyroid problem. *Id.* Yet again, no mention is made of her knee impairment. Similarly, on a Form entitled, "Claimant's Statement When Request for Hearing is Filed and the Issue is Disability," McConnell makes no mention of her knee impairment. *Id.* at p. 137.

**\*14** Then, during the Hearing, Plaintiff mentioned several of her ailments including neck, wrist, shoulder pain, hypothyroidism, and even red, itchy feet, but failed to mention the knee injury. Even when prompted by the ALJ and then by her own attorney to discuss *any* medical conditions that caused her pain, the knee injury was never brought to light. *See generally id.* at pp. 44-64 & 74-87. Despite Plaintiff's omission in specifically referencing her knee impairment to support her disability claim, we acknowledge there was treatment notes contained in the medical records which would alert the ALJ to the existence of such impairment. Indeed, it is clear that the ALJ did consider the knee impairment since he makes specific reference to a treatment report furnished by Dr. Peckham wherein treatment of the knee was being rendered. *See id.* at p. 18 (citing to Tr. at p. 194). Nevertheless, in light of the benign tests and treatment of such impairment, as set forth above, no error was committed when the ALJ failed to include the knee impairment as part of his Step Two analysis. This is further supported by Plaintiff's own testimony which illustrated that she experienced few, if any, functional limitations as a result of her knee injury. She testified that she was able to stoop,

crouch, kneel, crawl, and climb stairs. *Id.* at pp. 60 & 82-83. And, when questioned about her ability to crawl underneath a table, Plaintiff observed only that such a move would hurt her neck. *Id.* at pp. 82-83.

Based on the above discussion, we find that the objective medical evidence and Plaintiff's statements demonstrate that McConnell's knee injury was not severe and did not impair Plaintiff's daily and work activities. Accordingly, the ALJ did not err when he failed to consider the left knee injury as an impairment.

### 2. RFC Determination

As part of the disability analysis, the Commissioner assesses a claimant's residual functional capacity as a basis for determining the particular types of work the claimant may be able to perform despite the existence of physical and/or mental impairments. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). In qualifying work in the national economy, the Regulations classify and define jobs as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. Then, based upon such classification, if the applicant can still perform the kind of work he or she performed in the past, they are deemed not disabled. *Id* . at § 404.1520(e). In determining a claimant's RFC, the ALJ can consider a variety of factors including a physician's observations or opinions regarding limitations, the plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id.* at § 404.1545(a).

In assessing the medical evidence, ALJ Lischak found McConnell had a RFC consistent with a wide range of work at the light or sedentary exertional levels. [5] Specifically, the ALJ determined that McConnell

**\*15** has the residual functional capacity to perform work that does not require lifting and/or carrying more than 20 pounds on an occasional basis or ten pounds on a frequent basis, standing and/or walking more than about six hours in an eight-hour work day, sitting more than about six hours in an eight-hour work day, pushing and/or pulling more than about 20 pounds on an occasional basis or ten pounds on a frequent basis, reaching on more than a limited basis, or climbing, balancing, stooping, kneeling, crouching, or crawling on more than an occasional basis.

Tr. at p. 18.

In making this RFC determination, the ALJ relied upon the Residual Functional Capacity Assessments completed by Non-Examining Agency Physicians C.R. Manley, M.D., and Naveed Siddiqi, M.D. *Id.* at pp. 18 & 199-205. Plaintiff asserts that this RFC determination is not supported by the evidence and that in rendering such determination, the ALJ failed to give proper consideration and weight to her Treating Physicians' opinions as well as her own statements regarding her symptoms.

### a. Treating Physician Rule

Plaintiff claims that the ALJ failed to abide by the Treating Physician Rule when he failed to accord proper weight to the opinion of her treating physician, Dr. Peckham, and instead gave substantial weight to the opinions of the non-examining agency physicians. Pl.'s Br. at pp. 12-17. Plaintiff further criticizes the ALJ's omission of any reference to the opinions rendered by Douglas E. Sloan, D.O., and Barbara O'Brien, N.P. *Id.*

The treating physician doctrine recognizes that a claimant's treating sources, which in most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of [the patient's] medical impairment(s) and may bring a unique perspective to the medical findings" as opposed to an evaluation of a one-time non-examining, non-treating physician. 20 C.F.R. § 404.1527(d)(2); *see Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir.1993). Under the Regulations, a treating physician's opinion as to the nature and severity of a claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan,* 168 F.3d 72, 78-79 (2d Cir.1999). [6] However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel,* 177 F.3d 128, 133(2d Cir.1999); *see also* 20 C.F.R. § 404.1527(e)(1) (Commissioner provides the ultimate decision on disability). Furthermore, when weighing all medical opinions and assessing what weight to accord, "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof" are considerations. *Schisler v. Sullivan,* 3 F.3d at 568; 20 C.F.R. §§ 404.1527(d)(1)-(6); *see also Schaal v.*

*Apfel,* 134 F.3d 496 (2d Cir.1998). In the event the ALJ does not give controlling weight to the treating physician, he must specifically state the reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

**\*16** In this case, the ALJ gave Drs. Manley's and Siddiqi's RFC assessment substantial weight because it was "well supported by reference to objective medical findings in the record." Tr. at p. 17. On the other hand, as the ALJ explained, the opinion rendered by Dr. Peckham that Plaintiff was "in a state of 'total disability[,]' " was not afforded controlling nor substantial weight because it is not supported by objective medical findings and because a determination of disability is within the purview of the ALJ, not the doctor. *Id.* at p. 18. This is a correct statement of the legal principles the ALJ is bound to apply. 20 C.F.R. § 404.1527(e)(1) (Commissioner provides the ultimate decision on disability).

During the Hearing, ALJ Lischak stated he would leave the record open for a period of time in order to allow Plaintiff to submit additional medical evidence, including a RFC form to be completed by Dr. Peckham. *See* Tr. at p. 230. Plaintiff's attorney submitted a RFC form to Dr. Peckham, however, Dr. Peckham was unwilling to complete it. *Id.* at pp. 232 & 237. Dr. Peckham noted on that form that a functional capacity evaluation would be more appropriate, he did not have a definitive diagnosis, and was not actively treating McConnell. *Id.* Thus, there is no opinion in the record rendered by Dr. Peckham regarding the *nature and severity* of McConnell's impairment such that the ALJ could afford controlling weight therewith. Furthermore, Plaintiff's insistence that Dr. Peckham opined that she was in a state of "total disability" is a misstatement of the medical record. Pl.'s Br. at p. 12. In fact, Dr. Peckham's statement was not an opinion on disability, but rather was a recommendation that Plaintiff remain out of work on "total disability" while she underwent diagnostic testing for her knee injury. Tr. at p. 194. Incidentally, such diagnostic testing failed to yield definitive findings. A sedimentation factor test was not indicative of polymyalgia rheumatica, x-rays of her left knee were negative, and after reviewing a subsequent MRI of the left knee, Dr. Peckham did not feel that anything was wrong with the knee. *Id.* at pp. 192-93 & 195. It is also worth noting that such statement was rendered with regard to treatment of a knee injury, which was not a severe injury and thus would not form the basis for disability in the Social Security context. And, finally, with regard to Dr. Peckham's "total disability" statement, even if the Court adopts Plaintiff's proffered interpretation, such opinion would not be entitled to controlling weight as it is

an opinion on a matter reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(1) (Commissioner provides the ultimate decision on disability). As such, the ALJ committed no legal error by disregarding such statement.

Plaintiff also contends that the ALJ erred when he failed to mention the opinion rendered by Registered Nurse and Advanced Nurse Practitioner Barbara O'Brien. This claim is without merit since as a nurse practitioner, Ms. O'Brien does not constitute an "acceptable medical source" whose opinion would be used to establish the existence of a medical impairment. 20 C.F.R. § 404.1513(a). A nurse practitioner instead is considered under the category of "other sources" which the Commissioner *may* use to show "the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." *Id.* at § 404.1513(d). Nevertheless, in the event such opinion differed from acceptable medical sources, it would not be given controlling weight under the Regulations. In any event, aside from her general recitation of Plaintiff's height, weight, etc., Ms. O'Brien's treatment notes are a mere regurgitation of Plaintiff's medical treatment history, subjective complaints of symptoms, and what type of tests will be ordered. *See* Tr. at pp. 196-98 & 213-22. Though on December 8, 2000, Ms. O'Brien noted "extremely" limited range of motion of McConnell's head and neck, and further observed "a response of major proportion in a spasm which brought [McConnell's] shoulder up to her ear level," at no point does Ms. O'Brien render an opinion as to the physical limitations imposed by Plaintiff's thyroid condition. Thus, we find that no error was committed when the ALJ failed to make specific reference to Ms. O'Brien's statements.

**\*17** As for Drs. Manley's and Siddiqi's evaluation being given substantial weight, we find that the ALJ applied the correct legal principles and such determination is supported by the record. Agency medical consultants are considered highly qualified physicians and experts in social security disability evaluations. *See* 20 C.F.R. § 404.1527(f)(2)(i). Thus, a treating physician's opinion may be trumped by the opinion of the state agency physician, a non-examining source, if such opinion is supported by evidence in the record. *See generally* 20 C.F.R. § 404.1527(f); *see also Kiggins v. Barnhart,* 2004 WL 1124169, at \*12 (S.D.N.Y. May 20, 2004) (citing *Schisler v. Sullivan* 3 F.3d 563, 567-68 (2d Cir.1993) & *Diaz v. Apfel,* 59 F.3d 307, 313 n. 5 (2d Cir.1995)); *Punch v. Barnhart,* 2002 WL 1033543, at \*12 (S.D . N.Y. May 21, 2002) (citing, *inter alia, Richardson v. Perales,* 402 U.S. 389, 402 (1971) & 20 C.F.R. § 404.1527).

The agency physicians opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, walk, and/or sit for six hours in an eight-hour day, and was unlimited in her ability to push and/or pull. Tr. at p. 200. Furthermore, Plaintiff was deemed to have occasional postural limitations, such as climbing, balancing, stooping, kneeling, crouching, and crawling, and she was determined to be limited in reaching in all directions. *Id.* at p. 201. She was determined to be unlimited in other manipulative functions such as handling, fingering, and feeling, and she displayed no visual, communicative, nor environmental limitations. *Id.* at pp. 202-03. In rendering this assessment, the physicians relied upon the consultive examination conducted by Dr. Sloan as well as the claimant's subjective complaints. *Id.* at pp. 183-87 & 200-04. Ironically, Plaintiff complains that the ALJ failed to allot any weight or consideration to Dr. Sloan's opinions and that such constituted error. However, by according substantial weight to the agency physicians' opinions, the ALJ was similarly according substantial weight to the opinion which formed the basis of their assessments, namely, Dr. Sloan's opinion. *Cf. Jones v. Barnhart,* 2004 WL 3158536, at \*6 (E.D.N.Y. Feb. 3, 2004) (citing *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984), for the proposition that an ALJ is not obligated to "specifically address each piece of evidence in his decision"). On physical examination, Dr. Sloan observed that Plaintiff did not appear to be in any acute distress, though she displayed some difficulty with position and movement throughout the examination, "[o]ften holding [her] head somewhat flexed and slightly ... bent to the right." Tr. at p. 184. Dr. Sloan noted there was some decreased range of motion in her cervical spine, some tenderness in the lumbosacral spine, limited range of motion in her shoulders, and good range of motion on her wrists and hands. *Id.* at pp. 184-85. He further noted Plaintiff had full motor strength, good grip strength, and intact sensory and reflex function. *Id.* at p. 185. Her gait was normal and she was able to squat fully and walk heel to toe without difficulty.

**\*18** In addition to the agency physicians' medical findings, the record reveals that Plaintiff's impairments did not cause functional limitations greater than that proposed by Drs. Siddiqi and Manley. First, with regard to Plaintiff's CTS, as set forth above, there was a general consensus amongst the physicians as to the non-limiting effects of Plaintiff's CTS impairment. On September 21, 1998, Dr. Powell determined Plaintiff's left hand was better and she could return to work. Tr. at p. 149. By June 2, 1999, Dr. Powell reported that McConnell had full range of motion of her wrists, her scars

were well healed, and she displayed a "negative Tinel's excellent grip." *Id.* He further stated there was complete resolution of her symptoms and zero percent loss of use. *Id.* One year later, in July 2000, Dr. Sloan stated Plaintiff's motor strength was generally a five out of five and she had good grip strength. Plaintiff further reports that she cooks, washes dishes, dusts, makes the beds, sweeps, does laundry, performs minor household repairs such as changing a lightbulb, takes care of her personal hygiene, and tends to her youngest child. Such evidence supports the agency physicians' opinions regarding McConnel's physical limitations, namely, that she has no manipulative limitations in handling, fingering, and feeling, nor does she have visual, communicative, or environmental limitations.

With regard to Plaintiff's knee impairment, this Court has already reviewed the medical evidence and indicated that such impairment caused few functional limitations. In light of the benign objective medical test results, combined with Plaintiff's own testimony regarding her ability to stoop, crouch, kneel, and crawl, the ALJ properly afforded substantial weight to the agency physicians' assessment that Plaintiff had occasional postural limitations, such as climbing stairs, balancing, stooping, kneeling, crouching, and crawling. In fact, the postural limitations imposed were not attributed to Plaintiff's knee injury, but rather her reduced range of motion in her neck, shoulders, and back.

Which brings us to McConnell's other impairments. There is no doubt in this case that McConnell suffers from severe impairments, namely degenerative changes of the cervical spine and hypothyroidism with enlarged thyroid glands. The ALJ considered McConnell's testimony regarding her daily activities as well as the fact that she did not take any pain medication nor did she experience any side effects from her thyroid medication. Tr. at p. 18. The ALJ further considered the fact that on May 22, 2001, Dr. Peckham stated that McConnell's thyroid condition was under control and that there was no specific diagnosis nor etiology for her complaints of pain. *Id* . (citing Tr. at p. 206). It is worth repeating that Dr. Peckham refused to submit any RFC assessment due to his lack of diagnosis. Also, though Dr. Sloan recognized Plaintiff had limited range of motion of the cervical spine and shoulders, no gross muscle atrophy nor hypertrophy was noted in her upper and lower extremities. *Id.* at p. 185. Similarly, she had full sensory functions, negative straight leg raising, and only slightly decreased range of lumbar motion. *Id.* at pp. 184 & 187. These findings support the agency physicians' opinions regarding Plaintiff's ability

to perform the lifting requirements of light work, namely twenty pounds, and support the opinions regarding her ability to perform the standing, walking, and sitting requirements of light work. While Plaintiff testified to greater limitations than those propounded by the agency physicians, such statements were not credited in light of her extensive daily activities and the objective medical evidence, a subject we discuss next. *See infra* Part II.D.2.b.

### *b. Plaintiff's Credibility*

**\*19** Plaintiff claims that the ALJ's analysis that her symptoms were not fully credible was contrary to the Regulations. Pl.'s Br. at pp. 21-22.

Under 20 C.F.R. § 404.1529(a), subjective pain will be considered in determining a claim for disability to the extent in which "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Symptoms such as pain are to be considered by the ALJ at all steps of the disability determination. 20 C.F.R. §§ 404.1529(a) & (d). A claimant's statements about the persistence, intensity, and limiting effects of these symptoms are evaluated in the context of all objective medical evidence, which includes medical signs and laboratory findings. *Id* . at § 404.1529(c)(4). Once medically objective evidence is submitted, the ALJ must identify the severity of the pain and whether that pain will limit the claimant's ability to work. *Id.* at § 404.1529(c). "It is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where ... it is supported by objective medical evidence." *Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992) (quoting *Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir.1983)). However, in a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987). Where the ALJ resolves to reject subjective testimony with regards to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id.* at 608 (citing, *inter alia, Valente v. Sec'y of Health and Human Servs.,* 733 F.2d 1037, 1045 (2d Cir.1984)). In evaluating a claimant's complaints of pain, an

ALJ must consider several factors set forth in the Regulations including:

(i) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;

(v) Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;

(vi) Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

**\*20** In assessing Plaintiff's credibility, the ALJ recounted Plaintiff's testimony wherein she claimed an inability to work due to constant pain radiating from her head down to the middle of her spine, pain and stiffness in her hips, as well as pain and numbness in her arms. Tr. at p. 18. The ALJ further noted Plaintiff's claim that she experiences dry skin and hair loss due to hypothyroidism and that her feet become red, itchy, and blistered if she is on them for about two hours. *Id.* The Court has reviewed the ALJ's analysis regarding McConnell's credibility and finds that the ALJ properly considered the evidence in the record as well as the factors set forth in 20 C.F.R. § 404.1529(c)(3). Specifically, the ALJ considered Plaintiff's testimony and found that she could accomplish a wide range of routine daily activities, which included cooking, driving, shopping, washing dishes, and doing the laundry. Tr. at p. 18. He further noted that McConnell did not take any prescription pain medication and experiences no adverse side effects from her thyroid medication. *Id.* And, with regard to her cervical condition, the ALJ noted that Plaintiff attended physical therapy for only a brief period of time. *Id.* The ALJ found noteworthy that, on May 22, 2001, Dr. Peckham opined that Plaintiff's thyroid

condition was under control and that there was "no specific diagnosis or etiology" for Plaintiff's pain symptoms. *Id.* Based on these factors, the ALJ found Plaintiff's statements regarding her symptoms to not be fully credible. *Id.* In light of the above, we find that the ALJ reasonably concluded that the Plaintiff's subjective complaints of pain and other symptoms were not fully credible.

### 3. Step Five-Guidelines and Vocational Expert

Lastly, Plaintiff claims that the ALJ erred by solely relying upon the Medical-Vocational Guidelines (also known as "the Grids") to determine whether Plaintiff could perform work available in the national economy. Plaintiff asserts that such reliance was in error in light of the fact that she suffers from significant non-exertional impairments and as such, the ALJ should have elicited the testimony of a vocational expert. Pl.'s Br. at pp. 23-24.

Ordinarily, if a claimant suffers solely from exertional impairments, the Commissioner meets her burden at the fifth step by resorting to the applicable Medical-Vocational Guidelines ("the Grids"). *Rosa v. Callahan,* 168 F.3d 72, 82 (2d Cir.1999); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); 20 C.F.R. §§ 404.1569 & 404.1569a. The Grids place claimants with severe exertional impairments who can no longer perform past relevant work into categories according to their RFC, age, education, and work experience (*i.e.,* skilled or unskilled as well as transferability of skills). 20 C.F.R. Pt. 404, Subpt. P, App. 2; *see also Clark v. Barnhart,* 2003 WL 221917777, at \*4-5 (E.D.N.Y. Sept. 16, 2003). Based on these factors, the Grids are dispositive on whether the claimant is disabled or not disabled and proper application thereto will obviate the need for any vocational testing. *Rosa v. Callahan,* 163 F.3d at 82 ("For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled.").

**\*21** Exclusive use of the Grids, however, is "inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations," *i.e.,* when a combination of exertional and non-exertional limitations exist. 20 C.F.R. § 404.1569a(d). "[W]hen significant nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity." *Horbock v. Barnhart,* 210 F.Supp.2d 125, 127 (D.Conn.2002) (citing

*Bapp v. Bowen,* 802 F.2d at 605). "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen,* 802 F.2d at 603. Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" will sole reliance on the Grids be deemed inappropriate. *Id.* at 605-06. "A claimant's work capacity is 'significantly diminished' if there is an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.' " *Id.* at 606 (quoted in *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996)).[7] Exertional limitations are strength limitations, which include the ability to sit, stand, walk, carry, push, and pull. 20 C.F.R. § 404.1569a(a)-(b); *see also Zorilla v. Chater,* 915 F.Supp. 662, 667 n. 3 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1569a(b)). Non-exertional limitations imposed by impairments affect one's ability to meet requirements of jobs, other than strength demands including, "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a(c)(1)(vi); *see also Sobolewski v. Apfel,* 985 F.Supp. 300, 310 (E.D.N.Y.1997) (citing 20 C.F.R. §§ 404.1569a(a) & (c)).

In setting forth her argument, McConnell fails to specify exactly which non-exertional impairments significantly affect her ability to work. Nevertheless, the medical evidence supports the ALJ's determination that McConnell's "non-exertional limitations do not significantly erode the number of unskilled jobs available at the 'light' or 'sedentary' exertional levels[.]" Tr. at p. 19.

Drs. Manley and Siddiqi noted that based upon the medical record, Plaintiff had postural limitations in that she could occasionally climb, balance, stoop, kneel, crouch, or crawl. Manipulative limitations were also noted in McConnell's ability to reach in all directions, but it was determined that she was not limited in her abilities to handle, finger, or feel. *Id.* at pp. 201-02. These opinions support the ALJ's assessment that Plaintiff was not substantially limited by her non-exertional limitations. Since we found that the ALJ's accordance of substantial weight to this assessment was proper, we similarly find the ALJ was entitled to rely upon such assessment at other steps in the disability analysis. Furthermore, by her own testimony, McConnell established that she could bend at the waist, stoop, crouch, kneel, crawl, and climb stairs, but sometimes she experienced difficulty in maintaining balance and that her only limitation in performing some of these activities, such as crouching, was due to her neck pain. *Id.* at pp. 82-83. Contrary to the agency physicians' assessment, Plaintiff testified that she had difficulty grasping objects. *Id.* at pp. 62-63. Since, however, the ALJ found Plaintiff's disabling allegations were not fully credible, to the extent her testimony conflicted with the medical evidence, such was properly disregarded. As explained throughout this opinion, Plaintiff's wide range of daily activities contradicts her allegation that her non-exertional impairments significantly limited her ability to work. *Id.* at pp. 37, 65-69 & 84-85. Thus, in finding that Plaintiff's non-exertional limitations did not have a significant impact on her ability to do work, the ALJ properly relied on the Grids. *See generally Jordan v. Comm'r of Soc. Sec.,* 194 Fed. Appx. 59, 61 (2d Cir.2006) (unpublished opinion) (stating that in finding that the claimant's non-exertional limitations did not "significantly compromise[ ] her capacity to perform light work[,]" the ALJ correctly applied the Guidelines to the claimant's condition).

**\*22** Considering the record as a whole, including the opinions of the examining physicians, the state agency physician, and Plaintiff's daily activities, there is substantial evidence to support the ALJ's conclusion.

### III. CONCLUSION

In light of the foregoing discussion, it is clear that in finding McConnell was not disabled, the ALJ applied the correct legal standards and his determination is supported by substantial evidence. Thus, this Court recommends that decision be upheld.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that the Commissioner's decision denying disability benefits be **AFFIRMED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS***

*REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 833968

## Footnotes

1   Here, the non-exertional limitations include limited or reduced range of motion in her neck, shoulders and back.

2   The Court already determined the RFC assessment completed by the agency physicians was adequately relied upon.

1   This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Both parties have filed Briefs, though oral argument was not heard. Dkt. Nos. 9 & 12. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

2   "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 404.1545(a).

3   Tinel's sign is a "tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. Called also formication sign and distal tingling on percussion." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1527 (28th ed.1994).

4   Polymyalgia rheumatica is "a syndrome in the elderly characterized by proximal joint and muscle pain, high erythrocyte sedimentation rate, and a self-limiting course." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1329 (28th ed.1994).

5   The Social Security Regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> 20 C.F.R. § 404.1567(b)

> Sedentary work involves:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> *Id.* at § 404.1567(a).

6   A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual." *Jones v. Apfel,* 66 F.Supp.2d 518, 524-25 (S.D.N.Y.1999) (quoting *Schisler v. Bowen,* 851 F.2d 43, 46 (2d Cir.1988)).

7   The Second Circuit arrived at this standard in reliance on sister circuit case law as well as the report accompanying the promulgation of the Grids. *See Bapp v. Bowen,* 802 F.2d at 605-06. The promulgation report made clear that nonexertional limitations may have the effect of excluding certain jobs within a particular category, however, in some cases, such exclusions are negligible in that a wide range of jobs exist within the functional level especially in light of the fact that an individual "need not be able to perform each and every job in a given range of work." *Id.* at 606 (quoting 43 FED.REG. 55,349-55,361).

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 6157396
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lisa Marie SLATER, Plaintiff,
v.
COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 5:14–CV–255 (GTS).
|
Signed Oct. 20, 2015.

**Attorneys and Law Firms**

Olinsky Law Group, Howard D. Olinsky, Esq., of Counsel,
Syracuse, NY, for Plaintiff.

U.S. Social Security Admin., Office of Reg'l Gen. Counsel–
Region II, Elizabeth Rothstein, Esq., of Counsel, New York,
NY, for Defendant.

### DECISION and ORDER

GLENN T. SUDDABY, Chief Judge.

**\*1** Currently before the Court, in this Social Security
action filed by Lisa Marie Slater ("Plaintiff") against the
Commissioner of Social Security ("Defendant" or "the
Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)
(3), are the parties' cross-motions for judgment on the
pleadings. (Dkt.Nos.13, 14.) For the reasons set forth below,
Plaintiff's motion is denied and Defendant's motion is granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on September 22, 1988. (T. 126.) She
graduated high school. (T. 132.) Generally, Plaintiff's alleged
disability consists of bipolar, depression, anxiety, panic
attacks, Graves' disease, and learning disability. (T. 131.) Her
alleged disability onset date is March 1, 2008. (T. 126.) Her
date last insured is September 30, 2009. (*Id.*) She previously
worked as a certified nurse's aide ("CNA") and driver. (T.
132.)

### B. Procedural History

On April 21, 2011, Plaintiff applied for a period of Disability
Insurance Benefits ("SSD") under Title II, and Supplemental
Security Income Benefits ("SSI") under Title XVI, of the
Social Security Act. (T. 106.) Plaintiff's applications were
initially denied, after which she timely requested a hearing
before an Administrative Law Judge ("the ALJ"). On October
4, 2012, Plaintiff appeared before the ALJ, Marie Greener.
(T. 2646.) On November 7, 2012, ALJ Greener issued a
written decision finding Plaintiff not disabled under the
Social Security Act. (T. 10–25.) On January 28, 2014,
the Appeals Council ("AC") denied Plaintiff's request for
review, rendering the ALJ's decision the final decision of the
Commissioner. (T. 1–4.) Thereafter, Plaintiff timely sought
judicial review in this Court.

### C. The ALJ's Decision

Generally, in her decision, the ALJ made the following
five findings of fact and conclusions of law. (T. 15–21.)
First, the ALJ found that Plaintiff met the insured status
requirements through September 30, 2009 and Plaintiff had
not engaged in substantial gainful activity since March 1,
2008. (T. 15.) Second, the ALJ found that Plaintiff had the
severe impairment of an affective disorder. (*Id.*) Third, the
ALJ found that Plaintiff did not have an impairment that
meets or medically equals one of the listed impairments
located in 20 C.F.R. Part 404, Subpart P, Appendix. 1.
(T. 16–17.) Fourth, the ALJ found that Plaintiff had the
residual functional capacity ("RFC") to perform "a full
range of work at all exertional levels but [Plaintiff] [was]
unable to perform complex tasks and she need[ed] to avoid
confrontation with others (i .e. arguing with customers,
negotiating and detaining/restraining others)." (T. 18.) Fifth,
the ALJ determined that Plaintiff had no past relevant work;
however, there were jobs that existed in significant numbers
in the national economy that the Plaintiff could perform. (T.
19–20.)

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments

**\*2** Plaintiff makes essentially six separate arguments in
support of her motion for judgment on the pleadings. First,
Plaintiff argues the ALJ failed to develop the record. (Dkt.
No. 13 at 10–12 [Pl.'s Mem. of Law].) Second, Plaintiff
argues the ALJ failed to find Plaintiff's Graves' disease,

migraines, and physical impairments severe at step two. (*Id.* at 12–15.) Third, Plaintiff argues the ALJ erred in finding that Plaintiff's mental impairment did not meet or medically equal a Listing. (*Id.* at 15–17.) Fourth, Plaintiff argues the ALJ's RFC determination was not supported by substantial evidence. (*Id.* at 17–20.) Fifth, Plaintiff argues the ALJ's credibility analysis was legally erroneous and unsupported by substantial evidence. (*Id.* at 21–24.) Sixth, and lastly, Plaintiff argues the ALJ's step five determination was unsupported by substantial evidence. (*Id.* at 2425.)

### B. Defendant's Arguments

In response, Defendant makes six arguments. First, Defendant argues the ALJ properly assessed the evidence pertaining to Plaintiff's intellectual functioning. (Dkt. No. 14 at 5–7 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ correctly considered the severity of Plaintiff's impairments at step two. (*Id.* at 7–10.) Third, Defendant argues the ALJ correctly found that Plaintiff's impairments did not meet or medically equal a Listing. (*Id.* at 10–13.) Fourth, Defendant argues the ALJ properly considered the medical evidence of record and her RFC finding was supported by substantial evidence. (*Id.* at 13–20.) Fifth, Defendant argues the ALJ properly assessed Plaintiff's credibility. (*Id.* at 20–23.) Sixth, and lastly, Defendant argues the ALJ correctly relied on the Meidcal–Vocational Guidelines at step five. (*Id.* at 23–24.)

### III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S .C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs .,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

**\*3** "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has

an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

## IV. ANALYSIS

### A. Whether the ALJ Properly Developed the Record Regarding Plaintiff's Alleged Intellectual Disability.

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 14 at 5–7 [Def.'s Mem. of Law].) The Court adds the following analysis.

**\*4** Plaintiff argues the ALJ failed to develop the record regarding Plaintiff's alleged borderline intellectual functioning because the ALJ did not order an intelligence exam. (Dkt. No. 13 at 10 [Pl.'s Mem. of Law].) To be sure, an ALJ is under an affirmative duty to "make every reasonable effort" to develop the record. 20 C.F.R. §§ 404.1512(d), 416.912(d). However, reviewing courts have held that ALJs are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999); *see also Hart v. Comm'r of Soc. Sec.,* 5:07–CV–1270, 2010 WL

2817479, at \*5 (N.D.N.Y. July 10, 2012). Further, whether or not a consultative exam is obtained is made on a case-by-case basis and at the discretion of the Commissioner. 20 C.F.R. §§ 404.1517, 404.1519, 416.917, 416.919.

Here, the record did not indicate a severe intellectual impairment. Consultative examiner, Dennis Noia, Ph.D., opined that Plaintiff's intellectual functioning was in the borderline range; however, she was still capable of understanding and performing simple tasks, she could regularly attend to a routine and maintain a schedule, she could learn new tasks, and she could make appropriate decision. (T. 445–446.) Therefore, the ALJ was within her discretion to not order an intelligence evaluation where the record did not contain any obvious gaps and the record failed to indicate an intellectual impairment that prevented Plaintiff from performing more than simple work. *See Tankisi v. Comm'r of Soc. Sec.,* 521 Fed. App'x. 29, 32 (2d Cir.) (finding an ALJ was obligated to order a consultative examination where the facts did not warrant or suggest the need for it).

### B. Whether the ALJ's Step Two Determination was Proper.

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 14 at 7–10 [Def.'s Mem. of Law].) The Court adds the following analysis.

At step two of the sequential evaluation process, the ALJ must determine whether the plaintiff has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). The plaintiff bears the burden of presenting evidence establishing severity. *Miller v. Comm'r of Social Sec.,* No. 05–CV–1371, 2008 WL 2783418, at \*6–7 (N.D.N.Y. July 16, 2008); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a). Although the Second Circuit has held that this question is limited to "screen[ing] out de minimis claims," *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." *Coleman v.. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995). Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97–CV–5759, 1999 WL 294727, at \*5 (E.D.N.Y. March 19,1999) (*quoting Bowen,* 482 U.S. at 154 n. 12).

**\*5** In addition, "[w]here an ALJ has omitted an impairment from step two of the sequential analysis, other courts have declined to remand if the ALJ clearly considered the effects of the impairment in the remainder of his analysis." *Chavis v. Astrue,* No. 07–CV–0018, 2010 WL 624039, at \*12 (N.D.N.Y.Feb.18, 2010); *Lasiege v. Colvin,* No. 12–CV– 01398, 2014 WL 1269380, at \*10–11 (N.D.N.Y. Mar. 25, 2014); *Reices–Colon v. Astrue,* 523 F. App'x 796, 798 (2d Cir.2013) (finding the alleged step two error harmless because the ALJ considered the plaintiff's impairments during subsequent steps); *see also* 20 C.F.R. § 404.1523, 416.923 (stating that the ALJ is required to consider the "combined effect of all of [plaintiff's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity"). It has been well established that "[b]ecause step two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements." *Kessler v. Colvin,* 48 F.Supp.3d 578, 593 (S.D.N .Y.2014) (*citing Fortier v. Astrue,* No. 10–CV–01688, 2012 WL 3727178, at \*9 (D.Conn. May 11, 2012)).

Plaintiff asserts that the ALJ erred in her step two determination that Plaintiff's impairments of Graves' disease, migraine headaches, and back impairment were non-severe impairments. (Dkt. No. 13 at 12–15 [Pl.'s Mem. of Law].) Substantial evidence supports the ALJ's step two determination that Plaintiff's Graves' disease, migraine headaches, and back impairment were non-severe impairments.

Plaintiff contends that her Graves' disease decreased her ability to grip. (Dkt. No. 13 at 12 [Pl.'s Mem. of Law].) Upon examination, consultative examiner Kalyani Ganesh, M.D. observed intact hand and finger dexterity and full grip strength. (T. 449.) Dr. Ganesh also observed full range of motion in Plaintiff's upper extremities. (*Id.*) Overall, Dr. Ganesh opined Plaintiff had no gross physical limitations for sitting, standing, walking or the use of upper extremities. (T. 450.) Plaintiff also received treatment from Family Care Medical Group for her Graves' disease. Although there are notations indicating "fine tremor on outstretched hands," overall, the treatment notes fail to indicate any functional limitations stemming from Plaintiff's Graves' disease. (T. 513, 516, 519, 522, 525, 536, 567, 570, 573, 576.) Plaintiff asserts her Graves' disease also affects her ability to adapt to changes in the workplace. (Dkt. No. 13 at 14 [Pl.'s Mem. of Law].)

However, Plaintiff fails to cite to the record for support of this argument and instead provides a general description of Graves' disease symptomology. (*Id.* at 13 n. 6.)

The ALJ also properly evaluated Plaintiff's migraine headaches at step two. The ALJ concluded that Plaintiff headaches were non-severe because objective medical imaging was negative and Plaintiff's condition was treated with medication, indicating no more than minimal functional limitations from such impairment. (T.16.) The ALJ also properly evaluated Plaintiff's back impairment. The ALJ relied on Dr. Ganesh's examination that showed full range of motion, full strength, no sensory deficits and no atrophy in Plaintiff's back. (*Id.*) Therefore, the ALJ properly evaluated Plaintiff's impairments at step two. Further, any error at this step is deemed harmless as the ALJ proceeded with the sequential process and took into consideration the combined effects of Plaintiff's impairments in her RFC analysis and determination.

## C. Whether the ALJ's Step Three Determination was Proper.

**\*6** After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 14 at 10–13 [Def.'s Mem. of Law].) The Court adds the following analysis.

At step three of the sequential process, the ALJ must determine whether Plaintiff's impairment met or medically equaled the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.909) ("the Listings"). The ALJ determined that Plaintiff's affective disorder did not met or equal the criteria of Listing 12.04. (T. 16.) Plaintiff argues that her affective disorder meets the "paragraph B" criteria of Listing 12.04. (Dkt. No. 13 at 15 [Pl.'s Mem. of Law].) Listing 12.04 paragraph B criteria requires an affective disorder that results in at least two of the following: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04(B). However, substantial evidence supports the ALJ determination that Plaintiff's affective disorder does not meet or equal the criteria outlined in "paragraph B" of Listing 12.04.

The ALJ properly relied on medical evidence in the record and Plaintiff's testimony, indicating that Plaintiff did not have marked limitations in the areas outlined in paragraph B. For example, Plaintiff alleges the ALJ failed to take into account the full severity of Plaintiff's limitations in social functioning. (Dkt. No. 13 at 17 [Pl.'s Mem. of Law].) The ALJ did take Plaintiff's social limitations into account, noting Plaintiff "freaks out" on people. (T. 16.) However, the ALJ also properly noted that the record indicated that Plaintiff was also described as "cooperative" and overall she was "moderately" appropriate in social skills and presentation. (*Id.*) These limitations are reflected in the RFC determination which limits Plaintiff to occupations in which she can avoid conflict. Therefore, for the reasons stated herein, and in Defendant's brief, the ALJ's step three determination was supported by substantial evidence because she relied on medical evidence in the record and Plaintiff's testimony in support of her conclusion that Plaintiff did not meet or equal Listing 12.04.

### D. Whether the ALJ's RFC Assessment was Supported by Substantial Evidence.

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 14 at 13–19 [Def.'s Mem. of Law].) The Court adds the following analysis.

A plaintiff's RFC is "the most [the plaintiff] can do despite [her] limitations." 20 C.F.R. §§ 404.1545, 416.945. Plaintiff argues the ALJ erred in her RFC assessment because she failed to obtain a medical source statement from Plaintiff's treating sources, Dr. Rao and from Daniel Karn, P.A. (Dkt. No. 13 at 18 [Pl.'s Mem. of Law].) Further, Plaintiff argues the ALJ's RFC determination failed to provide for Plaintiff's physical and mental impairments in accordance with SSR 96–8p. (*Id.* at 20.)

**\*7** As stated in Part IV.A, the ALJ is under an affirmative duty to "make every reasonable effort" to develop the record. 20 C.F.R. §§ 404.1512(d), 416.912(d). Moreover, an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician, including an assessment of the claimant's functional capacity, in order to afford the claimant a full and fair hearing. *See Smith v. Astrue,* 896 F.Supp.2d 163, 176 (N.D.N.Y.2012) (citing 20 C.F.R. § 404.1512(e)); *Devora v. Barnhart,* 205 F.Supp.2d 164, 174 (S.D.N.Y.2002) (collecting cases); *Hardhardt v. Astrue,* No. 05–CV–2229, 2008 WL 2244995, at \*9 (E.D.N.Y. May 29, 2008). However, the ALJ has no duty to re-contact a source

where the evidence submitted by that source is complete. A source's opinion is complete where it includes all of the factors set forth in 20 C.F.R. § 416.913 [1] and there is no indication that further contact will result in additional information, re-contact is not necessary. *See Hluska v. Astrue,* No. 06–CV–0485, 2009 WL 799967, at \*17 (N.D.N.Y. Mar. 25, 2009).

Here, the record was complete and adequate enough to provide substantial evidence to support the ALJ's RFC determination. The ALJ's RFC determination was supported by the medical source statement of Dr. Noia and the non-examining State agency consultant L. Blackwell. [2] The record contained treatment notes from Plaintiff's treating providers with Family Care Medical Group as well as treatment records from emergency departments. The ALJ properly considered all the medical evidence in the record, including notations by Mr. Karn, Plaintiff's treating physician's assistant. (T. 19.) Therefore, the ALJ was not required to re-contact Plaintiff's treating source specifically to obtain a medical source statement because the record in Plaintiff's case was complete. *See Pellam v. Astrue,* 508 F. App'x 87, 90 (2d Cir.2013) (where the ALJ had all the treatment notes from the plaintiff's treating physician and a functional opinion from a consultative examiner, the ALJ had no further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians).

Plaintiff argues the ALJ failed to comply with SSR 96–8p, (S.S.A. July 2, 1996). (Dkt. No. 13 at 20–21 [Pl.'s Mem. of Law].) SSR 96–8p provides an ALJ with guidelines for assessing a plaintiff's RFC. Plaintiff argues the ALJ erred in her RFC determination, because the ALJ's RFC determination prescribed "no physical or mental limitation." (*Id.* at 20.) However, the ALJ's RFC determination does provide for mental limitations in that it limits Plaintiff to simple work that does not involve confrontation. (T. 18 .) To be sure, the RFC determination does not provide for physical limitations. (*Id.*) However, Plaintiff failed to establish that her physical medical impairments were severe and caused more than minimal effects on her ability to perform work.

**\*8** SSR 96–8P states: "[w]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96–8P (S.S.A. July 2, 1996). Plaintiff appears to argue the ALJ erred in

finding no physical limitations because SSR 96–8p allows for a finding of no physical limitations only in cases that 1) there is no allegation of a physical limitations and 2) the record does not support such limitations. (Dkt. No. 13 at 20 [Pl.'s Mem. of Law.].) The purpose of the SSR 96–8p is to stress to ALJs that:

> [i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.)

SSR 96–8p. The Ruling does not mandate an ALJ to provide for limitations in her RFC determination because there is an allegation of limitations and the record provides support. Here, the ALJ properly assessed Plaintiff's impairments at step two of the sequential process, as discussed in Part IV.B. The ALJ properly determined that Plaintiff's physical impairments did not significantly limit Plaintiff's ability to perform basic work functions. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). Further, the ALJ's RFC determination was supported by substantial evidence as discussed herein. The ALJ relied on the medical source statement of Dr. Ganesh opining Plaintiff had no physical limitations in sitting, standing, walking, or the use of her upper extremities. (T. 450.) Therefore, the ALJ's RFC determination was supported by substantial evidence in the record and the ALJ did not err in her physical RFC determination because the evidence in the record does not support greater physical restrictions than accounted for.

**E. Whether the ALJ's Credibility Assessment was Supported by Substantial Evidence.**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 14 at 20–22 [Def.'s Mem. of Law.].) The Court adds the following analysis.

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (*quoting Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints

without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

**\*9** "The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.,* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.* Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue,* 534 F. App'x 71, 75 (2d Cir.2013) (*citing Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible." (T. 19.) In support of her determination, the ALJ reasoned that Plaintiff's statement regarding her symptoms were inconsistent with objective medical evidence, inconsistent with her activities of daily living, and that Plaintiff had not been compliant with treatment. (*Id.*)

Plaintiff argues the ALJ's determination failed to provide specific reasoning to support her credibility determination. (Dkt. No. 13 at 22 [Pl.'s Mem. of Law].) First, the ALJ did provide specific reasoning in making her credibility determination in accordance with the factors outlined in 20 C.F.R. §§ 404.1529, 416.929. The ALJ specifically discussed objective medical evidence, activities of daily living, and treatment compliance. Failure to discuss each and every factor in the Regulations is not in and of itself grounds for remand. *See Halloran v. Barnhart,* 362 F.3d 28, 31–32 (2d Cir.2004) ("[w]e require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear").

Plaintiff also argues the ALJ erred in discrediting Plaintiff's testimony due to noncompliance with treatment. (Dkt. No. 13 at 23 [Pl.'s Mem. of Law].) Plaintiff stresses that her "persistence" in seeking treatment outweighs her non-compliance. (*Id.* at 2223.) To be sure, faulting a plaintiff with diagnosed mental illness for failing to pursue mental health treatment is a "questionable practice." *See Day v. Astrue,* No. 07 CV 157, 2008 WL 63285, at *5 n. 6 (E.D.N.Y. Jan. 3, 2008) (noting that it "is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (*quoting Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996)). The record indicated Plaintiff was discharged from mental health treatment due to nonattendance and failure to undergo required blood testing. (T. 434.) Notations stated Plaintiff ceased treatment because she felt it wasn't helping her. (*Id.*) Here, Plaintiff pursued treatment, but failed to comply and voluntarily ceased treatment. The ALJ did not determine Plaintiff was not disabled due to her non-compliance, the ALJ determined Plaintiff's statements concerning the limiting effects of her mental health symptoms were less credible. An ALJ may rely on Plaintiff's non-compliance as a part of her credibility assessment. SSR 96–7p, 1996 WL 374186, at *7 ("the individual's statements may be less credible if

the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").[3] In addition, non-compliance was just one factor the ALJ took into consideration in her overall credibility analysis.

**\*10** Therefore, the ALJ properly assessed Plaintiff's credibility. The ALJ is not obligated to accept Plaintiff's testimony regarding her limitations and symptoms without question. It is within the ALJ's discretion to evaluate Plaintiff's credibility in light of the evidence in the record. *Genier,* 606 F.3d at 49 ("the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record").

### F. Whether the ALJ's Step Five Determination was Proper.

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 14 at 23–24 [Def.'s Mem. of Law].) The Court adds the following analysis.

Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record).

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) is *DENIED;* and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 14) is *GRANTED;* and it is further

**ORDERED** that Defendant's decision denying disability benefits is *AFFIRMED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

**All Citations**

Slip Copy, 2015 WL 6157396

Footnotes

1    Pursuant to 20 C.F.R. § 416.913(b), medical reports should include a patient's (1) medical history, (2) clinical findings, (3) laboratory findings, (4) diagnosis, (5) treatment prescribed with response and prognosis, and a(6) statement about what the patient can still do despite his or her impairments based on the findings set forth in factors (1) through (5).

2    Plaintiff argues the ALJ erred in providing Dr. Blackwell with "significant weight;" however, an ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.,* No. 08–CV–1005, 2010 WL 2776978 at *4 (N.D.N.Y. June 7, 2010).

3    The treatment notes the ALJ cited to indicating non-compliance also provide the reasoning for Plaintiff's non-compliance; therefore, the ALJ was aware of Plaintiff's reasons for not pursuing mental health treatment in accordance with SSR 96–7p.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 398952
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Barbara TRYON, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendants.

No. 5:10–CV–537 (MAD).
|
Feb. 7, 2012.

**Attorneys and Law Firms**

Amdursky, Pelky, Fennell & Wallen, P.C., Gregory R. Gilbert, Esq., of Counsel, Oswego, NY, for Plaintiff.

Social Security Administration, Office of Regional Counsel, Region II, Sixtina Fernandez, Esq., of Counsel, New York, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

## I. INTRODUCTION

**\*1** Plaintiff Barbara Tryon, brings the above-captioned action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking a review of the Commissioner of Social Security's decision to deny her application for supplemental social security ("SSI") and disability insurance benefits ("DIB").

## II. BACKGROUND

On May 23, 2007, plaintiff protectively filed an application for SSI and DIB benefits. (Administrative Transcript at p. 106–118.)[1] Plaintiff was 42 years old at the time of the application with no prior work history. Plaintiff claims that she suffered from chronic back and leg pain and problems with her right arm and hand due to a motor vehicle accident in May 2003. (T. 144). Plaintiff claimed to be disabled as of April 27, 2005. On August 29, 2007, plaintiff's applications were denied and plaintiff requested a hearing by an ALJ which was held on September 29, 2009. (T. 21). On November 12, 2009, the ALJ issued a decision denying plaintiff's claim for benefits. (T. 8–16). The Appeals Council

denied plaintiff's request for review on March 26, 2010, making the ALJ's decision the final determination of the Commissioner. (T. 1–4). This action followed.

## III. DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir.2003) (quoting Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir.2002)); Shaw v. Chater, 221 F.3d 126, 132 (2d Cir.2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); see also Shaw, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The Court may also set aside the Commissioner's decision when it is based upon legal error. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.1999).

**\*2** Here, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since the alleged onset date, April 27, 2005. (T. 10). At step two, the ALJ concluded that plaintiff suffered from degenerative disc disease of the lumbar spine which qualified as a "severe impairment" within the meaning of the Social Security Regulations (the "Regulations"). (T. 10). At the third step of the analysis, the ALJ determined that plaintiff did not have an impairment or

combination of impairments that meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 11). The ALJ found that plaintiff had the residual functional capacity ("RFC") to, "perform the full range of light work" and specifically, "during an 8–hour workday, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of 6 hours, and sit for a total of 6 hours". (T. 12). At step four, the ALJ concluded that plaintiff had no past relevant work. (T. 15). At step five, relying on the medical-vocational guidelines ("the grids") set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T. 15). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 16).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ erred in failing to find that plaintiff's neck and right arm complaints were "severe impairments"; (2) the ALJ failed to properly apply the treating physician rule; (3) the ALJ failed to acknowledge the report from the state agency examining physician, Dr. Shayevitz; (4) the ALJ ignored the applicable Regulations and improperly assessed plaintiff's credibility; and (5) the ALJ's RFC determination is not supported by substantial evidence. (Dkt. No.).

## A. Severity of Impairments

Plaintiff argues that the ALJ erred when he determined that plaintiff's neck and right shoulder impairments were "non-severe". A "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities. *Meadors v. Astrue,* 370 F. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and

> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); see also Social Security Ruling 85–28, 1985 WL 56856, at *3–4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985).

**\*3** Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment. *See* 20 C .F.R. § 404.1520(c). The severity analysis at step two may do no more than screen out *de minimis* claims. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe. *McConnell v. Astrue,* 2008 WL 833968, at *2 (N.D.N.Y.2008) (citing *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995)). "Often when there are multiple impairments, and the ALJ finds that only some of the impairments, but not others, are severe, any error in the severity analysis is harmless because the ALJ continues with the with the sequential analysis, and does not deny plaintiff's application based on the second step alone." *Kemp v. Comm. of Soc. Sec.,* 2011 WL 3876526, at *8 (N.D.N.Y.2011).

## 1. Medical Evidence Relating to Neck and Right Arm/ Shoulder Impairments

From March 2004 until August 2008, plaintiff received treatment from Syracuse Orthopedic Specialists for complaints of pain in her neck and right arm/shoulder. The record contains a total of twelve treatment notes from Dr. Richard Zogby for the relevant time period and impairments (three visits in 2004; three visits in 2005; one visit in 2006; three visits in 2007 and one visit in 2008). On March 4, 2004, plaintiff complained of right shoulder pain. On examination, Dr. Zogby found, "right shoulder reveals stiffness with pain, internal external rotation". (T. 288). Dr. Zogby noted, "she has really significant problems with her shoulder at this time". On April 2, 2004, plaintiff complained of shoulder pain and the objective examination revealed the same results. Dr. Zogby diagnosed plaintiff with pain in her shoulder and commented, "as far as the shoulder is concerned, I feel this could be something that could be treated by Dr. Cooke who has seen her in the past and I will refer her for that". (T. 284). The record contains no evidence of any treatment with Dr. Cooke. In April 2004, an MRI of plaintiff's right shoulder revealed tendinosis without evidence of a rotator cuff tear and some inflammation with slight impingement .[2] (T. 436, 439). On September 14 2004, Dr.

Zogby's objective evaluation contained the same notation, "right shoulder reveals stiffness with pain, internal external rotation". (T. 281). In 2005, 2006 and 2007, plaintiff treated with Dr. Zogby for other impairments but made no complaints of neck or right arm/shoulder pain. During that time, Dr. Zogby offered no diagnosis, treatment or opinion relating to those alleged impairments. Indeed, plaintiff did not make any further complaints regarding her neck or right arm/shoulder until August 2008. On August 5, 2008, Dr. Zogby noted that plaintiff reported pain into her right arm with weakness. Dr. Zogby found pain present in her cervical region and limited range of motion in plaintiff's shoulder. (T. 493–496). On September 13, 2008, Dr. Zogby completed a Medical Assessment Form and opined that plaintiff could occasionally lift/carry up to 10 pounds. (T. 488).

**\*4** On December 6, 2006, plaintiff was examined by Berton Shayevitz, M.D., at the request of the agency. (T. 342). Dr. Shayevitz noted that plaintiff's "principal problem is low back pain" but also noted that since her automobile accident, she suffered pain in her right arm and hand and pain in the right trapezius muscle over the right scapula. Upon examination, the doctor noted that plaintiff was in "no acute distress", her gait and cervical rotation were normal. Forward and lateral flexion of her neck was limited due to tightness and some stiffness. (T. 344). Plaintiff's range of motion in her right shoulder was full except for forward elevation. Dr. Shayevitz diagnosed plaintiff with degenerative disc disease in the low back and cervical radiculopathy down the right arm, "although somewhat lacking in physical findings in the right arm and in the back". (T. 345). Dr. Shayevitz "strongly suspected" degenerative disease in the neck with radiculopathy. (T. 345). Dr. Shayevitz concluded that plaintiff was moderately and markedly limited in sitting, standing, walking, lifting, carrying, bending, pushing and pulling by her low back problem. Plaintiff was also moderately and markedly limited in the use of her right arm and shoulder in terms of lifting, pushing, pulling and carrying. Finally, plaintiff was moderately limited in motions of her neck and activities dependent on neck motions like driving and operating machinery. (T. 346).

In February 2007, plaintiff sought treatment at the New York Pain Center for complaints of pain in her right upper extremity. [3] (T. 356). Upon examination, Linda Ehrich, ANP, writing for Joseph Tiso, M.D., noted that plaintiff exhibited tenderness in her right trapezius. The doctor requested a cervical MRI. [4] On March 1, 2007, plaintiff returned to the Pain Center complaining of neck pain. Upon examination,

plaintiff exhibited a normal station and gait, full range of motion in her neck and head and tenderness with flexion, extension and rotation. (T. 355).

## 2. Analysis

The ALJ found that plaintiff's degenerative disc disease in the lumbar spine was a severe impairment. Plaintiff's complaints of pain in her neck and right arm/shoulder and her treatment for said complaints, was sporadic. All objective medical testing evidence relating to her neck and right arm/shoulder was normal. Despite the absence of objective evidence, Dr. Zogby and Dr. Shayevitz opined that plaintiff's ability to do work related activities was impaired by pain in her neck and right arm/shoulder. However, even assuming that the ALJ erred when he failed to acknowledge these opinions and find that plaintiff's neck and right arm/shoulder complaints were medically determinable impairments that limited her ability to do work, that omission does not constitute reversible error. The ALJ's omission of these impairments at Step Two of the analysis amounts to no more than "harmless error" because the ALJ continued with the sequential analysis. In the remaining steps, the ALJ discussed all of plaintiff's medical treatment and considered plaintiff's neck and right arm impairments in determining plaintiff's RFC. Indeed, the ALJ concluded, "plaintiff can lift/carry twenty pounds occasionally and ten pounds frequently". *See O'Grady v. Comm. of Soc. Sec.,* 2011 WL 3652432, at \*4 (N.D.N.Y.2011) (the Secretary continued with the analysis and considered the claimant's cervical condition in plaintiff's RFC). As the ALJ proceeded with the analysis and included plaintiff's severe and non-severe impairments in the RFC determination, there is no basis to remand this matter based upon the ALJ's step two analysis.

## B. Application of Treating Physician Rule and Evaluation of Opinion Evidence

**\*5** Plaintiff argues that the ALJ misapplied the treating physician rule when he failed to assign controlling weight to Dr. Zogby's opinions. Plaintiff also claims that the ALJ failed to evaluate or consider the opinions of the state agency examining physician, Dr. Shayevitz.

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C .F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78–79; *Schisler v. Sullivan,* 3 F.3d 563, 567

(2d Cir.1993). An ALJ may refuse to consider the treating physician's opinion controlling only if he is able to set forth good reason for doing so. *Saxon v. Astrue,* 781 F.Supp.2d 92, 102 (N.D.N.Y.2011). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *Otts v. Comm'r of Soc. Sec.,* 249 F. App'x 887, 889 (2d Cir.2007) (an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record").

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)).

The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *Williams v. Comm'r of Soc. Sec.,* 236 F. App'x 641, 643–44 (2d Cir.2007); *see also Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002) (citing 20 C.F.R. § 404.1527(d)(2)). When a treating physician's opinions are inconsistent with even his own treatment notes, an ALJ may properly discount those opinions. *See Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). "While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence. *See Martin v. Astrue,* 337 F. App'x 87, 89 (2d Cir.2009).

### 1. Medical Evidence

As discussed, plaintiff had twelve visits with Dr. Zogby from March 2004 through August 2008.[5] During those visits, Dr. Zogby's objective examinations of plaintiff's lumbar spine and lower extremities were consistently normal. On nearly every occasion, Dr. Zogby found that plaintiff's station and gait were normal and straight leg raising was negative bilaterally. The range of motion in plaintiff's lower extremities was full and painless. Additionally, as previously noted, Dr. Zogby's objective findings with respect to plaintiff's neck and right arm/shoulder were minimal. In April 2004, Dr. Zogby noted that he reviewed MRI films of plaintiff's lumbar spine and while no report had been prepared, he opined that the films revealed a disk bulge/protrusion at L5–S1 with disk dessication.[6] (T. 285). Dr. Zogby diagnosed plaintiff with discogenic syndrome.[7] Dr. Zogby referred plaintiff to the New York Pain Center for treatment. On August 11, 2004, plaintiff underwent an evaluation at the Pain Center.[8] Upon examination, plaintiff exhibited a normal station and gait and normal range of motion. Due to insurance issues, treatment was deferred. In June 2006, a lumbar discogram revealed concordant pain at L5–S1 with a small anular tear and epidural spread of contrast and some "atypical" increase in her pain symptoms at L3–4 and L4–5.[9] The report of the discogram indicates "no focal disk herniation". On October 3, 2006, plaintiff presented at the Pain Center with complaints of low back pain. The doctor noted that plaintiff's MRI of her lumbar spine was "normal". Upon examination, plaintiff exhibited a normal station and gait, pain upon flexion, extension and rotation and a full range of motion. Plaintiff was scheduled for a nerve block and advised to pursue physical therapy. In January 2007, without any further diagnostic films or additional objective findings, Dr. Zogby diagnosed plaintiff with a herniated disc with myelopathy.[10] (T. 508).

**\*6** In September 2008, Dr. Zogby prepared a Medical Assessment Form regarding plaintiff's ability to do work-related activities. In addition to the restrictions involving carrying and lifting, as discussed above, Dr. Zogby opined that plaintiff could sit for two hours in an eight hour workday and stand/walk for one hour. Dr. Zogby noted that plaintiff's response to treatment and prognosis were "poor". (T. 490).

In 2004 and 2005, plaintiff treated with various physicians at St. Joseph's Hospital Health Center, Family Practice Center. (T.361). On February 18, 2005, plaintiff treated with Sherin

Varkey, M.D. for low back pain. (T. 364). Dr. Varkey
discussed plaintiff's prior MRI and noted that it revealed
that plaintiff suffered from a disc bulge/protrusion at L5–
S1 with dessication. Dr. Varkey diagnosed plaintiff with
low back pain and noted, "I will find out about who will
accept the patient for diskography and a cortisone shot ...
and also she wanted some Lortab, which I will write a
prescription for chronic low back pain". [11] (T. 364). On April
22, 2005, plaintiff returned to Dr. Varkey complaining of
increased back pain. (T. 365). Upon examination, plaintiff
had mild tenderness in the lumbar region but her motor
exam in both extremities was 5/5, her sensory exam was
normal and her reflex exam was 2+ bilaterally in both lower
extremities. Dr. Varkey diagnosed plaintiff with discogenic
syndrome and provided plaintiff with Lortab and Skelaxin. [12]
(T. 365). On July 8, 2005, plaintiff inquired as to whether Dr.
Varkey could increase her Lortab prescription. (T. 366). Upon
examination, Dr. Varkey noted that plaintiff was, "generally
in no apparent distress. Back shows low back pain and mild
tenderness on palpation". (T. 366). On March 24, 2006,
plaintiff treated with Amber Shaff, M.D. for a follow up
for medications. Dr. Shaff noted that plaintiff was taking
Lortab and complaining of constipation. (T. 373). Upon
examination, Dr. Shaff found a full range of motion, strength
at 5/5 in all extremities and no loss of sensation. Dr. Shaff
diagnosed plaintiff with chronic back pain and noted that a
2004 MRI of plaintiff's lumbar spine showed "normal spine,
no significant disk bulge, herniation or stenosis". Dr. Shaff
refilled plaintiff's prescription for Lortab but noted, "I suspect
that she may be abusing these pain medications. This is
the first time I am seeing her, I discussed with the patient
the potential for addiction". (T. 373). Dr. Shaff opined that
plaintiff's complaints of constipation were secondary to the
pain medication and prescribed a laxative. (T. 374).

## 2. Dr. Zogby

The ALJ assigned "little weight", to Dr. Zogby's assessment
explaining:

> Little weight is given to the
> general opinions of Dr. Borio [13] and
> Dr. Zogby, concluding that she is
> "temporary totally disabled", as the
> determination of whether the claimant
> is disabled under the definition
> of the Social Security Act is an
> issue reserved exclusively to the
> Commissioner. Further, little weight is

> also given to Dr. Zogby's assessment
> form as it is inconsistent with his
> treatment notes which indicated that
> while the claimant appeared to be
> in mild discomfort, palpation of the
> lumbar area revealed only mild right
> paraspinal tenderness, her gait was
> normal, and the straight leg test was
> negative bilaterally.

*7 Upon review of the record, the Court agrees with
the ALJ's assessment of Dr. Zogby's opinions. Dr. Zogby's
September 2008 opinions regarding plaintiff's limitations are
not supported by substantial medical evidence. Plaintiff's
physicians at St. Josephs Health Care Center continually
noted that plaintiff was in no acute distress, her motor and
strength examinations were normal, sensory exams were
normal and her range of motion was full. In addition, Dr.
Tiso's notes indicate that plaintiff's objective medical testing
was normal. While the lumbar MRI report is not part of
the record herein, the physicians at St. Joseph's Health Care
Center and the physicians at the Pain Center, noted that the
films were negative/normal.

Moreover, Dr. Zogby's own objective testing further belies
his conclusions. Upon examination, Dr. Zogby consistently
found that plaintiff exhibited negative straight leg raising,
a normal gait and normal strength testing. Dr. Zogby also
stated that plaintiff walked "with no apparent pain or
difficulty" finding only that she appeared in "mild pain".
The limitations as expressed by Dr. Zogby in his September
2008 examination are far more limiting than any restrictions
discussed in his office records and do not coincide with his
contemporaneous findings. Accordingly, the ALJ assigned
the appropriate weight to these opinions. See Wynn v. Astrue,
617 F .Supp.2d 177, 184 (W.D.N.Y.2009) (the significant
limitations were not supported by objective assessments such
as range of motion and strength tests). Although the Court
is aware that deference should be accorded to Dr. Zogby's
opinions pursuant to the treating physician rule, the ALJ
articulated "good reasons" for failing to afford the opinions
such weight. See Bennett v. Astrue, 2010 WL 3909530, at *6
(N.D.N.Y.2010) (citation omitted). Accordingly, the matter
will not be remanded for further consideration of this issue.

## 3. Dr. Shayevitz

The treating physician rule does not apply to consulting
doctors. See Goldthrite v. Astrue, 2008 WL 445770, at

*10 (W.D.N.Y.2008). However, where the ALJ fails to give controlling weight to opinions from plaintiff's treating sources, the Regulations require an ALJ to explain the weight given to the opinions of state agency medical consultants. *Stytzer v. Astrue,* 2010 WL 3907771, at *7 (N.D.N.Y.2010).

Here, the ALJ was not required to assign controlling weight to Dr. Shayevitz's opinions as he was a consulting physician who examined the plaintiff on one occasion. However, because the ALJ declined to afford "controlling weight" to Dr. Zogby's opinion, the ALJ was required to explain the weight he afforded to other medical evidence. In this regard, the ALJ reasoned:

> I have given great weight to Dr. Putcha because of her specialty as an orthopedic surgeon, and her report is based on a review of the evidence in record. [14] I also give some weight to Dr. Ganesh's consultative examination because of her programmatic expertise and because it is based on an examination of the claimant. [15] (T. 15).

*8 The ALJ failed to specifically assign weight to Dr. Shayevitz opinions. However, upon review of the entire decision, it is clear that the ALJ considered and relied upon Dr. Shayevitz's opinions. The ALJ referred to Dr. Shayevitz's examination in the context of discussing plaintiff's right shoulder complaints:

> Berton Shayevitz, M.D. noted that the examination was lacking in physical findings in the claimant's right arm. (T. 11).

The ALJ also cited to Dr. Shayevitz's findings in a discussion of plaintiff's daily activities:

> In terms of activities of daily living, the claimant reported being able to tend to her personal needs; and do light cleaning, laundry and shopping. Socially the claimant lives with her son and boyfriend, socializes with her friends, and uses Facebook as a form of communicating with her friends. With regards to concentration,

persistence or pace, the claimant is able to read, write, watch television, and use the Internet without any difficulties. (T. 11).

Finally, the ALJ noted that Dr. Shayevitz's report is consistent with the finding that claimant was capable of performing light work. (T. 13).

Despite the fact that the ALJ failed to specifically assign weight to Dr. Shayevitz's opinion, the ALJ clearly considered the opinion and thus, the Court declines to remand this matter on that basis. *See Barringer v. Comm'r of Social Sec.,* 358 F.Supp.2d 67, 78–79 (N.D.N.Y.2005) (an ALJ's failure to cite specific evidence does not indicate that it was not considered).

**C. Credibility**

Plaintiff claims that the ALJ should have considered her efforts to alleviate her pain in connection with plaintiff's credibility assessment. Specifically, plaintiff contends that her "longstanding attempts at pain relief" should enhance her credibility.

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence. *See SSR 96–7p,* 1996 WL 374186, at *2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record. SSR 96–7p, 1996 WL 274186, at *5 (SSA 1996).

**\*9** After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Saxon,* 781 F.Supp.2d at 105 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c) (4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. *Melchior v. Apfel,* 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *Howe—Andrews v. Astrue,* 2007 WL 1839891, at \*10 (E.D.N.Y.2007).

In this case, the ALJ, citing to SSR 96–7p, found plaintiff "not credible" based upon the objective medical evidence and her activities of daily living. (T. 13). Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ correctly applied the standard, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility. The ALJ discussed plaintiff's daily activities noting that she was able to grocery shop, do household chores, use the Internet/Facebook, read, play Scrabble and help her son with his homework. (T. 14). The ALJ also commented on plaintiff's pain, the duration of the pain, aggravating factors, plaintiff's medication and plaintiff's attempts to alleviate her pain:

> The claimant also reported having neck pain everyday. She indicated that any activity would exacerbate her pain. More specifically, she cannot sit for more than an hour, and can only walk for a couple of minutes. In addition, she is unable to walk too far due to shooting pain in her leg. Despite taking medication for her pain five times a day, she testified that she still has pain, and is chronically fatigued.

The claimant is unable to drive or visit with friends and family. A side effect of her medication includes constipation, which has caused abdominal pain. She also pursued non-surgical treatments for her back pain, such as medication,

injections, physical therapy and transforaminal block; yet, the claimant's symptoms still remain. (T. 12).

The ALJ found plaintiff less than credible because the objective medical testing, including MRI films and clinical findings do not support her testimony. To wit, in February 2004, plaintiff advised her doctors at St. Joseph's Health Care Center that her low back pain "is much improved" and that she "doesn't really have any complaints currently". (T. 360). Moreover, plaintiff discussed her activities of daily living with Dr. Shayevitz and Dr. Kalyani Ganesh. (T. 475). Plaintiff stated that she could cook, clean, do laundry and light chores (with the exception of vacuuming and sweeping). Plaintiff could care for her personal needs, watch television and read. She lived with her significant other, her two children and her two grandchildren. Plaintiff also stated that she liked to socialize with friends. (T. 343).

**\*10** Plaintiff argues, without factual or legal support, that the ALJ should have found her credible based upon her persistent efforts to obtain relief from pain. Plaintiff refers to her frequent use of prescription medication and the gastrointestinal side effects; her chiropractor visits and the fact that she received six nerve blocks. Based upon the record, the ALJ properly assessed plaintiff's treatment and applied the Regulations. In October 2003, plaintiff received seven chiropractic treatments. (T. 228). There is no further evidence of any chiropractic treatment. Plaintiff had four physical therapy treatments in 2005 and nine sessions in 2006. (T. 300). Plaintiff has not had any physical therapy since November 2006. With regard to nerve blocks, as with all of plaintiff's medical treatment, the time in between treatments was lengthy. In 2007, Dr. Shaff suspected the plaintiff was abusing Lortab and other pain medications. Plaintiff claims that she "persistently" sought to alleviate her pain, however the substantial medical evidence does not support such efforts sufficient to warrant an enhancement of her credibility.

"To the extent the ALJ's RFC findings rested on his determination of plaintiff's credibility, it was 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology' ". *Cohen v. Astrue,* 2011 WL 2565659, at \*22 (S.D.N.Y.2011) (citations omitted). Taken as a whole, the record supports the ALJ's determination that plaintiff was not entirely credible. The Court finds that the ALJ employed the proper legal standards in assessing the

credibility of plaintiff's complaints of pain and adequately specified the reasons for discrediting plaintiff's statements.

## D. RFC

Plaintiff claims that the ALJ's RFC determination that plaintiff could perform the full range of "light work" is not supported by substantial evidence.

Residual functional capacity is:

> "what an individual can still do despite his or her limitations .... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making the RFC determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a).

**\*11** Here, the ALJ found that plaintiff had the RFC to perform a full range of light work. Plaintiff argues that the ALJ failed at Step Five of the sequential analysis based upon the same arguments asserted above. The Court has determined that the ALJ assigned the appropriate weight the medical opinion evidence and properly assessed plaintiff's credibility. Thus, the Court finds that the ALJ employed the correct legal standards and that substantial evidence supports the ALJ's RFC determination.

## IV. CONCLUSION
## IT IS HEREBY,

**ORDERED,** that the decision denying disability benefits be AFFIRMED; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings (Dkt. No. 9) is GRANTED; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED;** and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been RESCINDED, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit, and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2012 WL 398952

## Footnotes

1   "(T.)" refers to pages of the administrative transcript, Dkt. No. 6.
2   The MRI report is not part of the record herein.
3   Plaintiff previously sought treatment and received epidural injections at the Pain Center for lower back
4   There is no indication in the record that this testing was performed.
5   The record also contains four office notes from January 2004 through March 2004. However, those visits were for complaints of pain unrelated to issues presented on this appeal. In addition, the record contains one office note from December 2009 but the record is incomplete.
6   The MRI report is not part of the record herein.
7   Discogenic Syndrome is derangement of an intervertebral disc. *Dorland's Illustrated Medical Dictionary,* 534 (31st Ed.2007).
8   The records indicate that the August 2004 visit was a "follow up". However, the record does not contain any evidence of prior treatment at the Pain Center.

9     A discogram is a radiograph of an intervertebral disk. *Dorland's* at 553.

10    Myelopathy is a functional disturbances or pathological change in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. *Id.* at 1239.

11    Lortab is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* at 890, 1090.

12    Skelaxin is a centrally acting skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions. *Dorland's* at 1163, 1748.

13    Dr. Joseph Borio was plaintiff's chiropractor. Plaintiff does not dispute the weight afforded to his opinions.

14    Dr. Putcha did not examine plaintiff but performed a review of the record for the agency. Plaintiff does not contest or dispute the weight afforded to her opinions.

15    On July 26, 2007, Dr. Kalyani Ganesh performed an internal medicine consultative examination at the request of the agency. Plaintiff does not contest or dispute the weight afforded to her opinions.

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4518992
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leslye A. YOUNG, Plaintiff,

v.

Michael J. ASTRUE [*], Commissioner
of Social Security, Defendant.

No. 7:05–CV–1027 (NAM/GHL).
|
Sept. 30, 2008.

West KeySummary

1 **Social Security**
👉 **Medical and other expert evidence in general**

There was substantial evidence to support the ALJ's determination that a doctor's opinion was entitled to "little weight" rather than controlling weight in the proceedings related to a social security disability insurance benefits claim. Although the claimant argued that the doctor in question was a treating physician, the record contained only one report from that doctor which referenced only one physical examination. The record was devoid of any evidence that the doctor was a "treating source" so the ALJ was not required to assign controlling weight to the doctor's conclusions.

133 Cases that cite this headnote

**Attorneys and Law Firms**

Conboy, McKay, Bachman & Kendall, LLP, Lawrence D. Hasseler, Esq., of Counsel, Watertown, NY, for Plaintiff.

Andrew T. Baxter, Acting United States Attorney for the Northern District of New York, William H. Pease, Esq., of Counsel, Syracuse, NY, and Office of General Counsel, Social Security Administration, Barbara Spivak, Esq., Arthur Swerdloff, Esq., of Counsel, New York, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**I. INTRODUCTION**

*1 Plaintiff Leslye A. Young brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB"). (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

**II. PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on June 2, 2003. (Administrative Transcript at p. 52).[1] The application was denied on July 31, 2003. (T. 36–42). On August 10, 2003, plaintiff filed a request for reconsideration which was denied on September 11, 2003. (T. 27–34). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on January 13, 2005. (T. 226). On March 10.2005, ALJ Thomas G. Norman issued a decision denying plaintiff's claim for benefits. (T. 11–17). The Appeals Council denied plaintiff's request for review on June 20, 2005, making the ALJ's decision the final determination of the Commissioner. (T. 3). This action followed.

**III. FACTUAL BACKGROUND**

Plaintiff was born on November 11, 1969 and was 35 years old at the time of the administrative hearing on November 23, 2004. (T. 67, 231). Plaintiff currently lives in Fort Drum, New York with her husband, David R. Young, and their 3 children ages 8, 7 and 3. (T. 3, 229). In 2003, when plaintiff applied for DIB, she resided with her husband and children in Huntsville, Texas. (T. 52, 231). Prior to residing in Texas, plaintiff lived with her children in Fort Stewart, Georgia while her husband was on active duty with the United States Army in Kuwait. (T. 229).

Plaintiff received her GED and attended two years of classes at a "business college". (T. 87). From 1992 until 1996, plaintiff was employed as a retail salesperson and waitress. (T. 69). From February 1998 until April 1999, plaintiff was employed as a collections manager for two different "rent-to-own" businesses, Prime Time Rentals and Aaron's Rentals. (T. 69, 204, 233). Plaintiff was responsible for collecting past

due accounts. (T. 72). Plaintiff worked on a computer, wrote reports and called clients on the telephone. (T. 72). Plaintiff's job did not involve any lifting or carrying. (T. 72). Plaintiff was required to sit eight hours each day and write, type or handle small objects eight hours each day. (T. 72). Plaintiff's job at Prime Time required plaintiff to visit clients at home to establish payment plans if plaintiff was unable to contact the client via telephone. (T. 233). From July 1999 until May 2000, plaintiff was employed as a collections clerk/manager for Premier Medical Group, a medical insurance company. (T. 70, 204, 232). Plaintiff was responsible for collecting past due medical accounts for doctors. (T. 70). Plaintiff worked on a computer and called clients on the telephone. (T. 70). Plaintiff's job did not involve any lifting or carrying. (T. 70). Plaintiff was required to sit seven hours each day and write, type or handle small objects eight hours each day. (T. 70). From October 2000 until April 2001, plaintiff was employed at The Pennysaver, a newspaper in Hinesville, Georgia. (T. 204). Plaintiff worked in the advertising department and was responsible for advertising sales, photographs and placement. (T. 204). Plaintiff's last day of employment in any capacity was July 10, 2001 due to the birth of her youngest child. [2] (T. 81). Plaintiff claims she became disabled on August 1, 2002 due to several "cracked discs" in her back and degenerative bone disease. (T. 11, 81).

## A. Medical Treatment

**\*2** A review of the record reveals that plaintiff was treated for her alleged disabling conditions at Winn Army Community Hospital, Eisenhower Army Medical Center and Joint and Spine Center, P.C. Plaintiff also received treatment from Glenda Read, M.D., Sajid Z. Malik, M.D. and Cherry Matthew, M.D.

*Winn Army Community Hospital* [3]
On March 1, 2002, plaintiff appeared at the emergency room of Winn Hospital complaining of back, neck and shoulder pain. (T. 157). Plaintiff was referred to the Family Practice Clinic and was treated by Dr. Jose Hernandez. (T. 155–158). Plaintiff complained of chronic back pain (with a severity of 10 on a scale of 1–10) that had been present for 3 months. (T. 155–158). Plaintiff stated that the pain in her mid-back "radiated to middle of her chest" but denied any numbness or tingling in her legs. (T. 153). Plaintiff advised Dr. Hernandez that she was not taking any medications and stated that she was a "stay at home mom of a 3 month old and 4 year old". (T. 156). Dr. Hernandez's physical assessment of plaintiff was

"normal". (T. 156). Dr. Hernandez prescribed Ibuprofen and Flexeril. [4]

On October 21, 2002, plaintiff returned to the Family Practice Clinic complaining of back pain and was treated by Dr. Delano Parker. (T. 140). Plaintiff denied experiencing any trauma or injury and stated that the pain did not radiate. (T. 140). Upon examination, Dr. Parker noted a decreased range of motion, negative straight leg raising, and strength "5/5". Dr. Parker diagnosed plaintiff with "chronic low LBD", ordered x-rays and prescribed Motrin. [5]

On October 22, 2002, x-rays were taken of plaintiff's lumbar spine. The radiologist noted mild L5–S1 disc space narrowing and concluded "minor abnormality". (T. 175). The radiologist did not detect any "spondylolysis [sic] or spondylolisthesis". [6] (T. 175).

On October 28, 2002, plaintiff returned to the Family Practice Clinic complaining of back pain and was treated by Dr. Grant Foster. (T. 137). Plaintiff denied any numbness or tingling. (T. 137). Dr. Foster noted that plaintiff's examination was "normal" and her neurological examination was "non-focal". (T. 135). Dr. Foster found that plaintiff was not tender to palpation over the cervical, lumbar or thoracic areas. (T. 135). Dr. Foster diagnosed plaintiff with chronic back pain "probably due to lifting children and improper lifting technique". (T. 135). Dr. Foster prescribed Ibuprofen and Elavil and ordered additional x-ray films. [7] (T. 135). Dr. Foster advised plaintiff to avoid heavy lifting and use heat and massage. (T. 135). On October 28, 2002, x-rays were taken of plaintiff's thoracic and cervical spine. (T. 174–174). The radiologist's impression of the films was "normal". (T. 173–174).

On October 31, 2002, plaintiff appeared at the Physical Therapy Clinic and was evaluated by Amy Lyyski, PT. (T. 132). Plaintiff advised Ms. Lyyski that her spouse was in Kuwait so plaintiff "must take baby to all appointments and no one to care for his special needs". (T. 132). Plaintiff advised the therapist that Elavil gave her side effects and that she needed to be alert for her baby. (T. 132). Ms. Lyyski noted that plaintiff's neurological examination was unremarkable. (T. 132). Ms. Lyyski further found that plaintiff was tender to palpation, exhibited pain in her lower back on extension, and positive straight leg raising at 90 degrees. (T. 132). Ms. Lyyski suggested that plaintiff receive treatment once a month. (T. 132).

**\*3** On October 31, 2002, plaintiff had a telephone consultation with Dr. Foster. (T. 127). Dr. Foster spoke with plaintiff regarding her medical and home situation. (T. 127). Dr. Foster indicated that he spoke with a Red Cross representative regarding the possible redeployment of plaintiff's husband. (T. 127). Dr. Foster stated that "[f]rom a medical point of view, "patient is ambulatory, stable and neurologically intact. Redeployment would not be typically authorized." (T. 127). Dr. Foster further noted that due to plaintiff's social situation and lack of an appropriate family care plan, redeployment may need to be considered. (T. 127). Dr. Foster noted that plaintiff had been referred for "trial physical therapy". (T. 127). Dr. Foster stated that if plaintiff "fails to improve with conservative management over the next month, I would recommend an MRI". (T. 128).

On November 5, 2002 plaintiff had a further telephone consultation with Dr. Foster. (T. 124). Dr. Foster stated that he spoke with Cpt. Woods at plaintiff's husband's unit. (T. 124). Cpt. Woods indicated he would forward Dr. Foster's concerns to plaintiff's husband in Kuwait so that he could decide whether he wished to be redeployed. (T. 124). Dr. Foster also advised plaintiff that he spoke with the Red Cross and stated that "[I] cannot say that there is a medical necessity for the servicemember's redeployment based on the patient's low back pain, since she is ambulatory, neurologically non-focal and not in need of emergency services". (T. 124). Dr. Foster further noted that plaintiff's medications were not incapacitating nor did they significantly impair her ability to provide care for herself or her children. (T. 124). Dr. Foster opined that plaintiff should avoid heavy lifting and use proper lifting technique. (T. 124). Specifically, Dr. Foster noted that "20–25 pounds is not a big problem" and the "fact that she has a 23 pound baby should not a deciding factor". (T. 124). Dr. Foster concluded that plaintiff's emotional situation and lack of options in the family care plan are "more important issues here". (T. 124). Dr. Foster diagnosed plaintiff with "lbp (neurologically intact) / possible ddd" and indicated he would evaluate plaintiff further if she failed to respond to physical therapy over the next several weeks. (T. 124).

On November 6, 2002 plaintiff was treated by Dr. Heather Hansen at the Family Practice Clinic for "left upper quad. pain for 1 year that extends under left rib cage". (T. 124). Plaintiff described the pain to Dr. Hansen as "not constant" and sharp with radiating pain to her lower back. (T. 121). Dr. Hansen advised plaintiff to continue taking Elavil. (T. 122). On November 7, 2002 plaintiff telephoned Dr. Foster and

stated that she took "half of a 25 mg Elavil tablet" and that it caused drowsiness. (T. 123). Dr. Foster advised plaintiff to decrease her Elavil to 10 mg and to continue with physical therapy. (T. 123).

**\*4** On December 7, 2002, plaintiff had an MRI taken of her lumbar spine at the request of Dr. Foster. (T. 169). The radiologist found degenerative disc disease at L5–S1 with disk protrusion but no evidence of neural foraminal narrowing or nerve root impingement. (T. 169). The radiologist noted "minor abnormality" and "mild degenerative changes". (T. 169).

On December 9, 2002, an EMG and nerve conduction study were performed by Dr. Stephen G. Pappas. [8] (T. 176). Dr. Pappas' interpretation was "normal study". (T. 177).

On December 19, 2002, plaintiff appeared for an examination by Dr. Foster and a consultation to discuss the results of her "MRI, EMG and NCV". (T. 110). Plaintiff advised Dr. Foster that she was taking Lortab and Elavil and that the medications relieved her pain temporarily. (T. 110). Dr. Foster noted that plaintiff frequently lifted and held one of her children during the interview despite his recommendation to avoid heavy lifting. (T. 111). Upon examination, Dr. Foster noted that plaintiff was alert, oriented and overweight. (T. 111). Dr. Foster found decreased range of motion with extension and good flexion. (T. 111). Dr. Foster noted that straight leg raising was negative bilaterally and that plaintiff was mildly tender to palpation over her lumbar spine without spasm. (T. 111). Dr. Foster's sensory examination revealed that plaintiff was "grossly intact" however, plaintiff's motor examination was difficult due to "poor effort" and "give way weakness on left side". (T. 111). Dr. Foster noted that plaintiff exhibited 4/5 strength in all muscle groups. (T. 111). Dr. Foster noted that plaintiff's EMG/NCV were negative and diagnosed plaintiff with "L–S DDD with LLE radiculopathic symptoms not responding to conservative management including physical therapy, use of narcotics and activity modification". [9] (T. 111). Dr. Foster noted that "part of the problem is noncompliance" with the lifting restriction as "evidence by patient lifting, holding and walking around the office today with her toddler in her arms while I took my history". (T. 111). Dr. Foster noted that plaintiff was resistant to Elavil due to the sedative effects on the lowest dosage. (T. 111). Dr. Foster referred plaintiff to "pain clinic to consider epidural steroids" and to neurosurgery to explore options. (T. 112). Dr. Foster stated that plaintiff should refrain from heavy lifting and advised her to refill her prescriptions. (T. 112).

*Eisenhower Army Medical Center*
On January 30, 2003, plaintiff had a telephone consultation with Theodore J. Choma, M.D., an orthopedist affiliated with Eisenhower Army Medical Center. (T. 184). Plaintiff complained of episodic pain in L–S region, mid-back, neck and headaches. (T. 184). Dr. Choma indicated that he reviewed plaintiff's MRI films from December 2002 which revealed "normal structures from T–12–L5". (T. 184). Dr. Choma noted that the "L5–S1 disc is markedly dessicated with a posterior annular tear and bulge at this disc". (T. 184). Dr. Choma described disc degeneration to plaintiff and advised plaintiff that "normally" symptoms tend to fade with time. (T. 184). Dr. Choma suggested that plaintiff use steroids for episodic flare ups. (T. 184). Dr. Choma stated that "it is my guess that she has other dessicated discs in the more proximal spine, although I don't have images to prove it". (T. 184). Dr. Choma described surgical fusion surgery but stated "I believe that this should be reserved for the most recalcitrant cases of pain due to the downsides of surgery, even when it is successful". (T. 184). Plaintiff advised Dr. Choma that she would try to cope with her symptoms. (T. 184).

*Glenda Read, M.D.*
 **\*5** The record contains a report prepared by Dr. Glenda Read dated March 5, 2004 and addressed to "Whom It May Concern". (T. 187). Dr. Read was affiliated with Huntsville Pediatric & Adult Medicine Associates. [10] (T. 187). Dr. Read stated that she began treating plaintiff on February 9, 2004. [11] (T. 187). Dr. Read noted that plaintiff complained of back pain in her upper, mid and lower back and further stated that physical therapy had not provided her with relief. (T. 187). Plaintiff advised Dr. Read that she was unable to perform activities of daily living and unable to work. (T. 187). Plaintiff reported a history of degenerative bone disease however, Dr. Read noted that "records for this have been requested but not received". (T. 187). Dr. Read stated that a physical examination of plaintiff, "at that time", revealed "essentially normal neurological exam without focal findings". (T. 187). Dr. Read recommended that plaintiff consult a neurologist and pain management specialist. (T. 187). Dr. Read advised plaintiff to refrain from physical activity or working that required her to lift, push, pull, twist or stand for more than 30 minutes at a time. (T. 187). Dr. Read opined that "a desk job could be tolerated for up to 4 hours per day". (T. 187). Dr. Read referred plaintiff to Dr. Malik and Dr. Sims. [12] (T. 187).

On February 27, 2004, at the request of Dr. Read, MRI films were taken of plaintiff's cervical, lumbar and thoracic spine at Huntsville Memorial Hospital. (T. 188–189). The radiologist found "mild broad based protrusion at L5–S1". (T. 188). The radiologist noted normal spinal cord signal and no compression. (T. 188–189).

*Sajid Z. Malik, M.D.*
The record contains a notation by Dr. Sajid Malik, a neurologist, dated June 14, 2004 and addressed to "whom it may concern". (T. 205). In that notation, Dr. Malik stated that plaintiff should avoid any activity or environment that would make her symptoms worse. (T. 205). Dr. Malik further stated "[a]t this stage, I don't know the clear etiology of her symptoms or complaints. The work-up is in progress." (T. 205).

*Cherry Matthew, M.D.*
On October 21, 2004, plaintiff was examined by Dr. Matthew, a neurologist, at the request of Dr. Read. (T. 206). Plaintiff complained of experiencing pain in her neck, shoulders and low back for the last 3 years. (T. 206). Plaintiff advised that she was a "stay at home mom" and currently taking Naproxen for her pain. [13] (T. 206). Upon examination, Dr. Matthew noted that plaintiff was alert and oriented, exhibited a normal gait and demonstrated good coordination. (T. 206). Dr. Matthew noted that the EMG studies showed no evidence of any neuropathy. (T. 207). Dr. Matthew diagnosed plaintiff with "a diffuse musculoskeletal pain involving the cervical, thoracic and lumbar region and in fact even extensively". (T. 207). Dr. Matthew opined that the findings suggested fibromyalgia or related to some underlying degenerative disc disease, but "certainly nothing surgical and certainly no evidence of radiculopathy even though she has a bulging disc". (T. 207). Dr. Matthew suggested supportive treatment with anti-inflammatories and Neurontin. [14] (T. 207).

*Joint and Spine Center, P.C.*
 **\*6** On November 8, 2004, plaintiff appeared at the Joint and Spine Center for a Functional Capacity Evaluation. [15] (T. 190). The evaluator noted that plaintiff was referred to the clinic due to her chronic pain and dysfunction with musculoskeletal complaints. (T. 190). The evaluator noted that pain was persistent throughout testing with extreme pain with "stooping". (T. 191). The evaluator noted that "normal" straight leg raising was "80" and that, after three trials,

plaintiff's maximum raise was "4 on the left" and "6 on the right". (T. 192). The evaluator concluded that plaintiff demonstrated a safe weight lifting ability of 5 pounds. (T. 197). The evaluator found that plaintiff was not able to safely lift 15 pounds from the floor to her waist. (T. 197).

Plaintiff completed a Low Back Pain Disability Questionnaire for the evaluator and stated that "pain killers give moderate relief". (T. 198). She further stated that she was able to care for herself; lift very light weights; walk 1/4 miles; sit for 1/2 hour; stand for 10 minutes and maintain a normal sex life but with pain. (T. 198). Plaintiff also indicated that she was restricted to her home and could take short trips under 30 minutes. (T. 198). Plaintiff was "scored" and given a disability rating of "crippled". (T. 198). Plaintiff also completed a Neck Disability Index and was found to have a perceived disability rating of "severe". (T. 199).

### B. State Agency Consultant/Bonnie Blacklock, M.D.
On July 21, 2003, Dr. Blacklock completed a "Case Assessment Form" at the request of the agency. (T. 186). Dr. Blacklock reviewed all of the evidence and diagnosed plaintiff with a "non-severe impairment" and "L–S DDD". (T. 186).

### IV. ADMINISTRATIVE LAW JUDGE'S DECISION
The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (quoting *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002)); *Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (internal citations omitted).

**\*7** In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful work since the alleged onset date of her disability. (T. 16). At step two, the ALJ concluded that plaintiff has degenerative disc disease with chronic back pain. (T. 12). The ALJ found this impairment to be severe since it imposed more than a slight limitation on the ability to perform basic work related activities. (T. 12). At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 16). At the fourth step, the ALJ found that plaintiff had the residual functional capacity ("RFC"):

> to lift and carry 10 pounds frequently and 20 pounds occasionally and alternately sit and stand at will for 8 hours during the workday, but she cannot perform repetitive pushing and pulling with the arms, climb or work at heights or around moving and dangerous equipment. (T. 16).

The ALJ then concluded that plaintiff retained the RFC to perform her past relevant work as a collections manager or collection clerk. (T. 16). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Act. (T. 16).

### V. DISCUSSION
A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999).

Plaintiff argues that the ALJ: (1) failed to review and properly assign weight to the medical evidence; (2) failed to properly assess plaintiff's credibility: (3) failed to properly evaluate

plaintiff's RFC; and (4) erroneously concluded that plaintiff could perform her past relevant work. (Dkt. No. 6).

**A. Evaluation of Medical Evidence**

Plaintiff asserts that the ALJ failed to consider all medical evidence and improperly ignored the opinions of plaintiff's physicians. (Dkt. No. 6, pp. 7–10). Although not clearly expressed, plaintiff seemingly argues that the ALJ failed to apply the "treating physician rule" to the opinions of Dr. Read and the conclusions of the evaluator at the Joint and Spine Center. [16] *Id.* Plaintiff further argues that the ALJ failed to consider evidence of the progression of plaintiff's disease. *Id.* at 8. Defendant argues that the ALJ properly evaluated the evidence of record. (Dkt. No. 12, p. 6).

The relevant Regulation provides that the Secretary will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> **\*8** (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). Additionally, the Regulations direct the Commissioner to "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion". *Id.;* accord 20 C.F.R. § 416.927(d) (2).

The opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts. *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004); *see also Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002) (treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record"); 20 C.F.R. § 404.1527(d)(2). An opinion that is not based on clinical findings will not be accorded as much weight as an opinion that is well-supported. 20 C.F.R. § 404.1527(d)(3), § 416.927(d)(3); *see also Stevens v. Barnhart,* 473 F.Supp.2d 357, 362 (N.D.N.Y.2007). Similarly, the less consistent an opinion is with the record as a whole, the less weight it is to be given. *Stevens,* 473 F.Supp.2d at 362; *see also Otts v. Comm'r of Social Sec.,* 249 Fed.Appx. 887, 889 (2d Cir.2007) (an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record").

A treating source is defined as a plaintiff's own physician or psychologist who has provided plaintiff with medical treatment or evaluation and who has had an ongoing treatment relationship with the plaintiff. *Fernandez v. Apfel,* 1998 WL 812591, at \*3 (E.D.N.Y.1998) (citing 20 C.F.R. § 404.1502). Doctors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians. *See Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999); *see also Schisler v. Bowen,* 851 F.2d 43, 45 (2d Cir.1988) (the plaintiff's physician had only seen the plaintiff on two occasions and therefore the nature of his relationship with the plaintiff did not rise to the level of a treating physician). The amount of weight given to the opinion of a treating physician directly relates to the length of the treatment relationship. *See* 20 C.F.R. § 404.1527(d)(2)(i).

**1. Dr. Read**

In this matter, the ALJ discussed Dr. Read's opinions and stated:

> There is no indication that Dr. Read examined the claimant more than one time, and she is not shown to be a treating doctor. Therefore, the undersigned is not required to give her opinions controlling weight in the evaluation of this case. (T. 13).

**\*9** The ALJ concluded:

> Based on the results of the MRI scan in February 2004 that showed mild broad based disc protrusion at the

L5–S1 level but without evidence of impingement on a nerve root, and considering the normal neurological findings, the undersigned gives the opinions of Dr. Read little weight in the evaluation of this case. (T. 13).

Plaintiff argues that Dr. Read treated plaintiff on more than one occasion and coordinated plaintiff's treatment with other physicians. (Dkt. No. 6, p. 9). However, the record contains only one report from Dr. Read which references only one physical examination. (T. 187). The record is devoid of any evidence that would enable this Court to conclude that Dr. Read was a "treating source". Therefore, the ALJ was not required to assign controlling weight to Dr. Read's conclusions. Moreover, Dr. Read's opinions are further suspect as they are not based upon clinical findings and are inconsistent with other substantial evidence in the record.

Dr. Read stated in her report that she had not reviewed plaintiff's medical records. (T. 187). Dr. Read opined that plaintiff should refrain from physical activity or working "that requires her to lift, push, pull, twist or stand for 30 minutes at a time," however, Dr. Read's examination of plaintiff revealed an "essentially normal neurological exam without focal findings". (T. 187). Dr. Read's opinions do not comport with the objective testing including x-rays, MRI films, EMG studies and nerve conduction studies which were essentially "normal" or revealed "minor abnormalities". (T. 169; 173–177; 188). Dr. Read's opinions are also inconsistent with the opinions expressed by Dr. Grant Foster. Based upon the record and pursuant to the Regulations, Dr. Foster is the only physician who may be described as a "treating source". Dr. Foster specifically found that plaintiff could lift 20 to 25 pounds and repeatedly stated that plaintiff was "ambulatory, stable and neurologically intact". (T. 124, 127).

Plaintiff argues that Dr. Read's opinions should have been afforded greater weight as Dr. Read's March 2004 examination documented the progression of plaintiff's condition.[17] (Dkt. No. 6, pp. 8–9). Plaintiff claims that the ALJ failed to acknowledge that all evidence after July 2003 establishes that plaintiff's worsening condition required greater restrictions. *Id.* The Court disagrees. Although plaintiff alleges a back impairment that is progressively degenerative in nature, this description is unsupported by clinical findings. *See Gonzalez v. Schweiker,* 1983 WL 44215, at *7 (S.D.N.Y.1983); *see also Taveras v. Barnhart,* 2007 WL 1519317, at *2 (E.D.N.Y.2007) (the plaintiff's claim

that his symptoms had worsened despite treatment properly rejected as inconsistent with other evidence). The records do not support plaintiff's claim of worsening symptoms or progression of her disease. The medical treatment plaintiff received after July 2003 does not indicate or document any progression or worsening of plaintiff's condition. In fact, Dr. Matthew, the physician who conducted the most recent examination of plaintiff, concluded that plaintiff exhibited normal gait with no evidence of radiculopathy. (T. 207). Accordingly, the Court finds substantial evidence to support the ALJ's determination that Dr. Read's opinions are entitled to "little weight".

**2. Joint and Spine Center**

**\*10** Plaintiff contends that the ALJ improperly ignored the RFC assessment by the Joint and Spine Center. Plaintiff claims that the evaluation was "based on objective findings" and "that the ALJ did not even note this record". (Dkt. No. 6, p. 9). The ALJ discussed the Functional Capacity Evaluation completed at the Joint and Spine Center and stated that "the findings of the evaluation are questionable". (T. 14). The record does not contain the name or credentials of the individual who evaluated plaintiff at the Joint and Spine Center. Therefore, the evaluator cannot be deemed an acceptable medical source. *See* 20 C.F.R. § 416.913(a); *see also Smith v. Shalala,* 856 F.Supp. 118, 126 (E.D.N.Y.1994) (unlicensed physicians, physician's assistants, osteopaths and psychologists are not acceptable medical sources and therefore, their opinions should be accorded less weight). The ALJ assigned the appropriate weight to the evaluation as the record reveals that plaintiff was examined only once at the Joint and Spine Center. (T. 190). *See Duquesnay v. Astrue,* 2007 WL 3095413, at *9 (S.D.N.Y.2007) (concluding that although the record contained an RFC Assessment, the ALJ did not consider this in her decision because it was not prepared by an acceptable medical source pursuant to 20 C.F.R. § 416.913). The evaluator cannot be considered a treating source and thus, his or her opinions regarding plaintiff's functional abilities are not entitled to controlling weight.

Accordingly, the Court finds that the ALJ properly applied the treating physician rule and expressed good reason for not accepting the opinions of Dr. Read and the evaluation of the Joint and Spine Center.

**B. Credibility**

Plaintiff argues that the ALJ erred in determining that plaintiff's subjective complaints of pain were "less than fully credible". (Dkt. No. 11, p. 19). Specifically, plaintiff claims that although the ALJ referenced SSR 96–7p in the decision, the ALJ failed to evaluate plaintiff's complaints in accordance with the Ruling. [18] (Dkt. No. 6, p. 15).

When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino–Ortiz v. Astrue,* 2007 WL 2745704, at *11, n. 21 (S.D.N.Y.2007) (citing 20 C.F.R. § 404.1529(c)(2)). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c) (3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her neck and back pain are consistent with the objective medical and other evidence. *See* Social Security Ruling 96–7p, 1996 WL 374186, at *2.

**\*11** The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus,* 615 F.2d at 27; *Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999) (holding that an ALJ is in a better position to decide credibility). When rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief [.]" *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987). If the Commissioner's findings are supported by substantial evidence, "the court must uphold the

ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Secretary, Dept. of Health and Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984). A reviewing court's role is merely to determine whether substantial evidence supports the ALJ's decision to discount a claimant's subjective complaints. *Aponte,* 728 F.2d at 591 (quotations and other citations omitted).

In this matter, the ALJ found that plaintiff's testimony was not fully credible or consistent with the record considered as a whole. (T. 16). The ALJ stated:

> The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein, and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated. (T. 15).

Having reviewed the record, this Court is satisfied that the ALJ utilized the proper legal standards in his analysis of plaintiff's complaints of pain. Further, the Court finds that there is substantial evidence to support the ALJ's decision to discredit plaintiff's complaints of disabling pain. The ALJ referenced plaintiff's testimony regarding her daily activities and abilities and found that "[t]he claimant's activities of daily living suggest that her symptoms are not as severe as alleged". (T. 15). The ALJ also noted that plaintiff "stopped working due to pregnancy as opposed to stopping due to a back condition". (T. 15). In addition to the testimony cited by the ALJ, in November 2004, plaintiff stated that she was able to care for herself, lift very light weights, walk for 1/4 mile, take short journeys under 30 minutes, and maintain a "nearly normal sex life with pain". (T. 198).

The ALJ noted that objective findings and clinical findings regarding plaintiff's back complaints were normal. (T. 14). The ALJ stated that plaintiff complained that her pain medication caused "impairment" however, the record is devoid of any documentation or reference by any of her physicians that side effects from medication had disabling effects. (T. 14). In fact, plaintiff advised Dr. Foster that her medications "relieved her pain temporarily" and advised the evaluator at the Joint and Spine Center that pain killers give her "moderate relief". (T. 110, 198). During plaintiff's most recent examination, Dr. Matthew noted that plaintiff was

taking Naproxen. (T. 207). Dr. Matthew made no mention of any side effects. (T. 207). Plaintiff stated that "it was very painful to walk" however, the ALJ found that records from her physicians revealed that plaintiff exhibited a "normal gait". (T. 14).

**\*12** The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain. The decision contains enough detail to enable the Court to discern the reasons on which the ALJ relied in discounting plaintiff's allegations of disabling pain.

### C. Residual Functional Capacity

Plaintiff argues that the ALJ failed to "properly calculate plaintiff's residual functional capacity". (Dkt. No. 6, p. 10). In this case, the ALJ found that plaintiff had the RFC to:

> to lift and carry 10 pounds frequently and 20 pounds occasionally and alternately sit and stand at will for 8 hours during the workday, but she cannot perform repetitive pushing and pulling with the arms, climb or work at heights or around moving and dangerous equipment. (T. 16).

The ALJ further found that:

> The claimant's residual functional capacity is consistent with the demands of her past relevant work as a collections manager and collection clerk. (T. 16).

During the administrative hearing, the ALJ solicited testimony from Thomas W. King, a vocational expert. (T. 44, 240). The expert classified plaintiff's past relevant work as a collection clerk as sedentary and semi-skilled. (T. 15). The expert also classified plaintiff's past relevant work as a collections manager as sedentary and skilled. (T. 15).

Plaintiff argues that the RFC determination is flawed in three respects. Plaintiff claims that the ALJ failed to expressly classify plaintiff's exertional capacity. [19] (Dkt. No. 6, pp. 10–11). Plaintiff assumes, based upon the testimony of the vocational expert, that the ALJ found that plaintiff possessed the ability to perform sedentary work, but not light work. *Id.* at p. 11. Plaintiff asserts that substantial

evidence exists to conclude that plaintiff cannot perform even sedentary work. *Id.* at p. 12. Finally, plaintiff claims that the limitations assigned by the ALJ prevent plaintiff from performing sedentary work. The Commissioner argues that the ALJ's determination of plaintiff's RFC is based upon the assessments of Dr. Foster which are consistent with the weight of the evidence. (Dkt. No. 12, p. 11).

Residual functional capacity is:

> "what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at \*2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. Social Security Ruling 96–8p, 1996 WL 374184, at \*1 (S.S.A. July 2, 1996). To determine RFC, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity. 20 C.F.R. § 404.1513(c)(1). Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy. *Hogan v. Astrue,* 491 F.Supp.2d 347, 354 (W.D.N.Y.2007).

**\*13** At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and

'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it. *Dudelson v. Barnhart,* 2005 WL 2249771, at *9 (S.D.N.Y.2005); *Murphy v. Barnhart,* 2003 WL 470572, at *9 (S.D.N.Y.2003).

The Court, having reviewed the entire record, concludes that there is substantial evidence to support the ALJ's assessment of plaintiff's RFC. Plaintiff's first argument is without merit. As required by the Regulations, the ALJ made an express finding of plaintiff's RFC and properly detailed the RFC in terms of a function-by-function analysis.[20] The ALJ concluded, at step 4, that plaintiff retained the RFC to perform her past relevant work. (T. 16). Accordingly, the ALJ was not required to express plaintiff's RFC in terms of exertional categories. *See Dudelson,* 2005 WL 2249771, at *9.

Plaintiff argues that the ALJ's determination implies that she is capable of performing sedentary work.[21] Plaintiff claims that she cannot perform sedentary work based upon the opinions expressed by Dr. Read and the Functional Capacity Evaluation of the Joint and Spine Center. As previously discussed, the opinions of Dr. Read and the evaluator at the Joint and Spine Center were properly assigned little weight by the ALJ. The RFC is supported by substantial evidence including the opinions of Dr. Foster and the results of objective testing. The record is devoid of any functional evaluation by any treating source that contradicts the opinion of Dr. Foster that plaintiff may lift 20–25 pounds.

Plaintiff claims that the ALJ's determination that plaintiff must "alternately sit and stand" prevents her from performing sedentary work.[22] (Dkt. No. 6, p. 12). SSR 83–12 provides guidance on the issue of sedentary work and the need to alternate positions. SSR 83–12 provides:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing ... Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work ... or the prolonged standing or walking contemplated for most light work.
>
> ... In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

*See* SSR 83–12, 1983 WL 31253, at *3–4 (SSA 1982).
The Commissioner's policy statements do not rule out sedentary work "where a person must alternate between sitting and standing, but rather provide that where a person's inability to sit or stand for extended periods limits his ability to do a full range of work, a vocational expert should be consulted to identify possible jobs available to a person with the claimant's specific limitations". *Tatis v. Barnhart,* 2006 WL 2109510, at *2 (S.D.N.Y.2006); *see also Boergers v. Apfel,* 1999 WL 166814, at *5 (W.D.N.Y.1999) (holding that in cases of unusual functional limitations, the Commissioner should consult a vocational specialist to clarify implications for the occupational base). SSR 83–12 suggests that a vocational expert may determine the number of sedentary jobs that may be performed at the discretion of the worker either sitting or standing alternatively. *Castillo v. Apfel,* 1999 WL 147748, at *6 (S.D.N.Y.1999).

**\*14** In this case, the ALJ found plaintiff should "alternately sit and stand at will for 8 hours during the workday". (T. 15). This limitation does not render plaintiff unable to perform any sedentary work. *See Tatis,* 2006 WL 2109510, at *2; *see also Castillo,* 1999 WL 147748, at *6. Because this constituted an ability to perform less than a full range of sedentary work, the ALJ was correct in consulting with a vocational expert as to the existence of jobs that a person with plaintiff's exertional limitations and jobs skills would be able to perform. *See Shin v. Apfel,* 1998 WL 788780, at *8 (S.D.N.Y.1998).

**D. Past Relevant Work**

Plaintiff contends that the ALJ erroneously concluded that plaintiff could perform her past relevant work. (Dkt. No. 6, p. 13). Plaintiff specifically argues that the ALJ failed to acknowledge the vocational expert's testimony regarding available work if plaintiff required regular rest periods.[23] *Id.*

The burden of proof that a claimant is able to perform his or her past relevant work, or other work that exists in significant numbers in the national economy, shifts to the Commissioner only after the claimant has carried the initial burden of showing that he or she is unable to perform past relevant work. *Burger v. Barnhart,* 476 F .Supp.2d 248, 255 (W.D.N.Y.2007). The ALJ is entitled to rely on vocational expert evidence in deciding whether a plaintiff retains the capacity to perform other work which exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566(e); *see also Dumas v. Schweiker,* 712 F.2d 1545, 1554 (2d Cir.1983) (holding that the Commissioner may rely

on the testimony of a vocational expert as long as there is substantial evidence to support the assumption upon which the vocational expert based his opinion).

The ALJ noted that:

> In response to a hypothetical question by the Administrative Law Judge, which included the physical capacity of the claimant as described above, the vocational expert testified that such a hypothetical person could perform the claimant's past relevant work as a collections manager and collection clerk. (T. 15–16).

During the hearing, the ALJ posed a question to the vocational expert concerning plaintiff's ability to work if she had to "lay down several times during the day". (T. 241–242). The vocational expert testified that such a limitation would render plaintiff unable to do any of her past relevant work. (T. 242). Plaintiff argues that the "ALJ should have credited this aspect of plaintiff's condition as being highly credible". (Dkt. No. 6, p. 13). As previously discussed, the ALJ properly discounted plaintiff's credibility. Further, there is no evidence in the medical record suggesting that the final question posed to the vocational expert correctly classified plaintiff's situation. See *Quinones v. Barnhart,* 2006 WL 2136245, at *6 (S.D.N.Y.2006)* (holding that if the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert has no evidentiary value). Therefore, the ALJ properly disregarded this portion of the expert's testimony. Based upon the expert's testimony, the ALJ properly concluded that plaintiff could perform her past relevant work and, therefore, that she was not disabled.

## VI. CONCLUSION

 *15  Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits is **AFFIRMED;** and it is further

**ORDERED** that the defendant's motion for judgment on the pleadings is **GRANTED;** and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4518992

## Footnotes

\*   On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in this action.

1   Portions of the administrative transcript, Dkt. No. 5, will be cited herein as "(T\_\_)."

2   The record does not indicate where plaintiff was employed from April 2001 until July 2001.

3   Some medical records from Winn Army Community Hospital contain plaintiff's complaints of conditions/ailments that are unrelated to the within action. The records pertaining to unrelated treatment have been omitted from this discussion.

4   Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 725 (31st ed.2007).

5   Motrin is a nonsteroidal anti-inflammatory drug for the treatment of pain, fever, dysmenorrhea, osteoarthritis, rheumatoid arthritis, and other rheumatic and non-rheumatic inflammatory disorders. *Dorland's* at 923, 1201.

6   Spondylosis is a degenerative spinal change due to osteoarthritis. *Id.* at 1780. Spondylolisthesis is forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, usually due to a developmental defect. *Id.* at 1779.

7   Elavil is a tricyclic antidepressant; it is also used in the treatment of chronic pain. *Id.* at 64, 606.

8   An EMG (an electromyogram) is a record of electromyography which is a technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. *Dorland's* at 609.

9    LLE is an abbreviation for left lower extremity. MediLexicon, www.medilexicon.com/medicaldictionary (last visited May 2, 2008).

10    The record does not indicate whether or not Dr. Read specialized in any area of medicine.

11    The record is devoid of any reports or notations from Dr. Read prior to the March 5, 2004 report.

12    The record does not contain any reports or notations from Dr. Sims.

13    Naproxen is a nonsteroidal anti-inflammatory drug used in the treatment of pain, inflammation, and osteoarthritis. *Dorland's* at 1251.

14    Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures. *Id.* at 764, 287.

15    The record does not indicate who referred plaintiff to the Center. The record does not contain the name and/or credentials of the evaluator.

16    The Court notes that plaintiff makes no objection to the weight assigned by the ALJ to the opinions expressed by Drs. Choma, Foster, Malik and Matthew.

17    Although plaintiff argues that Dr. Read examined plaintiff in March 2004, the record does not support hat claim. (T. 187).

18    Plaintiff cites to SSR 96–7p as requiring the ALJ to evaluate plaintiff's complaints in light of various factors. However, these factors are set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) and § 416.929(c)(3)(i)-(vi).

19    Plaintiff does not cite to any legal authority in support of this argument.

20    Plaintiff does not object to this portion of the RFC assessment.

21    Sedentary work is the least rigorous of the five categories of work recognized by Social Security Administration regulations and is defined as:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> 20 C.F.R. § 416.967(a); *see also Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir.2000).

22    Plaintiff does not argue that her occupational base is significantly eroded by the need to alternate between sitting and standing.

23    Plaintiff also contends that her past work requires the capacity for sedentary work, which plaintiff claims she cannot perform. As previously discussed, substantial evidence exists to support the ALJ's assessment of plaintiff's RFC.

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  12